## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

BRYCE E. MASTERS,              )
                                      )
          Plaintiff,          )
                                        )
v.                                   )
                                        )
CITY OF INDEPENDENCE,     ) Case No. 4:16-cv-01045-DW
CHIEF OF POLICE TOM DAILEY,  )
SGT. BRYCE BLACKMORE,      )
TIMOTHY RUNNELS,          )
TASER INTERNATIONAL, INC., and )
PATRICK "RICK" SMITH,       )
                                        )
          Defendants.       )

## TASER INTERNATIONAL, INC.'S ANSWER AND
## AFFIRMATIVE DEFENSES TO COMPLAINT

Defendant TASER International, Inc. (TASER) hereby answers the Complaint filed by Plaintiff as follows:

### JURISDICTION AND VENUE

1.    Plaintiff alleges claims against Defendants City of Independence (City), Independence Police Department (IPD), Chief of Police Tom Dailey, Sgt. Bryce Blackmore and former IPD officer Timothy Runnels pursuant to 42 U.S.C. § 1983. Federal jurisdiction is conferred by 28 U.S.C. § 1331 and § 1343(3).

**ANSWER:  Paragraph 1 of the Complaint is not directed toward TASER and therefore TASER does not respond to this Paragraph. To the extent a response is required, TASER lacks sufficient information regarding these allegations and therefore denies them.**

2.    Plaintiff's products-liability claims against Defendants TASER International, Inc. (TASER), and its CEO Patrick "Rick" Smith arise under the laws of Missouri. They are so

related to the federal claims, however, that they form part of the same case or controversy and are therefore within the Court's supplemental jurisdiction pursuant 28 U.S.C. § 1367.

**ANSWER: Paragraph 2 contains legal conclusions to which no response is required. However, to the extent a response is required, TASER denies the allegations contained in this paragraph.**

3.     The underlying incident occurred in Independence, Missouri, and therefore venue is appropriate in the Western District of Missouri pursuant to 28 U.S.C. § 1391 (b)(2).

**ANSWER:   TASER admits, upon information and belief, that the underlying incident occurred in Independence, Missouri.  This Paragraph 2 otherwise contains legal conclusions to which no response is required.**

**PARTIES**

4.     Plaintiff Bryce E. Masters is an adult competent to bring suit. He is a citizen of Missouri. At the time of the incident, however, he was age 17.

**ANSWER:  TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

5.     Defendant City is a municipality, a political subdivision of the State of Missouri.

**ANSWER:  Admitted.**

6.     From 2008 through July 21, 2016, Defendant Tom Dailey was the IPD Chief of Police. Chief Daily is sued herein in his individual capacity only. Defendant Bryce Blackmore is an IPD sergeant. Defendant Timothy Runnels is a former IPD police officer. In doing the acts alleged herein each individual named above acted under color of Missouri state law, within the course and scope of his employment with the City and IPD. Defendant Runnels acted under the supervision of Chief Daily and Sgt. Blackmore.

2

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

7.     Defendant TASER International, Inc., ("TASER") is a Delaware Corporation with its principal place of business in Scottsdale, Arizona. Defendant TASER is engaged in the business of designing, manufacturing, marketing, distributing and selling products, including hand-held electrical weapons generally referred to as "tasers," but sometimes as "stun guns" or by an acronym such as "ECD," "NM," "ESW," or "CEW," along with replacement cartridges and other accessories. Starting in 2013, TASER manufactured, distributed and sold the Model X26, the product used in this incident. As a component of its marketing, sales, and risk management, TASER designed, manufactured, distributed, sold, and administered taser training programs for its customer agencies. TASER manufactured and sold the X26 and XP cartridge fired at Bryce Masters, and promulgated the training program used by IPD and other agencies, including the Kansas City Police Department, to train Runnels on tasers. TASER is qualified to do business in Missouri.

**ANSWER: TASER admits that it is a Delaware Corporation with its principal place of business in Scottsdale, Arizona, and that it is qualified to do business in Missouri; that it manufactures and sells the TASER® X26™ Conducted Electrical Weapon (CEW) (previously referred to as an Electronic Control Device or ECD) to law enforcement and corrections agencies, among other customers, in the United States, Canada and elsewhere; and that it manufactures and sells cartridges for the X26 CEW. TASER did not start selling the Model X26(E) CEW in 2013. The weapons are not "tasers" and should not be generically referred to as such in violation of TASER's intellectual property rights. TASER lacks sufficient information regarding the CEW and cartridge allegedly used by the**

3

Independence Police Department (IPD) on Plaintiff, and on those grounds denies those allegations. TASER admits that it has produced instructor and user TASER CEW training materials that customer agencies may or may not use at their sole discretion. TASER denies the remaining allegations in this paragraph.

8.     Defendant Patrick "Rick" Smith is a citizen of Arizona. He is the CEO of TASER. Smith is personally liable, as alleged herein, because he repeatedly made false representations regarding X26 safety, actively covered up and misled customer agencies and end users, and was the guiding spirit, the central figure, and the active directing hand in charge in regards to TASER's wrongful conduct, as alleged below.

**ANSWER:  TASER admits Patrick "Rick" Smith is the Chief Executive Officer (CEO) of TASER and a citizen of Arizona. TASER denies the remaining allegations in this paragraph.**

## FACTS RELEVANT TO THE TASER MODEL X26

9.     Jack Cover, an electrical engineer, invented tasers in the mid-1970s as a hand-held, non-lethal weapon for law-enforcement and correctional officers. Pulling the trigger fires two barbed darts designed to stick into clothing or flesh, each connected by a wire to the weapon. If both darts make adequate contact, an electrical circuit is completed and the taser discharges short, rapid pulses of electrical current that radiate through the tissue between the darts, causing muscle contractions intended to disable a person temporarily and safely. Mr. Cover's invention used the maximum electrical charge he believed to be cardiac safe.

**ANSWER:  TASER admits that John H. "Jack" Cover was the original inventor of TASER technology in the mid-1970s; and that current generation TASER CEWs are intended, in probe-deployment mode, to induce motor-nerve mediated skeletal muscle**

contractions that can temporarily incapacitate a person. **TASER admits that in a probe deployment, two small metal darts fire via compressed nitrogen and, if a completed circuit is achieved, can transmit electrical impulses into the target through very thin insulated trailing wires. TASER denies the remaining allegations in this paragraph.**

10. In the early 1990s, Defendant Rick Smith founded the company that later became Defendant TASER International, Inc., and acquired from Mr. Cover the trademark "TASER" — an acronym created by adding an "A" arbitrarily to the title of the children's book "Tom Swift's Electric Rifle" — along with various patents and licenses. Smith learned when attempting to create a market share for his products using Cover's original electrical specifications that tasers' popularity with law enforcement suffered due to the perception that the physiological effect of the electrical discharge was not powerful enough to satisfy end users.

**ANSWER: TASER admits Rick Smith co-founded TASER International, Inc. and acquired the trademark "TASER"—an acronym created by Jack Cover out of the title of the children's book "Tom Swift's Electric Rifle"—and other patents and licenses from Mr. Cover. TASER denies the remaining allegations in this paragraph.**

11. To boost sales to law enforcement and correctional agencies, so to dominate what was then a competitive market in tasers, Rick Smith increased his taser's electrical output four times, and released the "Advanced TASER Model M26" in late 1999.

**ANSWER: TASER admits that in late 1999 it released the ADVANCED TASER® M26™ CEW, the first TASER brand weapon to incorporate patented technology that affected both the sensory and motor nervous systems designed to cause incapacitation; and that prior generation CEWs worked primarily on pain compliance that could be overcome**

5

**by highly focused, combative individuals, emotionally disturbed persons, or those intoxicated by drugs or alcohol. TASER denies the remaining allegations in this paragraph.**

12.     This substantial increase in the electrical current made the taser much more powerful, but also increased cardiac risk. Smith and TASER represented to their law-enforcement and corrections customer base, and ultimately to the end users of their products, that the M26's electrical current was within established safety margins, and that extensive animal and human testing comparable to that required by the FDA for testing new drugs and medical devices proved that the M26 current cannot affect heart rhythms. These claims were false. There were no applicable safety standards (TASER used dated, inapplicable electrical-fence standards), the animal testing was minimal, at best, and there was no scientific testing on human beings.

**ANSWER: TASER admits that it accurately represented that the electrical current of the M26 CEW was within established safety margins based on preexisting medical, scientific, electrical, and engineering literature regarding the well-established effects of electricity on the human body, animal testing, and human volunteers. TASER retained the services of Robert A. Stratbucker, M.D., Ph.D., the leading CEW-knowledgeable scientist in the world at the time, to research and study its CEWs. TASER denies the remaining allegations in this paragraph.**

13.     In 2003, TASER began selling a lighter — yet slightly more powerful — taser, the Model X26. The X26 is designed to pulse about 19 times a second through a five-second "cycle." The pulses result in a clicking sound, louder when a circuit is not complete, but audible regardless. Pulling and releasing the trigger fires the darts and initiates a five-second cycle that can be terminated earlier by engaging the safety and repeated by pulling the trigger again after a cycle ends. Of particular relevance to this case, cycles are prolonged when the user holds the

6

trigger longer than five seconds. The X26 provides no warning or safety mechanism to prevent inattentive users from inadvertently holding the trigger during a tense field encounter, thereby continuing the cycle too long. The time and duration of each cycle is recorded on a chip in the X26 called the "dataport," which can be downloaded to document the time, number and duration of discharges.

**ANSWER: TASER admits that in May 2003 it introduced the TASER X26™ CEW with Shaped Pulse™ Technology; the X26 CEW specification for pulses per second (PPS) is 19 +1/-2.5 PPS; the X26 CEW is pre-set for 5-seconds of discharge upon trigger activation; X26 CEW discharge can be prolonged beyond 5 seconds by the operator holding the trigger; the X26 CEW discharge can be repeated by the operator pulling the trigger again; the discharge duration can be terminated early by the operator engaging the safety switch; and the time and duration of each discharge is recorded in the X26 CEW and can be downloaded. TASER denies the remaining allegations in this paragraph.**

14.    Although not directly relevant to this case, with the cartridge removed pulling the trigger cycles electricity between two electrodes, which can then be pressed against a person's skin, causing a painful burning sensation, a barbaric tactic TASER calls a "drive stun." Drive stuns can also be applied through an expended cartridge.

**ANSWER: TASER admits that in drive-stun mode (also referred to as "contact" or "touch" mode), the front of the CEW is physically pressed against the target utilizing the fixed electrodes on the front of the X26 CEW without a cartridge or the fixed rounded recessed electrodes on the sides of an expended cartridge. Electrical impulses are transmitted superficially along the skin between the electrodes causing pain. TASER denies the remaining allegations in this paragraph.**

15. To produce the equivalent disabling effect from a smaller power source, TASER increased the X26's pulse duration far beyond that of any previous taser. This longer pulse, even though it had lower peak amperage, increased the propensity of the X26 to "capture" cardiac rhythms when current flowed near the heart, thus increasing the risk of disrupting normal heart rhythms by triggering contractions where they do not belong, thereby creating the risk of inducing an arrhythmia, particularly ventricular fibrillation (VF), which invariably results in death unless promptly reversed with defibrillation shocks.

**ANSWER: Denied.**

16. TASER sells X26 cartridges with "extra-penetration" (XP) darts that can penetrate one-half inch or more into a human being, thus increasing cardiac risk by transmitting current nearer the heart. The X26 is not cardiac safe with shorter darts, however, and animal testing has shown that the X26 can interfere with heart rhythm when the darts do not penetrate the skin at all, or even when using the X26 to "drive stun" the chest over the heart.

**ANSWER: TASER admits that it sells a cartridge for the X26 CEW which contains an "XP" dart. The dart's penetration depends on a variety of factors, including, but not limited to: distance, clothing, angle, and trajectory. TASER denies the remaining allegations in this paragraph.**

17. TASER did not properly test or evaluate the cardiac risk of the X26 before distributing and selling it to law-enforcement and corrections agencies with representations (mostly based on testing of the M26, rather than the X26) such as "TASER tests have found no effect on heart rhythms" when "tested on animals," and "heart rate unchanged during TASER X26 stimulation directly through chest, across the heart." TASER and Smith knew their research was inadequate to support such categorical claims of cardiac safety, but made the claims in

8

reckless disregard of the consequences, and solely for the purpose of encouraging X26 sales and use.

**ANSWER: Denied.**

18. TASER states that agencies should train their X26 users with TASER "certified" instructors using TASER training materials. Under the direct supervision of Rick Smith and other high-level TASER executives, including former "Vice President for Training" Rick Guilbault, TASER employs "senior master instructors" to train and "certify" TASER "master instructors," generally off-duty officers. TASER contracts with the master instructors to hold "schools" where they train and "certify" training officers from customer agencies as "instructors," who, in turn, train and "certify" individual officers in the customer agencies to use the X26.

**ANSWER: TASER admits that it produces instructor and user training certification programs that law enforcement agencies may use or not use at their sole discretion. TASER also admits that it certifies Master Instructors, who in turn can certify Instructors, who in turn can certify end users. TASER denies the remaining allegations in this paragraph.**

19. For use throughout the training process, TASER issues "training versions," revised about every year or two, which consist of "command demonstration," "instructor" and "user" PowerPoints comprised of slides and videos, along with forms, tests, lesson plans, warnings, and other documents.

**ANSWER: TASER admits that it periodically updates its CEW training materials, which include, among other documents, PowerPoint® presentations, videos, tests, lesson plans, and warnings. TASER further states that when it releases new product warnings or**

9

**training versions, all prior product warnings and training programs are superseded and rendered obsolete. TASER denies the remaining allegations in this paragraph.**

20.     At irregular intervals TASER issues "training bulletins," along with product warnings and operating manuals. TASER directs master instructors and certified instructors to check TASER.COM within 72 hours of each class to insure that the latest training materials are used.

**ANSWER:   TASER admits that its current operating manual, product warnings, and training DVD are shipped with every CEW sold; that TASER periodically issues "training bulletins" to certified instructors between training versions, and that TASER requires certified CEW instructors to check the TASER.com website within 72 hours of each class to insure the latest training materials and warnings are used. TASER denies the remaining allegations in this paragraph.**

21.     TASER conveys instructions for X26 use and warnings to customer agencies and their users through this training protocol, frequent emails, surface mail, and other methods. While customer agencies such as the IPD rely on TASER to provide accurate, up-to-date information on the safe use of the X26, TASER has an unresolvable conflict of interest in providing training for the use of its products to public agencies authorized to use force on members of the public. In particular, to increase its revenues from the sale of the X26s and replacement cartridges, TASER has designed training to encourage X26 use, in part by minimizing risks and exaggerating the X26's effectiveness. At the same time TASER uses "fine print" with vague, ambiguous and sometimes conflicting warnings and instructions as part of a conscious risk-management strategy to shift liability arising from cardiac arrests from TASER to agencies, such as the IPD, and to end users, such as Runnels. TASER's multiple and conflicting

interests make isolated quotations from TASER's training materials and their public statements, taken out of the context of the whole, potentially deceptive and misleading.

**ANSWER: TASER admits only that it provides warnings and instructions for the safe use of its products through multiple methods and protocols likely to get the information into the hands of end users. TASER lacks sufficient information regarding IPD, and therefore denies that they "rely on TASER to provide accurate, up-to-date information on the safe use of the X26." Law enforcement agencies are the sole decision makers as to whether they use all, part, or none of the training information provided by TASER. TASER denies the remaining allegations in this paragraph.**

22.     Following the 2003 release of the X26 to law enforcement agencies, there were reports of cardiac arrests after discharges near the heart where the close proximity in time between the taser discharge and the cardiac arrest, and lack of a credible alternative explanation for the cardiac arrest, demonstrated that the direct effect of the X26 current on the heart rhythm was the cause of the cardiac arrest. (There were also in-custody deaths associated with X26 use involving other physiological mechanisms that are not relevant to this litigation.)

**ANSWER: TASER denies generally and specifically the allegations in Paragraph 22.**

23.     The first such report to appear in a major medical journal was published the prestigious *New England Journal of Medicine* on September l, 2005. The case is that of a 14-year-old Chicago boy named Akeem Watson who, like Bryce, became unresponsive immediately and was found to be in ventricular fibrillation within minutes after being tased on the chest. Like Bryce, he was defibrillated, but not until after he too suffering anoxic brain injury. TASER sent its people to Chicago to discredit the report. They fabricated a false explanation, elongating the

11

actual time course by about 18 minutes and falsely attributing the cardiac arrest to a bogus "excited delirium" diagnosis that had no basis in the records of that case.

**ANSWER: TASER admits the *New England Journal of Medicine* published a 2-paragraph letter to the editor on September 1, 2005 entitled "Ventricular Fibrillation after Stun-Gun Discharge." TASER denies the remaining allegations in this paragraph.**

24.    Starting in 2005, researchers began performing higher quality animal experiments to test the cardiac effects of the X26. TASER arranged for a leading electrophysiologist (a board-certified cardiologist who is also board-certified in the subspeciality of electrophysiology, the study of the heart's electrical rhythm), Patrick J. Tchou, M.D., of the Cleveland Medical Clinic, and his fellow, Dhanunjaya Lakkireddy, M.D., to perform X26 animal testing. TASER approved and funded the experiments, which it anticipated would tend to show that people with cocaine in their system are less likely to suffer cardiac arrest than those without. Darts were placed in various positions on pigs anesthetized for humane reasons, and five-second shocks were delivered using an X26 and a custom device modified to deliver increased charges.

**ANSWER: TASER admits generally that it provided funding for a cocaine study conducted by Patrick J. Tchou, M.D. and Dhanunjaya Lakkireddy, M.D. The content of the published study speaks for itself, and TASER denies Plaintiff's characterization of it. TASER denies the remaining allegations in this paragraph.**

25.    The Tchou-Lakkireddy study documented that standard X26 current "captured" cardiac rhythm when the darts were on the chest. The testing established beyond debate that darts to the chest, relatively near the heart, and only darts in that position, are likely to cause capture, and potentially trigger cardiac arrest. After they compiled the data Dr. Tchou and Dr. Lakkireddy

12

met with TASER representatives, including Rick Smith, and explained to them that darts near the heart can result in capture and therefore risk ventricular fibrillation.

**ANSWER: The content of the published study speaks for itself, and TASER denies Plaintiff's characterization of it. TASER denies the remaining allegations in this paragraph.**

26. The data were presented at the Spring 2006 conference of the Heart Rhythm Society (HRS), the professional organization of electrophysiology. They were subsequently peer reviewed and published the following July in "Effects of Cocaine Intoxication on the Threshold for Stun Gun Induction of Ventricular Fibrillation," *Journal of American College of Cardiology*, Vol. 48, No. 4, 8/15/2006: 805-11, and in a follow up article, "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?" *Pacing Clin. Electrophysiol.*, Vol. 31, 4/2008: 398-408. Drs. Tchou and Lakkireddy wrote in 2006 that their "study is the first to describe capture of ventricular myocardium during application of [taser] pulses." (As explained below, another study came to the same conclusion at the same time.)

**ANSWER: TASER admits that these two papers, which speak for themselves, were published. TASER denies the remaining allegations in this paragraph.**

27. In their second publication — based on data from the same 2005 TASER-funded testing — Tchou and Lakkireddy reported that the spread between the darts (a function of the distance from which the X26 is fired) substantially affects the cardiac risk, noting that a 15 centimeter spread — close range — has the greatest effect on cardiac rhythm. The second study concluded, among other things, that "our data would suggest that directing the barbs away from the PMI region [a point on the chest, near the heart] and especially toward the back would

13

markedly increase the safety margins." "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?" p. 408.

**ANSWER: TASER denies Plaintiff's characterizations of this study, which speaks for itself. TASER denies the remaining allegations in this paragraph.**

28.     At the same 2006 HRS meeting, Kumaraswamy Nanthakumar, M.D., another prominent electrophysiologist, presented the results of his independent study entitled "Cardiac Electrophysiological Consequences of Neuromuscular Incapacitating Device Discharges," which was peer reviewed and published in the same volume as the TASER sponsored Tchou-Lakkireddy report: *Journal of the American College of Cardiology*, Vol. 48, No. 4, 8/15/2006: 798-804. This study replicated the Tchou-Lakkireddy findings on capture, and also showed for the first time that the X26 almost always causes capture when the darts are near the heart, at about double the rate of the shorter pulsed M26. Dr. Nanthakumar also documented an occasion where a prolonged X26 exposure caused fibrillation in an anaesthetized pig that had been given epinephrine to simulate the adrenaline surge of a person in an altercation with police officers.

**ANSWER:    TASER admits that the referenced Nanthakumar pig study was published in close proximity to the Tchou-Lakkireddy study. TASER denies Plaintiff's characterizations of this study, which speaks for itself. TASER denies the remaining allegations in this paragraph.**

29.     During 2007 and 2008, a second group of independent researchers, headed by Andrew J. Dennis, D.O., and based at Stroger Hospital of Cook County in Chicago, replicated the Tchou-Lakkireddy and Nanthakumar results, documenting capture, ventricular arrhythmias and cardiac arrests from X26 exposures to the chest. The results of these well constructed experiments were published in three separate peer-reviewed studies: (1) "Acute Effects of

14

TASER X26 Discharges in a Swine Model," *Journal of Trauma*, Vol. 63, No. 3, 9/2007: 581-590, (2) "TASER X26 Discharges in Swine Produce Potentially Fatal Ventricular Arrhythmias," *Academy of Emergency Medicine*, Vol. 15, No. 1, 1/2008: 66-73), and (3) "Taser X26 Discharges in Swine: Ventricular Rhythm Capture is Dependent on Discharge Vector," *Journal of Trauma*, Vol. 65, No. 6, 12/2008: 1478-1487. They provided powerful confirmation that TASER discharges to the chest significantly increase the risk of cardiac arrest, especially when the exposures exceed five seconds.

**ANSWER: TASER admits that the referenced papers were published. TASER denies Plaintiff's characterizations of these studies, which speak for themselves. TASER denies the remaining allegations in this paragraph.**

30.     A 2007 peer-reviewed article by Michael Cao, M.D., Jerold S. Shinbane, M.D., Jeffrey M. Gillberg, M.S., and Leslie A. Saxon, M.D., "Taser-Induced Rapid Ventricular Myocardial Capture Demonstrated by Pacemaker Intracardiac Electrograms," *Journal of Cardiovascular Electrophysiology*, Vol. 18, No. 8, 8/2007: 876-879, documented cardiac capture for the first time in a human being, a California prison inmate with a pacemaker who was shocked in the chest by an X26. The medical device recorded cardiac capture coinciding with the tasing.

**ANSWER: TASER admits that on or about August 2007, a case report was published by Michael Cao, M.D. and others regarding an alleged incident of X26 cardiac capture in a prison inmate with a pacemaker. The case report speaks for itself. TASER denies the remaining allegations in this paragraph.**

27.     [sic] Although TASER funded the Tchou-Lakkireddy study, and TASER knew that the Nanthakumar study, the Dennis studies and the Cao case report were peer-reviewed and

15

scientifically sound, TASER and Smith maliciously, deliberately, wantonly and negligently failed to modify the design of the X26 or to change the warnings and training. For more than three years following the publication of the Tchou and Nanthakumar studies, TASER continued to sell X26s with what it then knew to be dangerous electrical characteristics and a trigger mechanism that allowed uses to prolong exposures beyond five seconds. The training continued to instruct users to "aim like a firearm at center mass" and used illustrations in training materials depicting law enforcement officers shooting persons directly in the chest with darts, where the risk of inducing ventricular arrhythmia is highest.

**ANSWER: TASER denies generally and specifically the allegations in this Paragraph 27, misnumbered in the Complaint.**

31.     The reason that Rick Smith and TASER stubbornly refused for years to instruct differently related to TASER's sales, which TASER and Smith placed above the safety of people shocked with its products. Police officers for whom the X26 was designed are trained extensively on aiming firearms. To maximize their efficacy as a defensive weapon, firearms are pointed at center mass. For officer safety law enforcement agencies drill "center mass" targeting into their officers "muscle memory." Modifying the X26 to make it safer by changing the electrical characteristics or trigger mechanisms, or marketing the X26 with directions that it must be aimed differently than a firearm, and with warnings that firing into the chest of a human being — exactly where firearms are aimed — increases the risk of cardiac arrest, would have impacted the cost/benefit analysis made by potential customer agencies contemplating the purchase and deployment of tasers, and cost TASER and Smith money.

**ANSWER: Denied.**

32.    TASER and Smith were concerned, from the point of view of agencies such as the IPD and managers such as Chief Dailey, that using X26s would mean paying to train officers to modify their "muscle memory" to distinguish between aiming firearms and aiming X26s. Moreover, TASER and Smith did not want agencies and managers to worry that firing an X26 into a person's chest and inadvertently triggering a cardiac arrest, after being warned not to do so, as happened in this case, would increase exposure to civil liability.

**ANSWER: Denied.**

33.    The evidence that X26 chest shots elevate cardiac risk, however, mounted until it because undeniable — at least to everyone other than TASER, Smith and their acolytes, who to this day claim that the risk is so low it can be treated as zero. In May 2009, a TASER-funded study reported a 2004 cardiac arrest (Greshmond Gray) as consistent with X26 darts to the chest. Charles D. Swerdlow, M.D., et al., "Presenting Rhythm in Sudden Deaths Temporally Proximate to Discharge of TASER Conducted Electrical Weapons," *Society for Academic Emergency Medicine*, (May 2009). In June 2009 the Braidwood Commissions of Inquiry on TASER use in Vancouver, Canada, after extensive hearings in which TASER participated, along with many others, concluded:

- There is evidence that the electrical current from a conducted energy weapon is capable of triggering ventricular capture.

- Based on animal studies, I am satisfied that the greatest risk of ventricular fibrillation arises when the probes are vectored across the heart, and that the risk of ventricular fibrillation increases as the tips of the probes get closer to the wall of the heart.

- There is a short "window" during the heart's normal beat cycle (the T-wave), when the heart is most vulnerable to an external electrical shock. However, this narrow window does not apply to rapid ventricular capture causing ventricular tachycardia, which may degenerate into ventricular fibrillation.

- Although there is often a lack of physical evidence on autopsy to determine whether arrhythmia was the cause of death, if a person dies suddenly and from no obvious cause after being subjected to a conducted energy weapon, death is almost certainly due to an arrhythmia

- The risk of ventricular fibrillation increases significantly in several circumstances—if the subject has cardiovascular disease or in thin subjects who have a smaller skin-to-heart distance. The intense pain, coupled with anxiety and stress, can cause an outpouring of adrenaline that can stimulate the heart and lead to dangerous arrhythmias. Skeletal muscle contractions can lead to acidosis, which affects the electrolyte balance, making the heart more susceptible to ventricular fibrillation. Also, an electrical current coinciding with the T-wave peak may induce fibrillation with a threshold 25 or more times lower than at other times in the heartbeat cycle.

**ANSWER: TASER states that the findings of the Swerdlow study and Braidwood Commission (a "commission" consisting of a single retired Canadian judge) speak for themselves. TASER denies the remaining allegations in this paragraph.**

34.     In addition to the foregoing, tort suits arising from cardiac arrests and wrongful death were filed or threatened against TASER. Some based on the fact that TASER failed to warn about the risk of cardiac arrest when instructing officers to fire at the chest exposed TASER to liability. More and more customer agencies were being sued for wrongful death and forced to make large payouts.

**ANSWER: TASER admits only that lawsuits have been filed against it with involving allegations of product liability for failure to warn. TASER denies the remaining allegations in this paragraph.**

35.     Beginning with Training Bulletin 15.0 on September 30, 2009, TASER "implemented new risk management strategies, including revisions to product warnings and training." In typical TASER double-talk, the Training Bulletin calls "ventricular fibrillation . . . on the normal adult heart . . . unlikely," although "Researchers have concluded that a close distance between the ECD dart and the heart is the primary factor in determining whether an

18

ECD will affect the heart," but then again that "the risk of an adverse cardiac event related to a TASER ECD discharge is deemed to be extremely low." Whoever deemed the risk of cardiac arrest "extremely low" for a supposedly non-lethal weapon is not identified. In fact there is no scientifically sound data with which to quantify the risk. Clearly — as TASER states in the midst of multiple disclaimers — the risk increases as the distance between the X26 current and the heart decreases. Regardless, the bulletin states: "We have issued a new TASER Targeting Guide," that "lowered the recommended point of aim from center of mass to lower-center of mass for front shots."

**ANSWER: TASER admits that it issued Training Bulletin 15.0 on September 30, 2009; that the Bulletin contained a Medical Research Update regarding cardiac and other CEW risks; and that the Bulletin contained a new TASER Targeting Guide lowering the point of aim from center of mass to lower-center of mass for front shots. The Bulletin speaks for itself. TASER denies the remaining allegations in this paragraph.**

36.    The revised targeting guide ignited an uproar in the law-enforcement and corrections community, in part because TASER had been so adamant for so long that chest shots were cardiac safe. After years of reliance on TASER's representations of cardiac safety, many customers perceived the new "targeting guide" as a risk-management strategy to minimize TASER's liability by shifting fault to the customer agencies and their officers, increasing their exposure in lawsuits arising from X26 chest shots followed by cardiac arrest. TASER was forced to mollify its customers, essentially announcing that the "targeting guide" need not be taken seriously because cardiac arrest is not, in fact, a measurable risk of chest shots.

**ANSWER: Denied.**

37.     On October 15, 2009, TASER issued: "TASER Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings." The document states: "The recent release of our Training Bulletin should not be interpreted as a significant change in how our products should be used," that the change in the preferred target zone "has less to do with safety and more to do with effective risk management for law enforcement agencies," that were a cardiac arrest to occur "involving a TASER® electronic control device (ECD) discharge to the chest area — plaintiff attorneys will likely file an excessive use of force claim against the law enforcement agency and officer and try to allege that the TASER ECD played a role in the arrest related death by causing ventricular fibrillation (VF), an arrhythmia that can be fatal without intervention," even though "[t]he available research does not support this." In sum, the reason for the targeting change is "improving risk management" rather than safety, a classic example of TASER talking out of both sides of its mouth. TASER distributed a video of Rick Guilbault reading the document.

**ANSWER:  TASER admits that it issued a document signed by its Vice President of Training Rick Guilbault dated October 15, 2009 that addressed certain frequently asked questions regarding TASER's Training Bulletin 15.0.  The document speaks for itself and must be considered as a whole.  TASER denies Plaintiff's summation.  TASER denies the remaining allegations in this paragraph.**

38.     In response to the rhetorical question, "Can I still deploy my TASER ECD into the chest," the October 15, 2009 document responds: "Yes." "However, when the situation allows for sufficient time to intentionally aim the ECD and from a best practice standpoint, it is recommended to try, when possible, to aim for the preferred target areas shown in the new training bulletin …. While this may require some slight modification to traditional target

20

acquisition by lowering the point of aim several inches to lower center mass, this will play an important role in reducing risk management issues and avoiding litigation."

**ANSWER: TASER admits that the October 15, 2009 document addressed the question of whether TASER CEWs could still be deployed to the chest. The document otherwise speaks for itself.**

39. On October 22, 2009, Rick Smith issued a statement containing unadulterated TASER double talk: "As you may have seen, there are sensational stories running in the media regarding a recent training bulletin from TASER International. Unfortunately, the stories in the public media are wildly inconsistent, and do not accurately represent the bulletin, or the rationale behind it."

> Media is reporting [sic] that TASER is prohibiting chest shots because of a danger of cardiac arrest.

> This is completely incorrect. TASER has RECOMMENDED slightly lowering the PREFERRED point of aim from center of mass to lower center of mass for shots to the front of the body. Aiming lower results in more effective TASER applications, further reduces the risk of accidental shots to the throat or eyes, and avoids the controversy over whether it is possible for the TASER to have an adverse effect on the "one in a million" person with a bad heart who is also high on drugs, etc — an impossible standard to meet, measure, or even quantify.

> ….

> …. We have not stated that the TASER causes VF events in this bulletin, only that the refined target zones avoid any potential controversy on this topic.

> ….

> …. These recommendations are also intend [sic] to help our agency customers develop the most effective policies and training that are responsive to community concerns about how police officers can most safely respond to violent resistance.

> · · · · The recent release of our Training Bulletin should not be interpreted as a significant change in how our products should be used. The recommendations should be viewed as best practices that mitigate risk management issues resulting

21

in more effective deployments while maximizing safety considerations such as avoiding the face, neck, and chest/breast shots.

**ANSWER: TASER admits that on October 22, 2009 Rick Smith issued an email announcing two conference calls to discuss TASER's Training Bulletin 15.0. The email speaks for itself.**

40.     On October 23, 2009, Rick Smith hosted a conference call joined by hundreds of master instructors, trainers, distributors and representatives of customer agencies. Plaintiff is informed and believes that IPD and its representatives participated in the call directly or indirectly. The call lasted about two hours. Although TASER's corporate counsel Doug Klint and Medical Director Jeffrey M. Ho, M.D., were also on the call, Rick Smith was the dominant voice throughout. Smith repeated much of the same double-talk contained in the October 22, 2009, release.

**ANSWER:  TASER admits that on October 23, 2009, TASER hosted a lengthy conference call joined by numerous law enforcement representatives, and that TASER's CEO Rick Smith, General Counsel Doug Klint, and Medical Director Jeffrey M. Ho, M.D. participated in the call.  Any recording or transcript of this call speaks for itself.  TASER denies the remaining allegations in this paragraph.**

41.     Smith began began [sic] the conference call: "'Are chest hits with the taser dangerous?' and the answer to that is definitively 'No.'" Dr. Ho added, "Categorically no," TASER had not seen instances of ventricular fibrillation from chest shots in field uses. This statement was deliberately false, as at that time TASER was aware of multiple instances of ventricular fibrillation following chest shots, including, but in no way limited to, Greshmond Gray in Georgia (2004), Akeem Watson in Illinois (2005), Steven Butler in California (2006), Darryl Turner in North Carolina (2008), Kevin Piskura in Ohio (2008), Derek Jones in Virginia

22

(January 2009), and Kevin Mitchell in Michigan (April 2009). After referring to the data from independent research on animals, Dr. Ho said that, the risk of an adverse cardiac event from a chest shot could be rounded to zero.

**ANSWER: TASER states that any recording or transcript of this call speaks for itself. TASER denies that any statement by any TASER representative was "deliberately false," and further denies any CEW-induced VF causation determination had been made concerning any of the named individuals in this paragraph. TASER denies the remaining allegations contained in this paragraph.**

42. Rick Smith told the listeners that agency policies should not be revised to prohibit chest shots, nor should such uses of a taser be classified lethal force. He said that the taser is more effective when shot lower (this is true), and aiming lower reduces the risk of head, throat and eye injuries (also true, although it increases both the risk of injury to genitalia and the likelihood that the lower dart will miss entirely, making the shot ineffective), but the "real and biggest reason here is risk management and eliminating the controversy." Based on an absurd hypothetical that TASER has not tested the X26 "on 60-pound persons with a ten-year history of abusing methamphetamine, who are high on a cocktail of drugs, who've been running from the police and are exhausted," Rick Smith said: "When we start talking about this risk there's been a lot of controversy whether the taser might affect this one-in-a-million person. And there have been pig studies on it. And if you do enough things to an anaesthetized pig you can cause some problems with the taser." Referring to Braidwood, Rick Smith said that after the final report was issued, plaintiffs' lawyers would present wrongful death cases to juries, which could "go the other way" if there were chest shots and the death was "proximal to the use of the taser." Failure "as a community" to "take this into consideration" could expose "us" to "punitive damages that

could be cataclysmic for either that agency or TASER International if the jury's convinced that collectively we've been non-responsive."

**ANSWER: TASER admits that listeners were told that TASER was not prohibiting chest shots, but recommending lower center mass below-chest preferred targeting "when possible and unless legally justified." TASER explained the lower point of aim for front shots was to maximize effectiveness; reduce the risk of head, throat, and eye shots; minimize controversy; and make deployments as safe as humanly possible. TASER admits that Rick Smith discussed the Braidwood Commission findings during the call and advised that, although disputed, the findings should not be ignored. Any recording or transcript of this call speaks for itself. TASER denies the remaining allegations in this paragraph.**

43.     Law enforcement and correctional agencies are generally immune from punitive damages, although TASER and Smith are not.

**ANSWER: Paragraph 43 contains legal conclusions to which no response is required. However, to the extent a response is required, TASER denies the allegations contained in this paragraph.**

44.     Shifting to the other side of his mouth, Smith assured listeners that there was no increased cardiac risk from the X26: "If you have to use force on somebody, about one in 600 is going to die," he said, a fabricated statistic that conflates shootings with non-lethal techniques. Rick Smith falsely claimed there was "no human data supporting the need to" change the targeting guide. Doug Klint added that the animal studies "do not represent real life field situations but we're stuck with it." Finally, Rick Smith concluded, "there is no evidence that we've seen, even in pigs, of a drive-stun to the chest" capturing heart rhythm. That ignores findings published in the TASER-funded "Cardiac Effects of Electrical Stun Guns: Does

24

Position of Barbs Contact Make a Difference?" *Pacing Clin. Electrophysiol.*, Vol. 31, 4/2008: 398-408 at 405.

**ANSWER:  The content of the call speaks for itself.  TASER expressly denies that it misrepresented any statistic or fabricated anything.   TASER denies the remaining allegations contained in this paragraph.**

45.     Following the conference call, TASER made various piecemeal changes to its training materials and warnings, but none with the urgency and clarity that the situation warranted. TASER did not change the electrical characteristics to make its product cardiac safe, nor did it change the triggering mechanism. As a result, agencies like IPD and users like Runnels did not change their behavior sufficiently to minimize the risk of an adverse cardiac event.

**ANSWER: TASER denies generally and specifically the allegations in Paragraph 45.**

46.     The evidence that TASER needed to change the design of the X26 and X26 training continued to mount. In July 2011, Tammy Lou Fontenot proved to a Charlotte, North Carolina, federal jury that a prolonged X26 cycle to the chest of her 17-year-old son Darryl Turner caused his death from cardiac arrest. Instead of trying to learn something, moving forward with a new design, training and warnings, however, within hours of the verdict, TASER issued a press release attributing the death to "hypertrophic cardiomyopathy (HCM), the leading cause of sudden cardiac arrest in young adults," a patently fabricated diagnosis rejected by both the medical examiner who performed the autopsy, the jury that heard the evidence, and the presiding federal judge who denied TASER's post-trial challenge to the verdict. After suggesting that the boy's death was linked somehow to a baggie of marijuana found in his sock, TASER cited out of context a statement in a "study just released by the United States Department of

Justice that 'current research does not support a substantially increased risk of cardiac arrhythmia in field situations, even if the CED (TASER ECD) darts strike the front of the chest.'" Doug Klint, as President and General Counsel of TASER, is quoted as saying that "compassion for Mr. Turner's family . . . overwhelmed the scientific evidence presented in this case." TASER chose not to appeal that ruling, however, and the Fourth Circuit Court of Appeals affirmed the liability judgment.

**ANSWER: TASER admits that a North Carolina jury in July 2011 found in favor of plaintiff on a product liability failure-to-warn claim in *Fontenot v. Taser Int'l, Inc.*, 3:10-CV-00125-RJC-DCK (W.D.N.C.), arising out of the arrest-related death of 17-year-old Darryl Turner; that Turner was exposed to an extended, continuous 37-second CEW application to the chest, followed by an additional 5-second exposure; that the jury's verdict did not differentiate between multiple medical causation theories presented at trial; and that the Fourth Circuit (No. 12-1617) did not address medical causation on appeal when it affirmed liability but reversed the damages award. TASER admits it issued a press release concerning the verdict on July 19, 2011, which speaks for itself. TASER denies the remaining allegations in this paragraph.**

47. After losing several pretrial motions challenging causation in other products-liability cases based on cardiac arrests following X26 chest shots, late in November 2013, TASER filed a Form 8-K with the Securities and Exchange Commission, stating that "In 2009, the Company implemented new risk management strategies, including revisions to product warnings and training, to better protect both the Company and its customers from litigation based on 'failure to warn' theories." Accordingly, "Management believes that pre-2009 cases have a different risk profile than cases which have occurred since the risk management procedures were

introduced in 2009. Therefore, the Company necessarily treats certain pre-2009 cases as exceptions to the Company's general no settlement policy in order to reduce caseload, legal costs and exposure. In November 2013, the Company agreed to settle two pre-2009 product liability lawsuits, where the Company had litigation exposure in excess of insurance coverage and the risk of potential high jury verdicts."

**ANSWER: TASER's SEC filings are publically available at https://www.sec.gov/index.htm and speak for themselves. TASER denies the remaining allegations in this paragraph.**

48. Earlier in 2013, TASER revised its X26 warnings, for the first time using a "black box" stating: "Cardiac Capture. CEW exposure in the chest area near the heart has a low probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death." The warning adds, "Cardiac capture may be more likely in children and thin adults because the heart is usually closer to the CEW-delivered discharge (the dart-to-heart distance). Serious complications could also arise in those with impaired heart function or in those with an implanted cardiac pacemaker or defibrillator." "To Reduce the Risk of Injury:" the warning states, in reference to a diagram: "Use preferred target areas. The preferred target areas (blue) are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart distance and reduce cardiac risks. Back shots are preferable to front shots when practicable."

**ANSWER: TASER admits that its March 1, 2013 law enforcement product warnings contain the following warnings on pages 2-3:**

> ⚠️**WARNING** **Cardiac Capture.** CEW exposure in the chest area near the heart has a low probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death.

Cardiac capture may be more likely in children and thin adults because the heart is usually closer to the CEW-delivered discharge (the dart-to-heart distance). Serious complications could also arise in those with impaired heart function or in those with an implanted cardiac pacemaker or defibrillator.

---

To reduce the risk of injury:

1. **Use preferred target areas.** The preferred target areas (blue) are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart distance and reduce cardiac risks. Back shots are preferable to front shots when practicable.
2. **Avoid sensitive areas.** When practicable, avoid intentionally targeting the CEW on sensitive areas of the body such as the face, eyes, head, throat, chest area (area of the heart), breast, groin, genitals, or known pre-existing injury areas.



**TASER denies the remaining allegations in this paragraph.**

49. Corresponding changes were made in training materials. Version 19, X26 User Course slides 14-16 issued simultaneously with the revised warning, state:

CEW cardiac risks are not zero.

CEW cardiac risks are sufficiently remote that making accurate risk or probability estimates are very difficult.

Experts have identified the following key factors related to CEW cardiac risks:

Dart-to-heart ("DTH") distances,

Amount of delivered electrical charge

The further a CEW dart is away from the heart and the lower the delivered electrical charge the lower the risk of the CEW affecting the heart.

To reduce cardiac risks (when possible):

Target the back

Avoid targeting chest

Avoid prolonged and repeated exposures

28

ANSWER: TASER admits that it released its Version 19 Training DVD on April 1, 2013; that the DVD included a PowerPoint® presentation for law enforcement use in conducting X26 CEW end user certification courses (also available on TASER's website); and that the user course PowerPoint contained substantial warnings and safe use instructions regarding targeting and cardiac risks, including but not limited to the following slides 14-16:







**Substantially similar slides were also contained in prior Training Version 17 (May 2010) and Version 18 (July 2011). TASER denies the remaining allegations in this paragraph.**

50. There are several problems with these more recent slides, which IPD used to "recertify" Runnels on the X26 in January 2014. Most notably, given the long history of TASER and Smith assuring customers that the X26 is cardiac safe even when fired directly into the chest, the mealy-mouthed new warnings and training, when viewed in the context of all the contradictory assurances made by TASER and Smith, do not convey the urgency necessary to change the behavior of law enforcement and corrections bureaucracies, or of end users lulled into a false sense of complacency.

**ANSWER: TASER admits, upon information and belief, that IPD used TASER's Version 19 Annual CEW User Update in recertifying former Officer Runnels on the X26 CEW in January 2014. TASER denies the remaining allegations in this paragraph.**

51. For years TASER attacked and sought to discredit everyone who raised a concern about cardiac safety, such as the North Carolina Fontenot jury, and insisted that the X26 was cardiac safe under all circumstances. TASER has continued to do so, either directly or through highly compensated surrogates such as electrical engineer Mark Kroll, the head of TASER's

30

"Scientific and Medical Advisory Board," and Jeffrey Ho, M.D., an emergency medicine doctor whom TASER considers its top medical researcher. On September 6, 2015 — a mere eight days before Bryce Master's X26 induced cardiac arrest — TASER lawyer Michael Brave published his revised 309-page "brief outline," replete with absurd claims such as "The demonstrated incidence of [taser]-induced cardiac arrest is extremely low, if not zero," "Conclusions of a connection between [taser] use and cardiac arrest are speculative at best," and "The overall theoretical VF risk [for 9 mm darts] was estimated not to exceed 1 in 2,873,147." (Brackets in original).

**ANSWER: TASER admits that Mark Kroll, a Ph.D. electrical engineer and bioelectricity scientist who holds more patents on implantable cardiac devices than anyone in the world, has served on its Scientific and Medical Advisory Board (SMAB) since its inception in 2004; that Jeffrey Ho, M.D., a board-certified attending emergency medicine physician at a Level 1 Trauma Center in Minneapolis, Minnesota, currently chairs TASER's SMAB and serves as the company's medical director; and that both Dr. Kroll and Dr. Ho have conducted CEW safety studies, published numerous peer-reviewed articles on CEW effects on the human body, and monitor evolving CEW-related medical, scientific, electrical, and engineering literature. TASER admits that Michael Brave is in-house counsel for the company, and maintains and regularly updates a comprehensive outline of selected CEW research and information published in the medical, scientific, and engineering literature and case decisions, including a 309-page version dated September 6, 2015. TASER denies the quoted language is Mr. Brave's, but rather originates in the published materials cited. TASER denies the remaining allegations in this paragraph.**

31

52.     TASER's and Smith's constant representations that the risk is "low," or "speculative" are not based on data, and are intended to counteract agency, managerial and user concerns that an X26 fired into the chest can trigger a cardiac arrest leading to death or catastrophic brain injury. Training users on the "amount of delivered electrical charge" makes no sense as the X26 has no mechanism for varying the amount of delivered electrical charge per pulse. That phrase only adds confusion. "Target the back," and "Avoid targeting chest" will reduce cardiac risk. Given the frequency of X26 use in dynamic field encounters when the user is facing the person targeted, however, chest shots are inevitable, especially as lowering the point of aim is impractical as it increases the probability the lower dart will miss altogether. Other than "Avoid prolonged or repeated exposures," the training does not instruct users what to do when the inevitable chest shots occurs.

**ANSWER:  Denied.**

53.     TASER's warnings and instructions should have included additional warnings and instructions, such as to consider engaging the safety to terminate exposures if the darts hit the front chest. TASER should have advised agencies to equip their patrol cars and locations, such as jails, where the X26 might be used with automatic external defibrillators (AEDs), and to train users that whenever a person becomes unresponsive shortly after an X26 exposure they need to immediately summon paramedics and rule out ventricular fibrillation with the AED, if available, or otherwise to use CPR and other lifesaving measures until paramedics arrive, and to not do what Runnels did, like the Charlotte-Mecklenburg officer who tased Darryl Turner in the chest [sic] — assume that the unresponsive person is "faking."

**ANSWER:  TASER denies that its warnings and instructions were inadequate in any respect relevant to this case, and denies that, as a product manufacturer, it had any**

**duty to provide post-exposure medical advice.  TASER denies the remaining allegations in this paragraph.**

54.     TASER's minimal, equivocal modifications of warnings and training, coupled with its continuing insistence of cardiac safety, has not changed the behavior of agencies and users, and shows that TASER's actual motivation is to shift liability to its customers and product users, as it will attempt in this case.

**ANSWER:  Denied.**

55.     TASER's language constitutes a tacit admission that the X26's "amount of delivered electrical charge," when too close to the heart, is not cardiac safe. An effective weapon can be produced with a lower "delivered electrical charge," and in fact the current tasers, including the X2 and X26P, deliver less electrical charge, thus increasing the cardiac safety of the tasers without reducing their utility.

**ANSWER:  TASER admits that its X2™ and X26P™ Smart Weapons, released in June 2011 and January 2013, respectively, contain "charge metering" technology not available in 2003 when the X26 CEW was released; that the X2/X26P CEWs only deliver less charge when the probes are embedded in the skin (as opposed to clothing); and that the X2/X26P models have an increased cardiac safety margin.  That does not mean, however, that the older X26 CEW is not cardiac "safe."  TASER expressly denies that, without charge metering, it could have lowered the delivered electrical charge of the X26 without reducing its utility, i.e., the ability to cause neuro-muscular incapacitation (NMI) in a variety of deployment circumstances.  TASER denies the remaining allegations in this paragraph.**

Case 4:16-cv-01045-DW   Document 11   Filed 01/17/17   Page 33 of 60

56.     Moreover, chest exposures, especially from close range, not only carry more cardiac risk than back shots, they also are significantly less effective because the middle of the chest has neither the muscles nor nerves necessary for the X26 electrical current to incapacitate the person targeted, an inherent flaw in taser technology not adequately described in TASER warnings and training. Confronted with a person who appears not incapacitated by the X26 cycle, even though he may have darts stuck in his chest, along with the stress inherent in a use of-force situation, many users find themselves inadvertently holding the trigger, rather than letting go, prolonging the TASER cycle and, as TASER now concedes, increasing the risk of cardiac arrest. That is exactly what happened in the 2008 Darryl Turner death in North Carolina, and that is exactly what happened here.

**ANSWER: TASER admits that back shots are generally more effective than chest shots; that close-range chest deployments resulting in narrow probe spreads may not cause NMI; and that it has warned and trained on these basic facts since at least 2009. TASER denies the remaining allegations in this paragraph.**

57.     TASER knows from training and field uses that some users hold the trigger. To make the device less dangerous, the X26 triggering mechanism should instead be that each cycle ends when the user releases the trigger or at five seconds, whichever occurs first. Repeating the discharge after each five-second cycle should require the user take an affirmative action — release and pull the trigger again.

**ANSWER: TASER admits that in stressful field and training situations some officers have inadvertently held the CEW trigger down resulting in an extended electrical discharge of unintended duration; and that TASER has warned and trained on trigger operation and potential unintended consequences since at least February 2011. TASER**

**also states that as early as June 2011, more than 3 years prior to the incident with Plaintiff, TASER manufactured and sold a modified TASER CEW battery—the Auto Shut-Down Performance Power Magazine (APPM)—which shuts down the CEW output after 5 seconds even if the trigger is not released. The APPM is compatible with TASER X2 and X26P Smart Weapons, and provides agencies with the option to prohibit extended or continuous exposures based on agency policy or preference. Because a subject can immediately resume violent conduct at the conclusion of the standard 5-second CEW cycle, an officer's ability to extend the electrical cycle was considered by TASER an important officer safety feature. TASER denies the remaining allegations in this paragraph.**

58. TASER and Smith refused to take any of the foregoing actions, or any other action, to minimize the cardiac risk of the X26, thousands of which remain in circulation and are used on human beings every day. In the foregoing fashion, TASER and Rick Smith maliciously, intentionally, deliberately, wantonly, recklessly and negligently placed a defective, unreasonably dangerous product in the stream of commerce, and misrepresented the medicine and science to their customers and users, defrauding them, lying to them, and misleading them concerning crucial facts that the risk of an adverse cardiac effect increases dramatically when the darts are vectored across the chest or located close to the heart, while at the same time giving false assurances of safety, which have led to more incidents of cardiac arrest, including Bryce Master's nearly fatal encounter with the IPD and Runnels.

**ANSWER: TASER denies generally and specifically the allegations in Paragraph 58 and denies liability.**

**FACTS RELATIVE TO PLAINTIFF'S CARDIAC ARREST**

59. Plaintiff understands that TASER sold the X26 Runnels used on Plaintiff, serial number X00-249486, through Ed Roehr Safety Products Co., its Missouri distributor, during

35

January 2007. From before that date through after the date of this incident, September 14, 2014, TASER maintained contact with IPD and its "certified X26 instructor" through its training program and various protocols.

**ANSWER: TASER admits that on January 11, 2007, it sold X26 CEW Serial No. X00-249486 to Ed Roehr Safety Products and shipped it to IPD. TASER does not have sufficient information or belief as to whether this weapon was issued to Defendant Runnels or used on Plaintiff, and on those grounds denies those allegations. TASER admits that it maintains email contact with current certified X26 instructors, including those with IPD, to send announcements, training bulletins, and updated warnings and training materials.**

60. Prior to his employment with IPD, the Kansas City Police Department hired Timothy Runnels and trained him on the X26. Because of poor judgment and temperament, however, the Kansas City Police Department compelled Runnels to resign, and, after a survey of his chain of command, designated him not eligible for rehire. IPD Chief Dailey, who retired as a major from the Kansas City Police Department after 27 years, knew the significance of the designation "not eligible for rehire." In spite of the designation and Chief Dailey's understanding of its significance, and numerous other indicators of Runnels' lack of fitness to be a police officers, the IPD hired Runnels with deliberate indifference to his fitness, and without conducting the necessary due diligence by contacting officials from the Kansas City Police Department, who would have told IPD that Runnels should not be hired and employed as a police officer.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

61.    This incident began about 3:00 in the afternoon on Monday, September 14, 2014, when Runnels saw Bryce Masters, whom he knew from prior contacts, driving lawfully in Independence. For no discernable reason Runnels ran the license plate on the car and then ran Bryce Masters by name. At 3:06 Runnels pulled Bryce over on Southside near Main Street, in front of Bryce's friend's home. There were no wants or warrants attached to the car, which had current registration and insurance, and there were no wants or warrants for Bryce. After the stop, the inquiry on the plate came back to a forty-year-old female driver of another car who had failed to appear on a speeding ticket. (Characters were transposed when the plate was entered by a clerk for the Pulaski County Sheriff.) The information obviously did not pertain to Bryce or the car he was driving. Thus the traffic stop and subsequent seizure of Bryce was made without any reasonable suspicion or probable cause.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

62.    The ensuing events were captured in full by an IPD car camera, which includes audio and video, and most of the initial contact between Runnels and Bryce was captured from another angle on Plaintiffs cell phone video camera. Over the next minute, Runnels approached the passenger's side, exchanged words with Bryce, then went to the driver's side and opened the door. At this point Bryce began recording. Bryce asked repeatedly why he was being detained and whether he was under arrest. Runnels never gave any reason for the traffic stop because he had none. Instead he ordered Bryce out of the car. Runnels threatened to tase Bryce if he didn't get his "ass out right now." Runnels reached into the car but appeared unable to pull Bryce out. Runnels called for backup. Runnels pointed the X26 at Bryce and said, "Alright, fuck it. Just get out."

37

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

63.     At 3:08:50 Runnels shot Bryce with his X26, with both darts in the chest. The discharge and clicks are on the recording, along with Runnels' commands, which made no sense because the X26 is supposed to incapacitate. The clicks last 23 seconds, and the dataport download records that Runnels held the trigger for at least 20 seconds. Because the chest shot did not incapacitate Bryce due to the inherent flaw in the technology described above, Bryce was able to get out of the car. As he seems to be laying down he collapsed onto the asphalt, screamed, and then moaned. Runnels said, "I told you," and then radioed "10-19" to let everyone know he had the situation under control.

**ANSWER: TASER admits that the CEW data download report reflects a single 20-second discharge.  As to the remainder of Paragraph 63, TASER does not have sufficient information or belief to answer the allegations, and on those grounds denies them.**

64.     The X26 cycle ends at 3:09:10, with Bryce unresponsive for at least the last five seconds. Runnels set his X26 on the asphalt. Bryce was unresponsive as Runnels handcuffed him behind his back. Ordering Bryce to stand, Runnels grabbed him by the arms, dragged him around to the rear of the car, and threw him face first into a concrete driveway, breaking multiple teeth and causing blood to flow from Bryce's mouth. Runnels asked rhetorically, "You don't like to play by the rules, do you?" as he searched Bryce, taking items from his pockets and throwing them on the ground.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

65.     Runnels radioed, "10-19, one in custody. If you want to start AVR [an ambulance] to check him out, that's fine." Runnels asked, "Do you want to sit up?" and then said,

38

"Bryce, you better sit up, I don't play games." The only sounds from Bryce were occasional moans associated with agonal breaths that can continue for minutes after a cardiac arrest. Runnels then asked, "You ready to sit up now? I've been tasered a dozen times and it doesn't act like that." A minute later, Runnels radioed Bryce's name and spelling, then asked him again to sit up.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

66.     At 3:12:25, Sgt. Blackmore arrived. Runnels said, "He doesn't want to sit up so I'm not going to make him until the ambulance gets here." Runnels added, "I pulled him over because he ducked me as soon as I got behind him," and "I told him to open the door. He won't open the door." At 3:13:20, Runnels rolled Bryce over and tried to sit him up. Blackmore said, "Wake up, guy." At 3:14 Blackmore radioed, "Make it an emergency." Blackmore did not direct Runnels to use an AED, although the IPD equips patrol cars with the life-saving device and trains officers to use it.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

67.     The first medical responders arrived at the patient at 3:15:30. By this time, Bryce had been in cardiac arrest for more than seven minutes without CPR and had turned blue, "cyanotic." Within seconds the ambulance crew noted the severity of Bryce's situation and requested a fire unit. They initiated CPR. At 3:18:30 they defibrillated Bryce, announcing a pulse 36 seconds later. Runnels lied to the medical responders, saying Bryce had been down for "maybe two minutes," rather than seven, before their arrival.

39

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

68.     The ambulance left shortly before 3:27 p.m. for the emergency room at Centerpoint Medical Center in Independence. The medical staff initiated a cooling protocol that minimized Bryce's anoxic brain injury, and, remarkably, he survived, regained consciousness, and began the slow, painful recovery that continues to this day.

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

69.     Despite having the patrol car video recording, with audio, the IPD immediately ratified Runnels' conduct by, among other things, issuing a press release stating that Runnels' actions were "within policy."

**ANSWER: TASER does not have sufficient information or belief to answer the allegations in this paragraph, and on those grounds denies them.**

## FIRST CLAIM FOR RELIEF

42 U.S.C. 1983 — Entity and Supervisory Liability

(Against Defendants City and Chief Dailey)

70.     Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER: TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

71.     Defendants City and Chief Dailey, with deliberate indifference, gross negligence, and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiff, and all persons similarly situated, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies, practices, and customs of, among other things,

40

a. Relying without appropriate skepticism on training and warnings from TASER, even though the manufacturer has a conflict of interest and has been repeatedly discredited for misrepresenting product safety, instead using TASER materials for the formulation of IPD training, standards and policy;

b. Allowing IPD officers to shoot people with the X26 without adequate training and knowledge of its cardiac dangers;

c. Not training IPD officers how to respond when a person becomes unresponsive after a taser chest shot, including using an AED or CPR;

d. Tolerating IPD officers who make arbitrary traffic stops and harass drivers without reasonable suspicion or probable cause;

e. Subjecting persons to tasers and other uses of force that are unreasonable or excessive under the circumstances;

f. Allowing officers to retaliate against persons who complain about officer misconduct or otherwise question their authority;

g. Selecting, retaining, and assigning officers with deliberate indifference to those officers demonstrable propensities for excessive force, false arrest, and other misconduct;

h. Failing to adequately train, supervise, and control officers in the arts of law enforcement, including dealing with complaining or questioning civilians;

i. Failing to adequately investigate and discipline officers involved in misconduct; and

j. Condoning and encouraging officers in the belief that they can violate the rights of persons such as the plaintiff in this action with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

**ANSWER: Paragraph 71 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

72. Chief Dailey and other supervisors for the IPD knew or reasonably should have known when selecting, hiring and supervising Officer Runnels and other subordinates had histories of misbehavior, and exhibited deliberate indifference to the constitutional rights of Plaintiff and others similarly situated.

**ANSWER: Paragraph 72 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

73.     Chief Dailey and other IPD supervisors knew or reasonably should have known that officers use X26s unreasonably, and otherwise use excessive force against individuals who question their authority. Despite this knowledge, defendants failed to take any steps to remedy these constitutional through adequate hiring, training, supervision and monitoring. In so doing, Chief Daily and other supervisors set in motion the forces that caused Plaintiffs injuries, and exhibited deliberate indifference to or tacitly approved the constitutional deprivations of Plaintiff and others similarly situated.

**ANSWER: Paragraph 73 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

74.     Defendants City and Chief Dailey ratified the wrongful conduct of Runnels alleged herein.

**ANSWER: Paragraph 74 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

75.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and attorneys' fees, but not punitive damages under this claim for relief.

**ANSWER: TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

42

## SECOND CLAIM FOR RELIEF

42 U.S.C. 1983 -Individual Liability for Wrongful

Detention and Excessive Force

(Against Defendant Runnels)

76.      Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER: TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

77.      Defendant Runnels, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including those secured by the Fourth Amendment by, among other things: (1) Detaining Plaintiff without reasonable suspicion that he was engaged in criminal activity, (2) firing an X26 into Plaintiffs chest—a potentially lethal use of force where no force, much less potentially lethal force—was objectively reasonable, (3) prolonging the X26 discharge, and (4) after inducing a cardiac arrest that rendered Plaintiff unresponsive, picking up Plaintiffs limp body and throwing it face first into concrete, smashing his mouth.

**ANSWER:  Paragraph 77 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

78.      In detaining Plaintiff without reasonable suspicion, and then using excessive and unreasonable force, Defendant Runnels did not act for any legitimate law enforcement purpose, but in retaliation for Plaintiffs questioning his authority and reason for the traffic stop, and for video recording him with a cell phone, all First Amendment protected activities.

**ANSWER: Paragraph 78 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

79.    As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and punitive damages, as well as attorneys' fees, under this claim for relief.

**ANSWER: TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

### THIRD CLAIM FOR RELIEF

42 U.S.C. 1983 — Individual Liability for Medical Indifference

(Against Defendant Runnels and Blackmore)

80.    Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER: TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

81.    Defendants Runnels and Blackmore, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including those secured by the Fourth and Fourteenth Amendments by, among other things, acting with deliberate indifference to Bryce's medical needs by not treating his cardiac arrest with an AED or CPR, or both, under circumstances where a reasonable person would know that Plaintiff required immediate medical attention. The actions of the officers were so dangerous that a knowledge of that risk can be presumed.

44

**ANSWER: Paragraph 81 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

82.     Defendants Runnels and Blackmore were both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they also drew the inference. They each acted with the level of culpability equal to the criminal law definition of recklessness. Despite the fact that Bryce was lying on the side of the road without pulse or respiration, and was turning blue, both Runnels and Blackmore refused to treat him, ignored his condition, and intentionally failed to use their AED and give him CPR, and otherwise engaged in conduct that clearly evinced a wanton disregard for Bryce's serious medical needs. Defendants' actions in failing to provide plaintiff medical attention before the paramedics arrived were objectively unreasonable and Defendants intended the consequence of those actions.

**ANSWER: Paragraph 82 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

83.     As a result of Defendants' deliberate indifference to his medical needs, Bryce sustained greater anoxic brain injury than he otherwise would have sustained, with the consequential enhanced residual effects.

**ANSWER: Paragraph 83 is not directed toward TASER and therefore no response is required. To the extent this paragraph can be construed as applied to TASER, TASER lacks sufficient information regarding these allegations, and therefore denies them.**

84.    As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and punitive damages, as well as attorneys' fees, under this claim for relief.

**ANSWER: TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

### FOURTH CLAIM FOR RELIEF

Mo. Rev. Stat. 537.760(3)(a) — Strict Products Liability Defective Product

(Against Defendants TASER and Smith)

85.    Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER: TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

86.    Defendants TASER and Smith, and each of them, designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the X26, which was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, as alleged above. These defects were capable of causing, and in fact caused, personal injuries to Plaintiff and others similarly situated when used in a manner reasonably foreseeable, thereby rendering X26s unreasonably unsafe and dangerous for their intended use, and not as safe as a consumer would expect.

**ANSWER:  Denied.**

87.    As alleged above, Runnels used the X26 in a manner reasonably anticipated, and Plaintiff was injured as a direct result of such defective condition as existed when the product was sold.

**ANSWER: Denied.**

88.     As a proximate result, Plaintiff was damaged as hereinabove alleged.  Plaintiff seeks compensatory and punitive damages under this claim for relief.

**ANSWER:  TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

### FIFTH CLAIM FOR RELIEF

Mo. Rev. Stat. 537.760(3)(b) — Strict Products Liability Failure to Warn

(Against Defendants TASER and Smith)

89.     Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER:  TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

90.     Defendants TASER and Smith, and each of them, designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the X26, which was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

**ANSWER: Denied.**

91.     As alleged above, Runnels used the X26 in a manner reasonably anticipated, and Plaintiff was injured as a direct result of the product being sold without an adequate warning.

**ANSWER: Denied.**

92.     As a proximate result, Plaintiff was damaged as hereinabove alleged.  Plaintiff seeks compensatory and punitive damages under this claim for relief.

47

**ANSWER: TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

### SIXTH CLAIM FOR RELIEF

Negligence

(Against Defendants TASER and Smith)

93.    Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER: TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

94.    At all times herein mentioned, Defendants TASER and Smith, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, warranting, instructing, providing warnings for, and advertising the X26, which these defendants knew, or in the exercise of reasonable care should have known, would be used without inspection for defects or dangers in their parts, mechanisms or design, or without conducting independent research into their safety.

**ANSWER: Denied.**

95.    Defendants' product was unreasonably dangerous and defective for use on human beings because, among other things, as alleged above it was negligently designed, manufactured with unsafe electrical characteristics and trigger mechanisms, and was sold with defective instructions for use and without warnings of the risks and dangers described herein.

**ANSWER: Denied.**

96.    At all times herein mentioned, Defendants TASER and Smith, and each of them, negligently and carelessly designed, manufactured, sold, distributed, installed, fabricated,

48

assembled, bought, inspected, altered, maintained, serviced, tested, repaired, marketed, warranted, provided warnings, instructed, and advertised their unreasonably dangerous defective product in that Defendants knew or should have known that the device was capable of causing, and did in fact cause, personal injuries, including cardiac arrest, and even death, to persons while being used in a manner reasonably forseeable [sic], thereby rendering the product unsafe and dangerous for its intended use.

**ANSWER: Denied.**

97.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

**ANSWER:  TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

### SEVENTH CLAIM FOR RELIEF

Negligent Training Program and Materials

(Against Defendants TASER and Smith)

98.     Plaintiff incorporates by reference each of the foregoing allegations.

**ANSWER:  TASER realleges and incorporates by reference its answers to all of the above paragraphs.**

99.     At all times herein mentioned, Defendants TASER and Smith, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, warranting, instructing, providing warnings for, and advertising the X26. As alleged above, in connection with those activities, TASER and Smith have promulgated a training program for

49

customer agencies and their end users which imposes on TASER and Smith a duty to exercise care.

**ANSWER: TASER admits that it designed, manufactured, marketed, and sold X26 CEWs between 2007 and 2014; and that it offered a CEW certification program to agency trainers and made training materials available for use pursuant to a Licensing Agreement, at the discretion of its customers. TASER denies the remaining allegations in this paragraph.**

100.    Defendants TASER and Smith breached their duty to exercise care when they deliberately chose not to timely and reasonably revise TASER training protocol and materials to instruct instructors and users to avoid shots to the chest because of the increased risk of cardiac arrest for its own marketing reasons, and failed to warn of material facts regarding the safety and efficacy of the X26, including that shots to the chest, near the heart, increase the risk of cardiac arrest. Had TASER done so, proper training could have been given and proper warnings could have been heeded. When TASER and Smith finally did address the increased cardiac risk of chest shots, they did so in a contradictory and mealy mouthed manner not intended to modify the behavior of customer agencies or users, but only to create a paper record that could be used to shift their liability to customer agencies such as the IPD, and users such as Runnels.

**ANSWER:    TASER denies generally and specifically the allegations in this paragraph, and denies liability.**

101.    TASER failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the X26. Had TASER done so, law enforcement professionals would have more safely deployed the X26.

**ANSWER: Denied.**

50

102.  As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

**ANSWER:  TASER denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

## COMPENSATORY DAMAGES

103.  Despite Bryce's ten minutes without a spontaneous heart rhythm, due to the heroic actions of the medical responders at the scene and the staff in the emergency room Bryce survived and regained consciousness. Bryce has regained much of his ability to to [sic] think, speak, recall and sense the world around him. He had extensive dental work to repair the damage to his mouth. The incident, compounded by the residual effects of the anoxic brain injury have had, and will continue to have, a profound effect on Bryce, however. He lives not only with memory deficiencies and other cognitive impairments, he has post-traumatic stress, extreme anxiety, and severe insomnia that makes interpersonal relationships challenging and difficult to an extent that they were not before his anoxic brain injury.

**ANSWER:  TASER does not have sufficient information or belief to answer this paragraph, and on those grounds denies generally and specifically each and every allegation contained therein.**

104.  As a direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the Defendants, and each of them, as alleged in this complaint, plaintiff Bryce Masters has been seriously injured in his health and person. He has sustained permanent brain and dental injuries, along with psychological and emotional trauma. As a result, Plaintiff has suffered and will continue to suffer great mental and physical pain, anguish, fright, nervousness, anxiety, shock, changes in personality, loss of memory and cognitive acuity,

51

humiliation, indignity, embarrassment, harm to reputation, and apprehension about his future, and other general damages, in an amount to be determined at trial.

**ANSWER: TASER does not have sufficient information or belief to answer this paragraph, and on those grounds denies generally and specifically each and every allegation contained therein. TASER further denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

105.    As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, and each of them, Plaintiff suffered past and future losses of income, and other economic losses, in amounts to be determined at trial.

**ANSWER: TASER does not have sufficient information or belief to answer this paragraph, and on those grounds denies generally and specifically each and every allegation contained therein.  TASER further denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

106.    As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, and each of them, Plaintiff incurred medical expenses, and will incur future medical expenses, and other out-of-pocket financial losses, in amounts to be determined at trial.

**ANSWER: TASER does not have sufficient information or belief to answer this paragraph, and on those grounds denies generally and specifically each and every allegation contained therein.  TASER further denies that Plaintiff is entitled to any damages or any other relief from TASER, and denies liability.**

## PUNITIVE DAMAGES ALLEGATIONS

107.    Defendants City is immune from punitive damages. Each of the other Defendants acted outrageously, willfully, wantonly, maliciously and oppressively, with evil motive and complete indifference to, and in conscious disregard for the safety and rights of Plaintiff and others similarly situated, entitling Plaintiff to exemplary and punitive damages in amounts to be proven at trial.

**ANSWER:   TASER denies generally and specifically the allegations in this paragraph, and denies liability.**

108.    Defendants TASER and Smith knew of the defects and danger in the X26 when they sold the product to IPD in January 2007, and had information from which TASER and Smith, in the exercise of ordinary care, should have known that their sales of the X26 created a high degree of probability of injury, and thereby showed complete indifference to and conscious disregard for the safety of others.

**ANSWER:   TASER denies generally and specifically the allegations in this paragraph, and denies liability.**

### PRAYER

**ANSWER:   TASER denies that Plaintiff is entitled to any relief for the claims asserted in the Complaint, and TASER denies liability.**

## GENERAL DENIAL

TASER denies each allegation of Plaintiff's Complaint not expressly admitted herein. To the extent TASER failed to specifically respond to any allegations by Plaintiff in his Complaint, TASER hereby denies the same and denies liability.

## AFFIRMATIVE DEFENSES

As for its affirmative defenses, and in order that TASER does not waive them, TASER alleges, upon information and belief, the following:

1.     TASER pleads and incorporates by reference each and every defense and presumption afforded to it under the provisions of the Missouri Product Liability Act, Missouri Revised Statute §§ 537.760-765, and relies upon this Act as a complete bar to Plaintiff's claims.

2.     The Complaint fails to state claim upon which relief may be granted.

3.     There was no negligence, fault, or culpable conduct on the part of TASER causing the damages alleged in the Complaint.

4.     Plaintiff may have failed to mitigate the alleged damages, thus barring or reducing recovery against TASER, if any.

5.     Plaintiff caused or contributed to cause the damages alleged in the Complaint through his own acts and omissions. In the event that any judgment or recovery is had by Plaintiff against TASER, TASER is entitled to a reduction of any such judgment or recovery in direct proportion to the percentage of comparative fault attributed to Plaintiff.

6.     Any claims against TASER are barred, in whole or in part, by virtue of the Plaintiff having knowingly and voluntarily assumed and/or incurred the risk of physical injury.

7.     The TASER X26 CEW was not defective and did not deviate in a material way from the manufacturer's specification or from otherwise identical units manufactured to the same manufacturing specification.

8.     The TASER X26 CEW was state-of-the-art under Missouri Revised Statute § 537.764, and not defective in warnings or design when it was placed in the stream of commerce in January 2007.

9.     The TASER X26 CEW was not defective or in a condition inherently or unreasonably dangerous for its intended use when it left the possession of the manufacturer on January 11, 2007.

10.    Plaintiff's claims are barred, in whole or in part, because alternative product designs were not technologically, economically or practically feasible in light of the scientific and technological knowledge reasonably available at the time of manufacture. TASER's products were at all material times consistent with industry customs, applicable standards, and available technological, scientific and industrial state-of-the-art.

11.    The benefits of the challenged design of the X26 CEW alleged in the Complaint outweigh any inherent risk of danger in the weapon.

12.    TASER provided appropriate, adequate and sufficient warnings and instructions regarding the use of its X26 CEW product.

13.    TASER had no duty to warn of alleged risks of CEW-induced ventricular fibrillation (VF) from chest shots neither known to TASER nor recognized in the medical and scientific community in January 2007 when the subject X26 CEW was sold.

14.    TASER did not owe or breach any duty to Plaintiff.

15.    No warnings causation exists as a matter of law.

55

16.     Any damages suffered by Plaintiff were not proximately or legally caused by, or resulting from, conduct of TASER, its employees, or its products.

17.     Any damages sustained by Plaintiff were actually or proximately caused in whole or in part by a third party's criminal conduct and/or product misuse.

18.     Plaintiff's claims against TASER are barred for the reason that the damages, if any, were caused by an intervening and/or superseding cause or negligence of third parties whom TASER had no control and with respect to whom it had no legal responsibility or liability.   To the extent that any damages are awarded to Plaintiff, such damages should be allocated and apportioned to such entities or persons in proportion to their own degree of fault.

19.     Pursuant to the common law rights to credits, reductions and set-offs, and under Missouri Revised Statute § 537.060, when an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.   If TASER is found to be liable to Plaintiff, which TASER denies, TASER is entitled to a set-off for the amount of any settlement between Plaintiff and any other entities or persons whether made a party to this action or not.

20.     For further Answer and Affirmative Defense, Plaintiff fails to state claims or causes of action for punitive damages because such claims violate the Fourth, Fifth, Sixth, Seventh, Eighth and Fourteenth Amendments to the Constitution of the United States in the following respects:

a.      The claim for punitive damages violates the Fifth Amendment of the Constitution of the United States for the following reasons:

i.     The double jeopardy clause is violated because multiple awards of punitive damages can be imposed upon Defendants for the same act or omission and because an award of punitive damages can be imposed upon Defendants even though Defendants were convicted or acquitted of a factually related offense in an underlying criminal proceeding;

ii.     The self-incrimination clause is violated because Defendants can be compelled to give testimony against themselves;

b.     The claim for punitive damages violates the Sixth and Fourteenth Amendments to the Constitution of the United States because damages may be imposed by a less than unanimous jury based upon a burden of proof applicable in civil cases, whereas punitive damages are a fine or penalty and are quasi-criminal in nature;

c.     The claim for punitive damages violates the rights of Defendants to access the courts as guaranteed by the Seventh and Fourteenth Amendments to the Constitution of the United States because the threat of an award of unlimited punitive damages chills the exercise of that right;

d.     The claim for punitive damages violates the Eighth Amendment guarantees that excessive fines shall not be imposed;

e.     The claim for punitive damages violates the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States because:

i.     The standard or test for determining the requisite mental state of Defendants for the imposition of punitive damages is void for vagueness;

57

ii.     Insofar as punitive damages are not measured against actual injury to Plaintiff and are left wholly to the discretion of the jury, there is no objective standard that limits the amount of such damages as may be awarded, and the amount of punitive damages that may be awarded is determinate at the time of the egregious conduct of Defendants;

iii.     In cases involving more than one Defendant, the evidence of the net worth of each is admissible and the jury is permitted to award punitive damages in differing amounts based upon the affluence of a given Defendant;

iv.     The tests or standards for the imposition of punitive damages differ from state to state such that a specific act or omission of a given Defendant may or may not result in the imposition of punitive damages, or may result in differing awards of punitive damages, depending upon the state in which the suit is filed, such that Defendants are denied equal protection of the law;

v.     Punitive damages may be imposed without a requisite showing of hatred, spite, ill will or wrongful motive.

21.    Pursuant to Missouri Revised Statute § 510.263, TASER is entitled to a bifurcated trial on the issues of punitive damages and/or aggravating circumstances.

22.    TASER at no time acted, intentionally or otherwise, with malice, fraud or oppression, and is thus exempted from punitive and/or exemplary damages.

23.    For further Answer and Affirmative Defense, pleading alternatively and hypothetically, without waiving any prior denials, if TASER is found to bear less than fifty-one percent of the fault, then TASER shall only be responsible for the percentage of the judgment

for which TASER is determined to be responsible by the trier of fact, pursuant to Missouri Revised Statute § 537.067.

## RESERVATION OF ADDITIONAL DEFENSES

TASER reserves the right to plead as additional affirmative defenses, any of the items set forth in the Federal Rules of Civil Procedure, Missouri statutes and laws, and any other matter constituting an avoidance or affirmative defense as the same may be revealed during disclosure and/or discovery proceedings in this matter.

WHEREFORE, TASER demands judgment dismissing the Complaint and decreeing that Plaintiff takes nothing by it, awarding TASER its costs, attorneys' fees, and other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

TASER hereby demands trial of this matter by a jury.

Dated: January 17, 2017     Respectfully submitted,


         /s/ Tyson H. Ketchum

         Tyson H. Ketchum #50426
         ARMSTRONG TEASDALE LLP
         2345 Grand Blvd., Suite 1500
         Kansas City, MO 64108
         (816) 221-3420 (Phone)
         (816) 221-0786 (Facsimile)
         tketchum@armstrongteasdale.com

         Pamela B. Petersen (pro hac pending)
         Michael A. Brave (pro hac pending)
         TASER INTERNATIONAL, INC.
         17800 N. 85th Street
         Scottsdale, Arizona 85255
         (623) 533-3875 (Phone)
         (480) 905-2027 (Facsimile)
         ppetersen@taser.com
         mbrave@taser.com
         legal@taser.com (secondary)

         *Attorneys for TASER International, Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2017 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record in the above-captioned case.


         */s/ Tyson H. Ketchum*