**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **BRYCE E. MASTERS,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CITY OF INDEPENDENCE,** | ) **Case No. 4:16-cv-01045** |
| **SGT. BRYCE BLACKMORE,** | ) |
| **TIMOTHY RUNNELS,** | ) |
| **TASER INTERNATIONAL, INC.,** | ) |
| | ) |
| **Defendants.** | ) |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**JURISDICTION AND VENUE**

1.     Plaintiff alleges claims against Defendants City of Independence (City), Independence Police Department (IPD),  Sgt. Bryce Blackmore and former IPD officer Timothy Runnels pursuant to 42 U.S.C. § 1983. Federal jurisdiction is conferred by 28 U.S.C. § 1331 and § 1343(3).

2.     Plaintiff's products-liability claims against Defendants TASER International, Inc. (TASER), arise under the laws of Missouri. They are so related to the federal claims, however, that they form part of the same case or controversy and are therefore within the Court's supplemental jurisdiction pursuant 28 U.S.C. § 1367.

3.     The underlying incident occurred in Independence, Missouri, and therefore venue is appropriate in the Western District of Missouri pursuant to 28 U.S.C. § 1391(b)(2).

**PARTIES**

4.     Plaintiff Bryce E. Masters is an adult competent to bring suit. He is a citizen of Missouri. At the time of the incident, however, he was age 17.

5.     Defendant City is a municipality, a political subdivision of the State of Missouri.

6.     Defendant Bryce Blackmore is an IPD sergeant. Defendant Timothy

1

Runnels is a former IPD police officer. In doing the acts alleged herein each individual named above acted under color of Missouri state law, within the course and scope of his employment with the City and IPD. Defendant Runnels acted under the supervision of Chief Daily and Sgt. Blackmore.

7.     Defendant TASER International, Inc., ("TASER") is a Delaware Corporation with its principal place of business in Scottsdale, Arizona. Defendant TASER is engaged in the business of designing, manufacturing, marketing, distributing and selling products, including hand-held electrical weapons generally referred to as "tasers," but sometimes as "stun guns" or by an acronym such as "ECD," "NMI," "ESW," or "CEW," along with replacement cartridges and other accessories. Starting in 2013, TASER manufactured, distributed and sold the Model X26, the product used in this incident. As a component of its marketing, sales, and risk management, TASER designed, manufactured, distributed, sold, and administered taser training programs for its customer agencies. TASER manufactured and sold the X26 and XP cartridge fired at Bryce Masters, and promulgated the training program used by IPD and other agencies, including the Kansas City Police Department, to train Runnels on tasers. TASER is qualified to do business in Missouri.

**FACTS RELEVANT TO THE TASER MODEL X26**

8.     Jack Cover, an electrical engineer, invented tasers in the mid-1970s as a hand-held, non-lethal weapon for law-enforcement and correctional officers. Pulling the trigger fires two barbed darts designed to stick into clothing or flesh, each connected by a wire to the weapon. If both darts make adequate contact, an electrical circuit is completed and the taser discharges short, rapid pulses of electrical current that radiate through the tissue between the darts, causing muscle contractions intended to disable a person temporarily and safely. Mr. Cover's invention used the maximum electrical charge he believed to be cardiac safe.

- 2 -

9.      In the early 1990s, Defendant Rick Smith founded the company that later became Defendant TASER International, Inc., and acquired from Mr. Cover the trademark "TASER" – an acronym created by adding an "A" arbitrarily to the title of the children's book "Tom Swift's Electric Rifle" – along with various patents and licenses. Smith learned when attempting to create a market share for his products using Cover's original electrical specifications that tasers' popularity with law enforcement suffered due to the perception that the physiological effect of the electrical discharge was not powerful enough to satisfy end users.

10.     To boost sales to law enforcement and correctional agencies, so to dominate what was then a competitive market in tasers, Rick Smith increased his taser's electrical output four times, and released the "Advanced TASER Model M26" in late 1999.

11.     This substantial increase in the electrical current made the taser much more powerful, but also increased cardiac risk. Smith and TASER represented to their law-enforcement and corrections customer base, and ultimately to the end users of their products, that the M26's electrical current was within established safety margins, and that extensive animal and human testing comparable to that required by the FDA for testing new drugs and medical devices proved that the M26 current cannot affect heart rhythms. These claims were false. There were no applicable safety standards (TASER used dated, inapplicable electrical-fence standards), the animal testing was minimal, at best, and there was no scientific testing on human beings.

12.     In 2003, TASER began selling a lighter – yet slightly more powerful – taser, the Model X26.   The X26 is designed to pulse about 19 times a second through a five-second "cycle." The pulses result in a clicking sound, louder when a circuit is not complete, but audible regardless. Pulling and releasing the trigger fires the darts and initiates a five-second cycle that can be terminated earlier by engaging the safety and repeated by pulling the trigger again after a cycle ends. Of particular relevance to this case, cycles are prolonged when the user holds the trigger longer than five seconds. The X26 provides no warning or safety mechanism to prevent inattentive users from inadvertently holding the trigger during a tense field encounter, thereby continuing the cycle too long. The time and duration of each cycle is recorded on a chip in the X26 called the "dataport," which can be downloaded to document the time, number and duration of discharges.

13.     Although not directly relevant to this case, with the cartridge removed pulling the trigger cycles electricity between two electrodes, which can then be pressed against a person's skin, causing a painful burning sensation, a barbaric tactic TASER calls a "drive stun." Drive stuns can also be applied through an expended cartridge.

14.     To produce the equivalent disabling effect from a smaller power source, TASER increased the X26's pulse duration far beyond that of any previous taser. This longer pulse, even though it had lower peak amperage, increased the propensity of the X26 to "capture" cardiac rhythms when current flowed near the heart, thus increasing the risk of disrupting normal heart rhythms by triggering contractions where they do not belong, thereby creating the risk of inducing an arrhythmia, particularly ventricular fibrillation (VF), which invariably results in death unless promptly reversed with defibrillation shocks.

15.     TASER sells X26 cartridges with "extra-penetration" (XP) darts that can penetrate one-half inch or more into a human being, thus increasing cardiac risk by

- 4 -

transmitting current nearer the heart. The X26 is not cardiac safe with shorter darts, however, and animal testing has shown that the X26 can interfere with heart rhythm when the darts do not penetrate the skin at all, or even when using the X26 to "drive stun" the chest over the heart.

16.     TASER did not properly test or evaluate the cardiac risk of the X26 before distributing and selling it to law-enforcement and corrections agencies with representations (mostly based on testing of the M26, rather than the X26) such as "TASER tests have found no effect on heart rhythms" when "tested on animals," and "heart rate unchanged during TASER X26 stimulation directly through chest, across the heart." TASER and Smith knew their research was inadequate to support such categorical claims of cardiac safety, but made the claims in reckless disregard of the consequences, and solely for the purpose of encouraging X26 sales and use.

17.     TASER states that agencies should train their X26 users with TASER "certified" instructors using TASER training materials. Under the direct supervision of Rick Smith and other high-level TASER executives, including former "Vice President for Training" Rick Guilbault, TASER employs "senior master instructors" to train and "certify" TASER "master instructors," generally off-duty officers. TASER contracts with the master instructors to hold "schools" where they train and "certify" training officers from customer agencies as "instructors," who, in turn, train and "certify" individual officers in the customer agencies to use the X26.

18.     For use throughout the training process, TASER issues "training versions," revised about every year or two, which consist of "command demonstration," "instructor" and "user" PowerPoints comprised of slides and videos, along with forms, tests, lesson plans, warnings, and other documents.

19.     At irregular intervals TASER issues "training bulletins," along with product warnings and operating manuals. TASER directs master instructors and certified instructors to check TASER.COM within 72 hours of each class to insure

- 5 -
- 5 -

that the latest training materials are used.

20.     TASER conveys instructions for X26 use and warnings to customer agencies and their users through this training protocol, frequent emails, surface mail, and other methods. While customer agencies such as the IPD rely on TASER to provide accurate, up-to-date information on the safe use of the X26, TASER has an unresolvable conflict of interest in providing training for the use of its products to public agencies authorized to use force on members of the public. In particular, to increase its revenues from the sale of X26s and replacement cartridges, TASER has designed training to encourage X26 use, in part by minimizing risks and exaggerating the X26's effectiveness. At the same time TASER uses "fine print" with vague, ambiguous and sometimes conflicting warnings and instructions as part of a conscious risk-management strategy to shift liability arising from cardiac arrests from TASER to agencies, such as the IPD, and to end users, such as Runnels. TASER's multiple and conflicting interests make isolated quotations from TASER's training materials and their public statements, taken out of the context of the whole, potentially deceptive and misleading.

21.     Following the 2003 release of the X26 to law enforcement agencies, there were reports of cardiac arrests after discharges near the heart where the close proximity in time between the taser discharge and the cardiac arrest, and lack of a credible alternative explanation for the cardiac arrest, demonstrated that the direct effect of the X26 current on the heart rhythm was the cause of the cardiac arrest. (There were also in-custody deaths associated with X26 use involving other physiological mechanisms that are not relevant to this litigation.)

22.     The first such report to appear in a major medical journal was published the prestigious *New England Journal of Medicine* on September 1, 2005. The case is that of a 14-year-old Chicago boy named Akeem Watson who, like Bryce, became unresponsive immediately and was found to be in ventricular fibrillation within

minutes after being tased on the chest. Like Bryce, he was defibrillated, but not until after he too suffering anoxic brain injury. TASER sent its people to Chicago to discredit the report. They fabricated a false explanation, elongating the actual time course by about 18 minutes and falsely attributing the cardiac arrest to a bogus "excited delirium" diagnosis that had no basis in the records of that case.

23.     Starting in 2005, researchers began performing higher quality animal experiments to test the cardiac effects of the X26. TASER arranged for a leading electrophysiologist (a board-certified cardiologist who is also board-certified in the subspeciality of electrophysiology, the study of the heart's electrical rhythm), Patrick J. Tchou, M.D., of the Cleveland Medical Clinic, and his fellow, Dhanunjaya Lakkireddy, M.D., to perform X26 animal testing. TASER approved and funded the experiments, which it anticipated would tend to show that people with cocaine in their system are less likely to suffer cardiac arrest than those without. Darts were placed in various positions on pigs anesthetized for humane reasons, and five-second shocks were delivered using an X26 and a custom device modified to deliver increased charges.

24.     The Tchou-Lakkireddy study documented that standard X26 current "captured" cardiac rhythm when the darts were on the chest. The testing established beyond debate that darts to the chest, relatively near the heart, and only darts in that position, are likely to cause capture, and potentially trigger cardiac arrest. After they compiled the data Dr. Tchou and Dr. Lakireddy met with TASER representatives, including Rick Smith, and explained to them that darts near the heart can result in capture and therefore risk ventricular fibrillation.

1

25.     The data were presented at the Spring 2006 conference of the Heart
Rhythm Society (HRS), the professional organization of electrophysiology. They were
subsequently peer reviewed and published the following July in "Effects of Cocaine
Intoxication on the Threshold for Stun Gun Induction of Ventricular Fibrillation,"
*Journal of American College of Cardiology*, Vol. 48, No. 4, 8/15/2006: 805-11, and in
a follow up article, "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs
Contact Make a Difference?", *Pacing Clin. Electrophysiol.*, Vol. 31, 4/2008: 398-408.
Drs. Tchou and Lakkireddy wrote in 2006 that their "study is the first to describe
capture of ventricular myocardium during application of [taser] pulses." (As explained
below, another study came to the same conclusion at the same time.)

26.     In their second publication – based on data from the same 2005
TASER-funded testing – Tchou and Lakkireddy reported that the spread between the
darts (a function of the distance from which the X26 is fired) substantially affects the
cardiac risk, noting that a 15 centimeter spread – close range – has the greatest effect
on cardiac rhythm. The second study concluded, among other things, that "our data
would suggest that directing the barbs away from the PMI region [a point on the chest,
near the heart] and especially toward the back would markedly increase the safety
margins." "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact
Make a Difference?" p. 408.

- 8 -

27.     At the same 2006 HRS meeting , Kumaraswamy Nanthakumar, M.D., another prominent electrophysiologist, presented the results of his independent study entitled "Cardiac Electrophysiological Consequences of Neuromuscular Incapacitating Device Discharges," which was peer reviewed and published in the same volume as the TASER sponsored Tchou-Lakkireddy report: *Journal of the American College of Cardiology*, Vol. 48, No. 4, 8/15/2006: 798-804. This study replicated the Tchou-Lakkireddy findings on capture, and also showed for the first time that the X26 almost always causes capture when the darts are near the heart, at about double the rate of the shorter pulsed M26. Dr. Nanthakumar also documented an occasion where a prolonged X26 exposure caused fibrillation in an anaesthetized pig that had been given epinephrine to simulate the adrenaline surge of a person in an altercation with police officers.

28.     During 2007 and 2008, a second group of independent researchers, headed by Andrew J. Dennis, D.O., and based at Stroger Hospital of Cook County in Chicago, replicated the Tchou-Lakkireddy and Nanthakumar results, documenting capture, ventricular arrhythmias and cardiac arrests from X26 exposures to the chest. The results of these well constructed experiments were published in three separate peer-reviewed studies: (1) "Acute Effects of TASER X26 Discharges in a Swine Model," *Journal of Trauma,* Vol. 63, No. 3, 9/2007: 581-590, (2) "TASER X26 Discharges in Swine Produce Potentially Fatal Ventricular Arrhythmias," *Academy of Emergency Medicine*, Vol. 15, No. 1, 1/2008: 66-73), and (3) "Taser X26 Discharges in Swine: Ventricular Rhythm Capture is Dependent on Discharge Vector," *Journal of Trauma*, Vol. 65, No. 6, 12/2008: 1478-1487. They provided powerful confirmation that TASER discharges to the chest significantly increase the risk of cardiac arrest, especially when the exposures exceed five seconds.

29.     A 2007 peer-reviewed article by Michael Cao, M.D., Jerold S. Shinbane, M.D., Jeffrey M. Gillberg, M.S., and Leslie A. Saxon, M.D., "Taser-Induced Rapid Ventricular Myocardial Capture Demonstrated by Pacemaker Intracardiac Electrograms," *Journal of Cardiovascular Electrophysiology*, Vol. 18, No. 8, 8/2007: 876-879, documented cardiac capture for the first time in a human being, a California prison inmate with a pacemaker who was shocked in the chest by an X26. The medical device recorded cardiac capture coinciding with the tasing.

30.     Although TASER funded the Tchou-Lakkireddy study, and TASER knew that the Nanthakumar study, the Dennis studies and the Cao case report were peer-reviewed and scientifically sound, TASER and Smith maliciously, deliberately, wantonly and negligently failed to modify the design of the X26 or to change the warnings and training. For more than three years following the publication of the Tchou and Nanthakumar studies, TASER continued to sell X26s with what it then knew to be dangerous electrical characteristics and a trigger mechanism that allowed uses to prolong exposures beyond five seconds. The training continued to instruct users to "aim like a firearm at center mass" and used illustrations in training materials depicting law enforcement officers shooting persons directly in the chest with darts, where the risk of inducing ventricular arrhythmia is highest.

31.     The reason that Rick Smith and TASER stubbornly refused for years to instruct differently related to TASER's sales, which TASER and Smith placed above the safety of people shocked with its products. Police officers for whom the X26 was designed are trained extensively on aiming firearms. To maximize their efficacy as a defensive weapon, firearms are pointed at center mass. For officer safety law enforcement agencies drill "center mass" targeting into their officers "muscle memory." Modifying the X26 to make it safer by changing the electrical characteristics or trigger mechanisms, or marketing the X26 with directions that it must be aimed differently than a firearm, and with warnings that firing into the chest

- 10 -

- 10 -

of a human being – exactly where firearms are aimed – increases the risk of cardiac arrest, would have impacted the cost/benefit analysis made by potential customer agencies contemplating the purchase and deployment of tasers, and cost TASER and Smith money.

32.     TASER and Smith were concerned, from the point of view of agencies such as the IPD and managers such as Chief Dailey, that using X26s would mean paying to train officers to modify their "muscle memory" to distinguish between aiming firearms and aiming X26s. Moreover, TASER and Smith did not want agencies and managers to worry that firing an X26 into a person's chest and inadvertently triggering a cardiac arrest, after being warned not to do so, as happened in this case, would increase exposure to civil liability.

33.     The evidence that X26 chest shots elevate cardiac risk, however, mounted until it because undeniable – at least to everyone other than TASER, Smith and their acolytes, who to this day claim that the risk is so low it can be treated as zero. In May 2009, a TASER-funded study reported a 2004 cardiac arrest (Greshmond Gray) as consistent with X26 darts to the chest. Charles D. Swerdlow, M.D., et al., "Presenting Rhythm in Sudden Deaths Temporally Proximate to Discharge of TASER Conducted Electrical Weapons," *Society for Academic Emergency Medicine*, (May 2009). In June 2009 the Braidwood Commissions of Inquiry on TASER use in Vancouver, Canada, after extensive hearings in which TASER participated, along with many others, concluded:

•     There is evidence that the electrical current from a conducted energy weapon is capable of triggering ventricular capture.

•     Based on animal studies, I am satisfied that the greatest risk of ventricular fibrillation arises when the probes are vectored across the heart, and that the risk of ventricular fibrillation increases as the tips of the probes get closer to the wall of the heart.

•     There is a short "window" during the heart's normal beat cycle (the T-wave), when the heart is most vulnerable to an external electrical shock.   However, this narrow window does not apply to rapid ventricular capture causing ventricular tachycardia, which may degenerate into ventricular fibrillation.

- 11 -
- 11 -

• Although there is often a lack of physical evidence on autopsy to determine whether arrhythmia was the cause of death, if a person dies suddenly and from no obvious cause after being subjected to a conducted energy weapon, death is almost certainly due to an arrhythmia.

• The risk of ventricular fibrillation increases significantly in several circumstances—if the subject has cardiovascular disease or in thin subjects who have a smaller skin-to-heart distance. The intense pain, coupled with anxiety and stress, can cause an outpouring of adrenaline that can stimulate the heart and lead to dangerous arrhythmias. Skeletal muscle contractions can lead to acidosis, which affects the electrolyte balance, making the heart more susceptible to ventricular fibrillation. Also, an electrical current coinciding with the T-wave peak may induce fibrillation with a threshold 25 or more times lower than at other times in the heartbeat cycle.

34. In addition to the foregoing, tort suits arising from cardiac arrests and wrongful death were filed or threatened against TASER. Some based on the fact that TASER failed to warn about the risk of cardiac arrest when instructing officers to fire at the chest exposed TASER to liability. More and more customer agencies were being sued for wrongful death and forced to make large payouts.

35. Beginning with Training Bulletin 15.0 on September 30, 2009, TASER "implemented new risk management strategies, including revisions to product warnings and training." In typical TASER double-talk, the Training Bulletin calls "ventricular fibrillation . . . on the normal adult heart . . . unlikely," although "Researchers have concluded that a close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart," but then again that "the risk of an adverse cardiac event related to a TASER ECD discharge is deemed to be extremely low." Whoever deemed the risk of cardiac arrest "extremely low" for a supposedly non-lethal weapon is not identified. In fact there is no scientifically sound data with which to quantify the risk. Clearly – as TASER states in the midst of multiple disclaimers – the risk increases as the distance between the X26 current and the heart decreases. Regardless, the bulletin states: "We have issued a new TASER Targeting Guide," that "lowered the recommended point of aim from center of mass to lower-center of mass for front shots."

36. The revised targeting guide ignited an uproar in the law-enforcement and

- 12 -

corrections community, in part because TASER had been so adamant for so long that chest shots were cardiac safe. After years of reliance on TASER's representations of cardiac safety, many customers perceived the new "targeting guide" as a risk-management strategy to minimize TASER's liability by shifting fault to the customer agencies and their officers, increasing their exposure in lawsuits arising from X26 chest shots followed by cardiac arrest. TASER was forced to mollify its customers, essentially announcing that the "targeting guide" need not be taken seriously because cardiac arrest is not, in fact, a measurable risk of chest shots.

37.     On October 15, 2009, TASER issued: "TASER Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings." The document states: "The recent release of our Training Bulletin should not be interpreted as a significant change in how our products should be used," that the change in the preferred target zone "has less to do with safety and more to do with effective risk management for law enforcement agencies," that were a cardiac arrest to occur "involving a TASER® electronic control device (ECD) discharge to the chest area – plaintiff attorneys will likely file an excessive use of force claim against the law enforcement agency and officer and try to allege that the TASER ECD played a role in the arrest related death by causing ventricular fibrillation (VF), an arrhythmia that can be fatal without intervention," even though "[t]he available research does not support this." In sum, the reason for the targeting change is "improving risk management" rather than safety, a classic example of TASER talking out of both sides of its mouth. TASER distributed a video of Rick Guilbault reading the document.

38.     In response to the rhetorical question, "Can I still deploy my TASER ECD into the chest," the October 15, 2009 document responds: "Yes." "However, when the situation allows for sufficient time to intentionally aim the ECD and from a best practice standpoint, it is recommended to try, when possible, to aim for the preferred target areas shown in the new training bulletin . . . . While this may require

- 13 -

some slight modification to traditional target acquisition by lowering the point of aim several inches to lower center mass, this will play an important role in reducing risk management issues and avoiding litigation."

39.     On October 22, 2009, Rick Smith issued a statement containing unadulterated TASER double talk: "As you may have seen, there are sensational stories running in the media regarding a recent training bulletin from TASER International. Unfortunately, the stories in the public media are wildly inconsistent, and do not accurately represent the bulletin, or the rationale behind it."

Media is reporting [sic] that TASER is prohibiting chest shots because of a danger of cardiac arrest.

This is completely incorrect. TASER has RECOMMENDED slightly lowering the PREFERRED point of aim from center of mass to lower center of mass for shots to the front of the body. Aiming lower results in more effective TASER applications, further reduces the risk of accidental shots to the throat or eyes, and avoids the controversy over whether it is possible for the TASER to have an adverse effect on the "one in a million" person with a bad heart who is also high on drugs, etc – an impossible standard to meet, measure, or even quantify.

. . . .

. . . . We have not stated that the TASER causes VF events in this bulletin, only that the refined target zones avoid any potential controversy on this topic.

          . . . .

. . . . These recommendations are also intend [sic] to help our agency customers develop the most effective policies and training that are responsive to community concerns about how police officers can most safely respond to violent resistance.

. . . .    The recent release of our Training Bulletin should not be interpreted as a significant change in how our products should be used. The recommendations should be viewed as best practices that mitigate risk management issues resulting in more effective deployments while maximizing safety considerations such as avoiding the face, neck, and chest/breast shots.

- 14 -

40.     On October 23, 2009, Rick Smith hosted a conference call joined by hundreds of master instructors, trainers, distributors and representatives of customer agencies. Plaintiff is informed and believes that IPD and its representatives participated in the call directly or indirectly. The call lasted about two hours. Although TASER's corporate counsel Doug Klint and Medical Director Jeffrey M. Ho, M.D., were also on the call, Rick Smith was the dominant voice throughout. Smith repeated much of the same double-talk contained in the October 22, 2009, release.

41.     Smith began began the conference call: "'Are chest hits with the taser dangerous?' and the answer to that is definitively 'No.'" Dr. Ho added, "Categorically no," TASER had not seen instances of ventricular fibrillation from chest shots in field uses. This statement was deliberately false, as at that time TASER was aware of multiple instances of ventricular fibrillation following chest shots, including, but in no way limited to, Greshmond Gray in Georgia (2004), Akeem Watson in Illinois (2005), Steven Butler in California (2006), Darryl Turner in North Carolina (2008), Kevin Piskura in Ohio (2008), Derek Jones in Virginia (January 2009), and Kevin Mitchell in Michigan (April 2009). After referring to the data from independent research on animals, Dr. Ho said that the risk of an adverse cardiac event from a chest shot could be rounded to zero.

42.       Rick Smith told the listeners that agency policies should not be revised to prohibit chest shots, nor should such uses of a taser be classified lethal force. He said that the taser is more effective when shot lower (this is true), and aiming lower reduces the risk of head, throat and eye injuries (also true, although it increases both the risk of injury to genitalia and the likelihood that the lower dart will miss entirely, making the shot ineffective), but the "real and biggest reason here is risk management and eliminating the controversy." Based on an absurd hypothetical that TASER has not tested the X26  "on 60-pound persons with a ten-year history of abusing methamphetamine, who are high on a cocktail of drugs, who've been running from the police and are exhausted," Rick Smith said: "When we start talking about this risk there's been a lot of controversy whether the taser might affect this one-in-a-million person. And there have been pig studies on it. And if you do enough things to an anaesthetized pig you can cause some problems with the taser."  Referring to Braidwood, Rick Smith said that after the final report was issued, plaintiffs' lawyers would present wrongful death cases to juries, which could "go the other way" if there were chest shots and the death was "proximal to the use of the taser." Failure "as a community" to "take this into consideration" could expose "us" to "punitive damages that could be cataclysmic for either that agency or TASER International if the jury's convinced that collectively we've been non-responsive."

43.       Law enforcement and correctional agencies are generally immune from punitive damages, although TASER and Smith are not.

44.       Shifting to the other side of his mouth, Smith assured listeners that there was no increased cardiac risk from the X26: "If you have to use force on somebody, about one in 600 is going to die," he said, a fabricated statistic that conflates shootings with non-lethal techniques. Rick Smith falsely claimed there was "no human data supporting the need to" change the targeting guide. Doug Klint added that the animal studies "do not represent real life field situations but we're stuck with it." Finally,

Rick Smith concluded, "there is no evidence that we've seen, even in pigs, of a drive-stun to the chest" capturing heart rhythm. That ignores findings published in the TASER-funded"Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?"*Pacing Clin. Electrophysiol.*, Vol. 31, 4/2008: 398-408 at 405.

45.    Following the conference call, TASER made various piecemeal changes to its training materials and warnings, but none with the urgency and clarity that the situation warranted. TASER did not change the electrical characteristics to make its product cardiac safe, nor did it change the triggering mechanism. As a result, agencies like IPD and users like Runnels did not change their behavior sufficiently to minimize the risk of an adverse cardiac event.

46.       The evidence that TASER needed to change the design of the X26 and X26 training continued to mount. In July 2011, Tammy Lou Fontenot proved to a Charlotte, North Carolina, federal jury that a prolonged X26 cycle to the chest of her 17-year-old son Darryl Turner caused his death from cardiac arrest. Instead of trying to learn something, moving forward with a new design, training and warnings, however, within hours of the verdict, TASER issued a press release attributing the death to "hypertrophic cardiomyopathy (HCM), the leading cause of sudden cardiac arrest in young adults," a patently fabricated diagnosis rejected by both the medical examiner who performed the autopsy, the jury that heard the evidence, and the presiding federal judge who denied TASER's post-trial challenge to the verdict. After suggesting that the boy's death was linked somehow to a baggie of marijuana found in his sock, TASER cited out of context a statement in a "study just released by the United States Department of Justice that 'current research does not support a substantially increased risk of cardiac arrhythmia in field situations, even if the CED (TASER ECD) darts strike the front of the chest.'" Doug Klint, as President and General Counsel of TASER, is quoted as saying that "compassion for Mr. Turner's family . . . overwhelmed the scientific evidence presented in this case." TASER chose not to appeal that ruling, however, and the Fourth Circuit Court of Appeals affirmed the liability judgment.

47.     After losing several pretrial motions challenging causation in other products-liability cases based on cardiac arrests following X26 chest shots, late in November 2013, TASER filed a Form 8-K with the Securities and Exchange Commission, stating that "In 2009, the Company implemented new risk management strategies, including revisions to product warnings and training, to better protect both the Company and its customers from litigation based on 'failure to warn' theories." Accordingly, "Management believes that pre-2009 cases have a different risk profile than cases which have occurred since the risk management procedures were introduced in 2009. Therefore, the Company necessarily treats certain pre-2009 cases as exceptions to the Company's general no settlement policy in order to reduce caseload, legal costs and exposure. In November 2013, the Company agreed to settle two pre-2009 product liability lawsuits, where the Company had litigation exposure in excess of insurance coverage and the risk of potential high jury verdicts."

48.     Earlier in 2013, TASER revised its X26 warnings, for the first time using a "black box" stating: "**Cardiac Capture**. CEW exposure in the chest area near the heart has a low probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death." The warning adds, "Cardiac capture may be more likely in children and thin adults because the heart is usually closer to the CEW-delivered discharge (the dart-to-heart distance). Serious complications could also arise in those with impaired heart function or in those with an implanted cardiac pacemaker or defibrillator." "To Reduce the Risk of Injury:" the warning states, in reference to a diagram: "Use preferred target areas. The preferred target areas (blue) are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart distance and reduce cardiac risks. Back shots are preferable to front shots when practicable."

- 19 -

49.     Corresponding changes were made in training materials. Version 19, X26 User Course slides 14-16 issued simultaneously with the revised warning, state: CEW cardiac risks are not zero.

CEW cardiac risks are sufficiently remote that making accurate risk or probability estimates are very difficult.

Experts have identified the following key factors related to CEW cardiac risks:

Dart-to-heart ("DTH") distances,

Amount of delivered electrical charge

The further a CEW dart is away from the heart and the lower the delivered electrical charge the lower the risk of the CEW affecting the heart.

To reduce cardiac risks (when possible):

Target the back

Avoid targeting chest

Avoid prolonged and repeated exposures

50.     There are several problems with these more recent slides, which IPD used to "recertify" Runnels on the X26 in January 2014. Most notably, given the long history of TASER and Smith assuring customers that the X26 is cardiac safe even when fired directly into the chest, the mealy-mouthed new warnings and training, when viewed in the context of all the contradictory assurances made by TASER and Smith, do not convey the urgency necessary to change the behavior of law enforcement and corrections bureaucracies, or of end users lulled into a false sense of complacency.

51.     For years TASER attacked and sought to discredit everyone who raised a concern about cardiac safety, such as the North Carolina *Fontenot* jury, and insisted that the X26 was cardiac safe under all circumstances. TASER has continued to do so, either directly or through highly compensated surrogates such as electrical engineer Mark Kroll, the head of TASER's "Scientific and Medical Advisory Board," and Jeffrey Ho, M.D., an emergency medicine doctor whom TASER considers its top medical researcher. On September 6, 2015 – a mere eight days before Bryce Master's

- 20 -
- 20 -

X26 induced cardiac arrest – TASER lawyer Michael Brave published his revised 309-page "brief outline," replete with absurd claims such as "The demonstrated incidence of [taser]-induced cardiac arrest is extremely low, if not zero," "Conclusions of a connection between [taser] use and cardiac arrest are speculative at best," and "The overall theoretical VF risk [for 9 mm darts] was estimated not to exceed 1 in 2,873,147." (Brackets in original).

52. TASER's and Smith's constant representations that the risk is "low," or "speculative" are not based on data, and are intended to counteract agency, managerial and user concerns that an X26 fired into the chest can trigger a cardiac arrest leading to death or catastrophic brain injury. Training users on the "amount of delivered electrical charge" makes no sense as the X26 has no mechanism for varying the amount of delivered electrical charge per pulse. That phrase only adds confusion. "Target the back," and "Avoid targeting chest" will reduce cardiac risk. Given the frequency of X26 use in dynamic field encounters when the user is facing the person targeted, however, chest shots are inevitable, especially as lowering the point of aim is impractical as it increases the probability the lower dart will miss altogether. Other than "Avoid prolonged or repeated exposures," the training does not instruct users what to do when the inevitable chest shots occurs.

53. TASER's warnings and instructions should have included additional warnings and instructions, such as to consider engaging the safety to terminate exposures if the darts hit the front chest. TASER should have advised agencies to equip their patrol cars and locations, such as jails, where the X26 might be used with automatic external defibrillators (AEDs), and to train users that whenever a person becomes unresponsive shortly after an X26 exposure they need to immediately summon paramedics and rule out ventricular fibrillation with the AED, if available, or otherwise to use CPR and other lifesaving measures until paramedics arrive, and to not do what Runnels did, like the Charlotte-Mecklenburg officer who tased Darryl

- 21 -

Turner in the cheast – assume that the unresponsive person is "faking."

54.     TASER's minimal, equivocal modifications of warnings and training, coupled with its continuing insistence of cardiac safety, has not changed the behavior of agencies and users, and shows that TASER's actual motivation is to shift liability to its customers and product users, as it will attempt in this case.

55.     TASER's language constitutes a tacit admission that the X26's "amount of delivered electrical charge," when too close to the heart, is not cardiac safe. An effective weapon can be produced with a lower "delivered electrical charge," and in fact the current tasers, including the X2 and X26P, deliver less electrical charge, thus increasing the cardiac safety of the tasers without reducing their utility.

56.     Moreover, chest exposures, especially from close range, not only carry more cardiac risk than back shots, they also are significantly less effective because the middle of the chest has neither the muscles nor nerves necessary for the X26 electrical current to incapacitate the person targeted, an inherent flaw in taser technology not adequately described in TASER warnings and training. Confronted with a person who appears not incapacitated by the X26 cycle, even though he may have darts stuck in his chest, along with the stress inherent in a use-of-force situation, many users find themselves inadvertently holding the trigger, rather than letting go, prolonging the TASER cycle and, as TASER now concedes, increasing the risk of cardiac arrest. That is exactly what happened in the 2008 Darryl Turner death in North Carolina, and that is exactly what happened here.

57.     TASER knows from training and field uses that some users hold the trigger. To make the device less dangerous, the X26 triggering mechanism should instead be that each cycle ends when the user releases the trigger or at five seconds, whichever occurs first. Repeating the discharge after each five-second cycle should require the user take an affirmative action – release and pull the trigger again.

58.     TASER and Smith refused to take any of the foregoing actions, or any

- 22 -

other action, to minimize the cardiac risk of the X26, thousands of which remain in circulation and are used on human beings every day. In the foregoing fashion, TASER and Rick Smith maliciously, intentionally, deliberately, wantonly, recklessly and negligently placed a defective, unreasonably dangerous product in the stream of commerce, and misrepresented the medicine and science to their customers and users, defrauding them, lying to them, and misleading them concerning   crucial facts that the risk of an adverse cardiac effect increases dramatically when the darts are vectored across the chest or located close to the heart, while at the same time giving false assurances of safety, which have led to more incidents of cardiac arrest, including Bryce Master's nearly fatal encounter with the IPD and Runnels.

## FACTS RELATIVE TO PLAINTIFF'S CARDIAC ARREST

59.    Plaintiff understands that TASER sold the X26 Runnels used on Plaintiff, serial number X00-249486, through Ed Roehr Safety Products Co., its Missouri distributor, during January 2007. From before that date through after the date of this incident, September 14, 2014, TASER maintained contact with IPD and its "certified X26 instructors" through its training program and various protocols.

60.    Prior to his employment with IPD, the Kansas City Police Department hired Timothy Runnels and trained him on the X26. Because of poor judgment and temperament, however, the Kansas City Police Department compelled Runnels to resign, and, after a survey of his chain of command, designated him not eligible for rehire. IPD Chief Dailey, who retired as a major from the Kansas City Police Department after 27 years, knew the significance of the designation "not eligible for rehire." In spite of the designation and Chief Dailey's understanding of its significance, and numerous other indicators of Runnels' lack of fitness to be a police officers, the IPD hired Runnels with deliberate indifference to his fitness, and without conducting the necessary due diligence by contacting officials from the Kansas City Police Department, who would have told IPD that Runnels should not be hired and

- 23 -
- 23 -
Case 4:16-cv-01045-GAF   Document 82   Filed 01/06/18   Page 23 of 39

employed as a police officer.

61.     This incident began about 3:00 in the afternoon on Monday, September 14, 2014, when Runnels saw Bryce Masters, whom he knew from prior contacts, driving lawfully in Independence. For no discernable reason Runnels ran the license plate on the car and then ran Bryce Masters by name. At 3:06 Runnels pulled Bryce over on Southside near Main Street, in front of Bryce's friend's home. There were no wants or warrants attached to the car, which had current registration and insurance, and there were no wants or warrants for Bryce. After the stop, the inquiry on the plate came back to a forty-year-old female driver of another car who had failed to appear on a speeding ticket. (Characters were transposed when the plate was entered by a clerk for the Pulaski County Sheriff.) The information obviously did not pertain to Bryce or the car he was driving. Thus the traffic stop and subsequent seizure of Bryce was made without any reasonable suspicion or probable cause.

62.     The ensuing events were captured in full by an IPD car camera, which includes audio and video, and most of the initial contact between Runnels and Bryce was captured from another angle on Plaintiff's cell phone video camera. Over the next minute, Runnels approached the passenger's side, exchanged words with Bryce, then went to the driver's side and opened the door. At this point Bryce began recording. Bryce asked repeatedly why he was being detained and whether he was under arrest. Runnels never gave any reason for the traffic stop because he had none. Instead he ordered Bryce out of the car. Runnels threatened to tase Bryce if he didn't get his "ass out right now." Runnels reached into the car but appeared unable to pull Bryce out. Runnels called for backup. Runnels pointed the X26 at Bryce and said, "Alright, fuck it. Just get out."

63.    At 3:08:50 Runnels shot Bryce with his X26, with both darts in the chest. The discharge and clicks are on the recording, along with Runnels' commands, which made no sense because the X26 is supposed to incapacitate. The clicks last 23 seconds, and the dataport download records that Runnels held the trigger for at least 20 seconds. Because the chest shot did not incapacitate Bryce due to the inherent flaw in the technology described above, Bryce was able to get out of the car. As he seems to be laying down he collapsed onto the asphalt, screamed, and then moaned. Runnels said, "I told you," and then radioed "10-19" to let everyone know he had the situation under control.

64.    The X26 cycle ends at 3:09:10, with Bryce unresponsive for at least the last five seconds. Runnels set his X26 on the asphalt. Bryce was unresponsive as Runnels handcuffed him behind his back. Ordering Bryce to stand, Runnels grabbed him by the arms, dragged him around to the rear of the car, and threw him face first into a concrete driveway, breaking multiple teeth and causing blood to flow from Bryce's mouth. Runnels asked rhetorically, "You don't like to play by the rules, do you?" as he searched Bryce, taking items from his pockets and throwing them on the ground.

65.    Runnels radioed, "10-19, one in custody. If you want to start AMR [an ambulance] to check him out, that's fine." Runnels asked, "Do you want to sit up?" and then said, "Bryce, you better sit up, I don't play games." The only sounds from Bryce were occasional moans associated with agonal breaths that can continue for minutes after a cardiac arrest. Runnels then asked, "You ready to sit up now? I've been tasered a dozen times and it doesn't act like that." A minute later, Runnels radioed Bryce's name and spelling, then asked him again to sit up.

66.    At 3:12:25, Sgt. Blackmore arrived. Runnels said, "He doesn't want to sit up so I'm not going to make him until the ambulance gets here." Runnels added, "I pulled him over because he ducked me as soon as I got behind him," and "I told him

to open the door. He won't open the door." At 3:13:20, Runnels rolled Bryce over and tried to sit him up. Blackmore said, "Wake up, guy." At 3:14 Blackmore radioed, "Make it an emergency." Blackmore did not direct Runnels to use an AED, although the IPD equips patrol cars with the life-saving device and trains officers to use it.

67.     The first medical responders arrived at the patient at 3:15:30. By this time, Bryce had been in cardiac arrest for more than seven minutes without CPR and had turned blue, "cyanotic." Within seconds the ambulance crew noted the severity of Bryce's situation and requested a fire unit. They initiated CPR. At 3:18:30 they defibrillated Bryce, announcing a pulse 36 seconds later. Runnels lied to the medical responders, saying Bryce had been down for "maybe two minutes," rather than seven, before their arrival.

68.     The ambulance left shortly before 3:27 p.m. for the emergency room at Centerpoint Medical Center in Independence. The medical staff initiated a cooling protocol that minimized Bryce's anoxic brain injury, and, remarkably, he survived, regained consciousness, and began the slow, painful recovery that continues to this day.

69.     Despite having the patrol car video recording, with audio, the IPD immediately ratified Runnels' conduct by, among other things, issuing a press release stating that Runnels' actions were "within policy."

# FIRST CLAIM FOR RELIEF

## 42 U.S.C. § 1983 – Entity and Supervisory Liability

### (Against Defendants City)

70.     Plaintiff incorporates by reference each of the foregoing allegations.

71.     Defendant City, with deliberate indifference, gross negligence, and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiff, and all persons similarly situated, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies, practices, and customs of, among other things,

a. Relying without appropriate skepticism on training and warnings from TASER, even though the manufacturer has a conflict of interest and has been repeatedly discredited for misrepresenting product safety, instead using TASER materials for the formulation of IPD training, standards and policy;

b. Allowing IPD officers to shoot people with the X26 without adequate training and knowledge of its cardiac dangers;

c. Not training IPD officers how to respond when a person becomes unresponsive after a taser chest shot, including using an AED or CPR;

d. Tolerating IPD officers who make arbitrary traffic stops and harass drivers without reasonable suspicion or probable cause;

e. Subjecting persons to tasers and other uses of force that are unreasonable or excessive under the circumstances;

f. Allowing officers to retaliate against persons who complain about officer misconduct or otherwise question their authority;

g. Selecting, retaining, and assigning officers with deliberate indifference to those officers demonstrable propensities for excessive force, false arrest, and other misconduct;

h. Failing to adequately train, supervise, and control officers in the arts of law enforcement, including dealing with complaining or questioning civilians;

i. Failing to adequately investigate and discipline officers involved in misconduct; and

j. Condoning and encouraging officers in the belief that they can violate the rights of persons such as the plaintiff in this action with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

72.     Defendant City, Chief Dailey and other IPD supervisors knew or reasonably should have known that officers use X26s unreasonably, and otherwise use excessive force against individuals who question their authority. Despite this knowledge, defendants failed to take any steps to remedy these constitutional through adequate hiring, training, supervision and monitoring. In so doing, Chief Daily and other supervisors set in motion the forces that caused Plaintiff's injuries, and exhibited deliberate indifference to or tacitly approved the constitutional deprivations of Plaintiff and others similarly situated.

73.         Defendant City and Chief Dailey ratified the wrongful conduct of Runnels alleged herein.

74.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and attorneys' fees, but not punitive damages under this claim for relief.

### SECOND CLAIM FOR RELIEF

42 U.S.C. § 1983 – Individual Liability for

Wrongful Detention and Excessive Force

(Against Defendant Runnels)

75.     Plaintiff incorporates by reference each of the foregoing allegations.

76.     Defendant Runnels, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including those secured by the Fourth Amendment by, among other things: (1) Detaining Plaintiff without reasonable suspicion that he was engaged in criminal activity, (2) firing an X26 into Plaintiff's chest–a potentially lethal use of force where no force, much less potentially lethal force–was objectively reasonable, (3) prolonging the X26 discharge, and (4) after inducing a cardiac arrest that rendered Plaintiff unresponsive, picking up

Plaintiff's limp body and throwing it face first into concrete, smashing his mouth.

77.     In detaining Plaintiff without reasonable suspicion, and then using excessive and unreasonable force, Defendant Runnels did not act for any legitimate law enforcement purpose, but rather as a result of Plaintiff's questioning his authority and reason for the traffic stop, and for video recording him with a cell phone, all First-Amendment protected activities. Defendant's actions as described above were unreasonable in light of the facts and circumstances confronting Defendant.

78. Defendant's actions were committed with a wanton disregard and reckless indifference to the rights and needs of Plaintiff.

79.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and punitive damages, as well as attorneys' fees, under this claim for relief.

## THIRD CLAIM FOR RELIEF

42 U.S.C. § 1983 – Individual Liability for Medical Indifference

(Against Defendant Runnels and Blackmore)

80.     Plaintiff incorporates by reference each of the foregoing allegations.

81.     Defendants Runnels and Blackmore, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including those secured by the Fourth and Fourteenth Amendments by, among other things, acting with deliberate indifference to Bryce's medical needs by not treating his cardiac arrest with an AED or CPR, or both, under circumstances where a reasonable person would know and easily recognize that Plaintiff required immediate medical attention. The actions of the officers were so dangerous and the risk to Plaintiff so obvious that a knowledge of that risk can be presumed.

82.     Defendants Runnels and Blackmore were both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they also drew the inference. Despite the fact that Bryce was lying on the side of the road

without pulse or respiration, and was turning blue, both Runnels and Blackmore refused to treat him, ignored his condition, and recklessly failed to use their AED and give him CPR, and otherwise engaged in conduct that clearly evinced a wanton disregard and deliberate indifference for Bryce's serious medical needs. Defendants' actions in failing to provide plaintiff medical attention before the paramedics arrived were objectively unreasonable in light of the serious risks posed by Plaintiff's serious medical condition.

83.     As a result of Defendants' deliberate indifference to his medical needs, Bryce sustained greater anoxic brain injury than he otherwise would have sustained, with the consequential enhanced residual effects.

84.     Defendants' actions and omissions were committed with a wanton disregard and reckless indifference to the rights and medical needs of Plaintiff.

85.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory damages and punitive damages, as well as attorneys' fees, under this claim for relief.

### FOURTH CLAIM FOR RELIEF

Mo. Rev. Stat. § 537.760(3)(a) – Strict Products Liability Defective Product
(Against Defendants TASER)

86.     Plaintiff incorporates by reference each of the foregoing allegations.

87.     Defendants TASER, and each of them, designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the X26, which was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, as alleged above. These defects were capable of causing, and in fact

- 30 -

caused, personal injuries to Plaintiff and others similarly situated when used in a manner reasonably foreseeable, thereby rendering X26s unreasonably unsafe and dangerous for their intended use, and not as safe as a consumer would expect.

88.    As alleged above, Runnels used the X26 in a manner reasonably anticipated, and Plaintiff was injured as a direct result of such defective condition as existed when the product was sold.

89.    As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

**FIFTH CLAIM FOR RELIEF**

Mo. Rev. Stat. § 537.760(3)(b) – Strict Products Liability Failure to Warn

(Against Defendants TASER)

90.     Plaintiff incorporates by reference each of the foregoing allegations.

91.     Defendants TASER, and each of them, designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the X26, which was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

92.     As alleged above, Runnels used the X26 in a manner reasonably anticipated, and Plaintiff was injured as a direct result of the product being sold without an adequate warning.

93.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

## SIXTH CLAIM FOR RELIEF

### Negligence

### (Against Defendants TASER)

94.     Plaintiff incorporates by reference each of the foregoing allegations.

95.     At all times herein mentioned, Defendants TASER, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, warranting, instructing, providing warnings for, and advertising the X26, which these defendants knew, or in the exercise of reasonable care should have known, would be used without inspection for defects or dangers in their parts, mechanisms or design, or without conducting independent research into their safety.

96.     Defendants' product was unreasonably dangerous and defective for use on human beings because, among other things, as alleged above it was negligently designed, manufactured with unsafe electrical characteristics and trigger mechanisms, and was sold with defective instructions for use and without warnings of the risks and dangers described herein.

97.     At all times herein mentioned, Defendants TASER, and each of them, negligently and carelessly designed, manufactured, sold, distributed, installed, fabricated, assembled, bought, inspected, altered, maintained, serviced, tested, repaired, marketed, warranted, provided warnings, instructed, and advertised their unreasonably dangerous defective product in that Defendants knew or should have known that the device was capable of causing, and did in fact cause, personal injuries, including cardiac arrest, and even death, to persons while being used in a manner reasonably forseeable, thereby rendering the product unsafe and dangerous for its intended use.

98.     As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

- 33 -
- 33 -

## SEVENTH CLAIM FOR RELIEF

### Negligent Training Program and Materials

### (Against Defendants TASER)

99.     Plaintiff incorporates by reference each of the foregoing allegations.

100.    At all times herein mentioned, Defendants TASER, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, warranting, instructing, providing warnings for, and advertising the X26. As alleged above, in connection with those activities, TASER has promulgated a training program for customer agencies and their end users which imposes on TASER a duty to exercise care.

101.    Defendants TASER breached their duty to exercise care when they deliberately chose not to timely and reasonably revise TASER training protocol and materials to instruct instructors and users to avoid shots to the chest because of the increased risk of cardiac arrest for its own marketing reasons, and failed to warn of material facts regarding the safety and efficacy of the X26, including that shots to the chest, near the heart, increase the risk of cardiac arrest. Had TASER done so, proper training could have been given and proper warnings could have been heeded. When TASER finally did address the increased cardiac risk of chest shots, they did so in a contradictory and mealy mouthed manner not intended to modify the behavior of customer agencies or users, but only to create a paper record that could be used to shift their liability to customer agencies such as the IPD, and users such as Runnels.

102.    TASER failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the X26. Had TASER done so, law enforcement professionals would have more safely deployed the X26.

103.    As a proximate result, Plaintiff was damaged as hereinabove alleged. Plaintiff seeks compensatory and punitive damages under this claim for relief.

## COMPENSATORY DAMAGES

104.    Despite Bryce's ten minutes without a spontaneous heart rhythm, due to the heroic actions of the medical responders at the scene and the staff in the emergency room Bryce survived and regained consciousness. Bryce has regained much of his ability to to think, speak, recall and sense the world around him. He had extensive dental work to repair the damage to his mouth. The incident, compounded by the residual effects of the anoxic brain injury have had, and will continue to have, a profound effect on Bryce, however. He lives not only with memory deficiencies and other cognitive impairments, he has post-traumatic stress, extreme anxiety, and severe insomnia that makes interpersonal relationships challenging and difficult to an extent that they were not before his anoxic brain injury.

105.    As a direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the Defendants, and each of them, as alleged in this complaint, plaintiff Bryce Masters has been seriously injured in his health and person. He has sustained permanent brain and dental injuries, along with psychological and emotional trauma. As a result, Plaintiff has suffered and will continue to suffer great mental and physical pain, anguish, fright, nervousness, anxiety, shock, changes in personality, loss of memory and cognitive acuity, humiliation, indignity, embarrassment, harm to reputation, and apprehension about his future, and other general damages, in an amount to be determined at trial.

106.    As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, and each of them, Plaintiff suffered past and future losses of income, and other economic losses, in amounts to be determined at trial.

107.    As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, and each of them, Plaintiff incurred

medical expenses, and will incur future medical expenses, and other out-of-pocket financial losses, in amounts to be determined at trial.

## PUNITIVE DAMAGES ALLEGATIONS

108.    Defendants City is immune from punitive damages. Each of the other Defendants acted outrageously, willfully, wantonly, maliciously and oppressively, with evil motive and complete indifference to, and in conscious disregard for the safety and rights of Plaintiff and others similarly situated, entitling Plaintiff   to exemplary and punitive damages in amounts to be proven at trial.

109.    Defendants TASER knew of the defects and danger in the X26 when they sold the product to IPD in January 2007, and had information from which TASER, in the exercise of ordinary care, should have known that their sales of the X26 created a high degree of probability of injury, and thereby showed complete indifference to and conscious disregard for the safety of others.

## PRAYER

WHEREFORE Plaintiff prays for judgment against Defendants as follows:

1.      On the First Claim for Relief, Entity Liability against the City of Independence andIndependence Police Department, compensatory damages according to proof and § 1988 attorneys' fees;

2.      On the Second Claim for Relief, Wrongful Detention and Excessive Force against Timothy Runnels, compensatory and punitive damages according to proof and § 1988 attorneys' fees;

3.      On the Third Claim for Relief, Deliberate Indifference to Medical Needs against Timothy Runnels and Bryce Blackmore, compensatory and punitive damages according to proof and § 1988 attorneys' fees;

4.      On the Fourth Claim for Relief, Strict Products Liability – Defective Product, against TASER International, Inc., compensatory and punitive damages

according to proof;

5.    On the Fifth Claim for Relief, Strict Products Liability – Failure to Warn, against TASER International, Inc., compensatory and punitive damages according to proof;

6.    On the Sixth Claim for Relief, Negligence – Products Liability – Failure to Warn, against TASER International, Inc., compensatory and punitive damages according to proof;

7.    On the Seventh Claim for Relief, Negligence – Training Program and Materials, against TASER International, Inc., compensatory and punitive damages according to proof;

8.    On all causes of action: Prejudgment interest according to law, costs of suit, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE LAW OFFICES OF JOHN BURTON

By *s/s John Burton*
John Burton, (CA Bar 86029) *Pro Hac Vice*
128 North Fair Oaks Avenue
Pasadena, California   91103
(626) 449-8300
Fax (626) 449-4417
jb@johnburtonlaw.com

THE HAUS LAW FIRM, LLC

By *s/s Daniel J. Haus*
Daniel J. Haus, MO Bar No. 45678
7926 East 171st Street, Suite 106
Belton, Missouri   64012
(816) 591-3960
Fax (816) 245-7802
dhaus@hauslawfirm.com

PRESLEY & PRESLEY, LLC

By /s/ Kirk R. Presley

- 37 -

- 37 -

Kirk R. Presley     MO Bar No. 31185
Matthew A. McCoy MO Bar. No. 68240
4801 Main Street, Suite 375
Kansas City, MO 64112
Phone: (816) 931-4611
Fax:    (816) 931-4646
Email: kirk@presleyandpresley.com
           matthew@presleyandpresley.com

- 38 -

1

## DEMAND FOR JURY TRIAL

2

3    Plaintiff demands trial by jury on all issues.

4

5                              Respectfully submitted,

6                              THE LAW OFFICES OF JOHN BURTON

7

8                                  By *s/s John Burton*
                             John Burton, (CA Bar 86029) *Pro Hac Vice*
9                            128 North Fair Oaks Avenue
                             Pasadena, California   91103
10                           (626) 449-8300
                             Fax (626) 449-4417
11                           jb@johnburtonlaw.com

12                           THE HAUS LAW FIRM, LLC

13                           By *s/s Daniel J. Haus*
                             Daniel J. Haus, MO Bar No. 45678
14                           7926 East 171st Street, Suite 106
                             Belton, Missouri   64012
15                           (816) 591-3960
                             Fax (816) 245-7802
16                           dhaus@hauslawfirm.com

17                           PRESLEY & PRESLEY, LLC

18                           By /s/ Kirk R. Presley
                             Kirk R. Presley      MO Bar No. 31185
19                           Matthew A. McCoy MO Bar. No. 68240
                             4801 Main Street, Suite 375
20                           Kansas City, MO 64112
                             Phone: (816) 931-4611
21                           Fax:     (816) 931-4646
                             Email: kirk@presleyandpresley.com
22                                   matthew@presleyandpresley.com

23

24

25

26

27

28

                                   - 39 -