```
 1            IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2

 3

 4   BRYCE E. MASTERS,              )
                                    )
 5           Plaintiff,             )
                                    )
 6      vs.                         )     Case No.
                                    ) 4:16-cv-01045-GAF
 7   CITY OF INDEPENDENCE, et al., )
                                    )
 8           Defendants.            )

 9

10

11       VIDEOTAPED DEPOSITION OF TIMOTHY RUNNELS

12
                 TAKEN ON BEHALF OF THE PLAINTIFF
13

14                      MARCH 2, 2018

15

16

17

18

19

20

21

22

23

24

25                                     EXHIBIT 17
```

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 4:16-cv-01045-GAF    Document 230-4    Filed 10/01/18    Page 1 of 3

Page 61

1    A.  Yes.
2    Q.  All right.  So he's trying to do the best
3  he can by that point.
4        Wouldn't you agree?
5    A.  No.
6    Q.  Well, how is he not complying with anything
7  you've asked?
8    A.  He did not get out when I ordered him to.
9    Q.  Before you asked him to get out of the car.
10   A.  He did not roll down the window when I told
11 him to.
12   Q.  Did he tell you he couldn't roll down the
13 window?
14   A.  I do not know.
15   Q.  He showed you -- he did not prevent you
16 from opening the door; correct?
17   A.  The door was able to be opened, yes.
18   Q.  You knew at that point that he was the sole
19 occupant of the vehicle; true?
20   A.  Once the door was opened.
21   Q.  And that he had both hands on his cell
22 phone videotaping your conduct?
23   A.  I'm not sure about both hands.
24   Q.  He had his cell phone out and at least in
25 one hand.

Page 62

1       You would agree?
2    A.  Sure.  Yes.
3    Q.  And he was videotaping your conduct; isn't
4  that correct?
5    A.  It appeared to be he was.
6    Q.  The same thing that led to your arrest and
7  handcuffing of Ms. Bradford?
8    A.  Correct.  We were also trained not to allow
9  to point -- to have anything pointed in our general
10 direction --
11   Q.  Okay.
12   A.  -- video phone or not, because we don't
13 know what it is until after the fact.
14   Q.  So you knew it was a cell phone, though,
15 when you opened the door?
16   A.  After the fact.
17   Q.  Yes, after.
18       So by the time you've opened the door, you
19 had the opportunity, instead of ordering him to get
20 out of the vehicle, to ask for his driver's license,
21 registration, and proof of insurance; isn't that true?
22   A.  I could have, but at that time, he was
23 already interfering, so I was going to place him in
24 handcuffs until I could figure out what was going on.
25   Q.  You could have, but you chose not to,

Page 63

1  didn't you?
2    A.  Based on his actions, yes.
3    Q.  In fact, you chose to escalate the
4  situation, didn't you?
5    A.  No.
6    Q.  And you're trained to de-escalate the
7  situation; isn't that correct?
8    A.  We were trained to, yes.
9    Q.  In fact, you're trained to inform the
10 violator of what laws were violated and the intended
11 enforcement action?
12   A.  In ideal situations, yes.
13   Q.  All right.  So when you're standing there
14 yelling at Bryce to get out, is there any reason why
15 you couldn't say, "Bryce," or whoever, "you violated
16 whatever traffic law"?
17       MR. CUTLER:  Object to the form of the
18 question and use of the word "yell."
19   A.  Repeat, please.
20   Q.  (By Mr. Presley)  Yeah.  Is there any
21 reason you couldn't tell him and inform them what
22 traffic law was being violated and what your intended
23 enforcement action was?
24   A.  At that point, like I said, he had already
25 interfered with the investigation and wasn't following

Page 64

1  my orders, so I was going to get him out and secure
2  him prior to continuing.
3    Q.  Well, isn't the whole point of informing
4  the violator of what laws are being violated and the
5  intended enforcement action designed to de-escalate
6  the situation?
7    A.  In ideal situations.
8    Q.  And in -- you don't know what his response
9  to that would have been.  He might have said, "Okay.
10 Well, if that's the case, I'll get out of the car."
11 Do you?
12       MR. CUTLER:  Object to the form of the
13 question.
14   A.  Repeat, please.
15   Q.  (By Mr. Presley)  You don't know what his
16 response would have been had you taken the time to
17 inform him of what laws were being violated?
18   A.  I do not know what his response -- but
19 based on his mannerisms so far, he did not appear to
20 be compliant.
21   Q.  Well, in fact, you don't tell him what law
22 he's violated because he's violated no law; isn't that
23 true?
24   A.  The law was the window tint.
25   Q.  But you never told him that?

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:16-cv-01045-GAF     Document 230-4     Filed 10/01/18     Page 2 of 3

Page 101

1  act, because I believe him to be further
2  non-compliance.
3      Q.  So you told Bryce that you'd been tased a
4  dozen times, and it doesn't act like that; true?
5      A.  True.
6      Q.  And that was not correct.  You've been
7  tased once?
8      A.  I said it for the fact to reiterate he
9  needs to stop acting that way because I believe him to
10 be acting non-compliant.
11     Q.  My only question is:
12         You've been tased once; is that correct?
13     A.  Correct.
14     Q.  Where were you tased?
15     A.  In the police station.  I volunteered to be
16 tased.
17     Q.  Where in the body?  Bad question.
18     A.  My back.
19     Q.  When you were tased, did you become
20 immobilized?
21     A.  I was told just to stand there.
22     Q.  And could -- did you?
23     A.  Did I stand there?  Yes.
24     Q.  Could you move?
25     A.  I could move.

Page 102

1      Q.  You could move?
2      A.  It was not very easy, and I stayed put,
3  though.
4      Q.  You could move, but you chose not to?
5      A.  Correct.
6      Q.  All right.  So let's play it.
7         (Video played.)
8         MR. PRESLEY:  Pause it.
9      Q.  (By Mr. Presley)  What did you call in?
10     A.  I requested AMR.
11     Q.  And is that standard procedure?
12     A.  Yes.
13     Q.  Prior to this time, have you assessed
14 Bryce's physical condition?
15     A.  I checked him as I was frisking him, and I
16 believed him to be further non-compliance.
17     Q.  You would agree that he's non-verbal at
18 this stage?
19     A.  He was not verbally responding.
20     Q.  What did that tell you?
21     A.  At that time, it told me that he did not
22 choose to answer.
23     Q.  He's trying to make sounds, though, isn't
24 he?
25     A.  There are sounds.

Page 103

1      Q.  Yeah.  So how do you know whether he's
2  choosing not to verbally respond or making sounds and
3  cannot form words?
4      A.  At that point in time, my belief was it was
5  just non-compliance, and he was choosing not to.
6      Q.  Yeah.  So how did you make that
7  determination?
8      A.  Based on his previous actions of
9  non-compliance, that's what I believed to be
10 continuing in the situation.
11     Q.  So when he was previously non-compliant, he
12 kept asking you, "Am I under arrest?  Am I under
13 arrest?  What did I do wrong?  What did I do wrong?"
14        Correct?
15     A.  Correct.
16     Q.  He was able to speak; true?
17     A.  Correct.
18     Q.  He had no problem speaking.  In fact, you
19 could hear him from the passenger side window; true?
20     A.  Correct.
21     Q.  All right.  So why would -- why the change?
22 You think he was just mumbling to piss you off?
23     A.  I don't know why the change.  I just
24 perceived it as further non-compliance.
25     Q.  So you pled guilty to dropping Bryce on the

Page 104

1  pavement; correct?
2      A.  Yes.
3      Q.  Were you more pissed off at Bryce when you
4  tased him or when you dropped him?
5      A.  I wasn't pissed.
6         MR. CUTLER:  Object to the form of the
7  question.
8      A.  I was not pissed off at Bryce.
9      Q.  (By Mr. Presley)  Well, why did you drop
10 him on the pavement if you weren't pissed off at him?
11     A.  It wasn't an intentional drop to harm him.
12 It was a drop to try to get him to the curb.  I felt
13 like my hands were slipping, and I made a mistake and
14 should have been more careful, and I dropped him.
15     Q.  Now, wait a minute.  That's not what you
16 told the Federal Court, is it?
17     A.  Do what?
18     Q.  You told the Federal Court that you dropped
19 Bryce on purpose.
20     A.  The charge was I intentionally dropped
21 Bryce Masters.
22     Q.  That's exactly right.
23     A.  And that is true.
24     Q.  And that's what you pled guilty to?
25     A.  And that is true.

26 (Pages 101 to 104)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:16-cv-01045-GAF    Document 230-4    Filed 10/01/18    Page 3 of 3