# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| BRYCE MASTERS, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No.: 4:16-cv-01045 |
| CITY OF INDEPENDENCE, et al. | ) ) ) |
| Defendants. | ) |

## PLAINTIFF'S TRIAL BRIEF

COMES NOW, Plaintiff Bryce Masters, by and through undersigned counsel, and pursuant to the Court's Scheduling and Trial Order, hereby submits his Trial Brief:

i

**TABLE OF CONTENTS**

I. Background……………………………………………………………………..1

II. §1983 Excessive Force Claim…………………………………………………..1

    a. No Evidence Of Immediate Threat And Any
       Resistance Was Minimal……………………………………………………...2

    b. Defendant's Manner Of Using The Taser
       Is Known To Increase The Risk Of Cardiac Arrest…………………...2

    c. Use Of Probe Mode Lacks Operational Purpose………………………4

III. Qualified Immunity……………………………………………………………….5

    a. 8th Circuit Qualified Immunity For Taser Usage………………………5

    b. Defendant's Taser Training Provided Notice
       His Actions Violated Plaintiff's Rights…………………………………7

IV. Insurance Coverage For Punitive Damages………………………………..8

    a. Missouri Public Policy Does Not
       Preclude Coverage For Punitive Damages……………………………..8

    b. Starr Has Agreed To Indemnify Defendant
       For Any Punitive Award……………………………………………………...9

    c. Rule 411 Does Not Exclude Evidence
       Of Coverage For Punitive Damages……………………………………….9

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. City of Mountain View, Mo*, 709 F.3d 1201 (8th Cir. 2013)…………………..1

*Ayers v. Christiansen*, 564 P.2d 895 (Alaska 1983)…………………………………………..10

*Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009)……………………1, 5, 6, 7

*Colson v. Lloyd's of London*, 435 S.W.2d 42 (Mo. Ct. App. 1968)……………………8, 9

*Crumley v. City of St. Paul*, 324 F.3d 1003 (8th Cir. 2003)…………………………………1

*DeBoise v. Taser Intern., Inc.*, 760 F.3d 892 (8th Cir. 2014)…………………………..5, 6, 7

*Fleegal v. Estate of Boyles*, 61 P.3d 1267 (Alaska 2002)……………………………………10

*Graham v. Connor*, 490 U.S. 386 (1989)……………………………………………………1

*Mo. Pub. Entity Risk Mgmt. Fund v. Investors Ins. Co. of America*,
    338 F.Supp.2d 1046 (W.D. Mo. 2004)………………………………………………8, 9

*Moore v. City of Ferguson, Mo.*, 213 F.Supp.3d 1138 (E.D. Mo. 2016)……………….5, 6

*New Madrid County Reorganized School Dist. No. 1, Enlarged v.*
    *Continental Cas. Co.*, 904 F.2d 1236 (8th Cir. 1990)……………………………..8

*Perrin v. Anderson*, 784 F.2d 1040 (6th Cir. 1986)………………………………………….10, 11

*Shane v. Rhines*, 672 P.2d 895 (Alaska 1983)…………………………………………...10

*Tennessee v. Garner*, 471 U.S. 1 (1985)…………………………………………………….1

*Van Raden v. Larsen,* 2015 WL 853592 (D. Minn. Feb. 26, 2015)…………………5, 6, 7

*Wallace v. Poulos*, 861 F.Supp.2d 587 (D. Md. 2012)………………………………………..10

**Other Authorities**

Fed. R. Civ. P. 42(b)……………………………………………………………………………8

Fed. R. Evid. 411……………………………………………………………………………….9

8th Cir. Model Jury Instr. §4.72………………………………………………………………8

23 Fed. Prac. & Proc. Evid. §5368…………………………………………………………10

## I. Background

This is an excessive force case involving the misuse of a taser on Plaintiff, a seventeen year-old high school student, by Defendant after a traffic stop. After the Court's Summary Judgment Order, issues remain as to whether Defendant shooting a electrified darts from a Taser Model X26 into Plaintiff's chest for twenty seconds, triggering the loss of consciousness followed by cardiac arrest and anoxic brain injury, constitutes an unreasonable use of force[1] and whether Defendant is entitled to Qualified Immunity.

## II. §1983 Excessive Force Claim

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989)(quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case." *Atkinson v. City of Mountain View, MO*, 709 F.3d 1201, 1209 (8th Cir. 2013). The circumstances to be considered include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). Additionally, the result of the force may also be considered. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003). The Court ruled on summary judgment that genuine issues of fact precluded ruling on Runnel's request for

---

[1] Defendant cannot dispute his tossing a handcuffed and unresponsive seventeen year-old face first onto concrete was not unreasonable in light of his judicial admission and criminal conviction.

1

qualified immunity. Plaintiff contends that the following are the remaining disputes of fact concerning Defendant's use of the X26.

### a. No Evidence Of Immediate Threat And Any Resistance Was Minimal

The evidence will show that the only probable cause for the traffic stop and ensuing detention was tinted windows. The encounter between Plaintiff and Defendant occurred in broad daylight on a quiet residential street, and was captured on multiple videos with no recording showing any actual or perceived threat. Plaintiff was armed only with a cell phone that was recording the interaction and was alone in his vehicle. Defendant has stipulated that Plaintiff did not hit him and did not verbally threaten Defendant throughout the entire encounter and complied with each and every command given after Defendant shot him in the chest with his taser. (Stip. Facts ¶¶ 21, 39-40). Instead of any threat, the video's show Defendant directing vulgarity toward Plaintiff while leaning with one arm on the open door of Plaintiff's vehicle.

In addition to no threat being posed, any resistance was minimal. Plaintiff was not hitting or kicking at Defendant. He was recording with his cell phone and asking why he was being detained. At most Plaintiff can be seen propping his feet against the door jamb to prevent Runnels from pulling him violently from the car without first explaining his reason for the stop. This minimal resistance, taken in conjunction with no threat or violent actions from Plaintiff, does not justify the use, and abuse, of an electrical weapon in a potentially lethal manner.

### b. Defendant's Manner Of Using The Taser Is Known To Increase The Risk Of Cardiac Arrest

Plaintiff's position that whether Defendant used excessive force does not turn solely on Defendant's decision to use the taser, but necessarily includes the manner in which Defendant fired the weapon. To extract a person from a car, when warranted, the

2

cartridge with the darts should be removed, exposing electrodes, and the X26 should be used as a drive stun. Instead, Defendant deployed the X26 in probe mode (discussed in the following section), targeting Plaintiff's chest and administering twenty seconds of current discharge. The reasonableness of this manner of deployment, after being trained that it could result in death or great bodily injury, is the core issue the jury should determine.

As it relates to shooting Plaintiff in the chest, Defendant was warned on numerous occasions through documents provided by TASER International and through his own department to avoid targeting the chest. These precautions and warnings were specifically implemented to lessen the risk of cardiac issues including cardiac arrest. However, Defendant chose to place the laser aim on Plaintiff's chest and deploy the taser when he was only a matter of feet away from Plaintiff. Defendant's claims that he did not intend to shoot Plaintiff in the chest are not supported by the video or his prior statements.

The X26 is programmed to shut off after five seconds unless the trigger is held down. Defendant was trained not to hold the trigger down, and was provided numerous documents warning that the model taser he carried and deployed would continue to discharge current if the trigger was depressed. These were vital warnings as the continuous and extended discharge of the taser increases the cardiac risks present with such a deployment. Rather than heed these warnings, Defendant continued to hold the trigger down on the taser for twenty seconds-four times the standard deployment. During these twenty seconds, Defendant had the opportunity and presence of mind to throw

3

Plaintiff's phone, stand over Plaintiff and state "I told you" but chose not to release the trigger.

When confronted with his conduct of continuously deploying the taser, Defendant has set out multiple excuses on various fronts. However, these excuses have been shown and will be shown to be false through trial testimony of both his use of force expert and the officer who provided his taser training while Defendant was employed by the City of Independence.

### c. Use of Taser in Probe Mode Lacks Operational Purpose

Defendant's justification for using the X26 was to remove Plaintiff from his vehicle while investigating a vehicle equipment infraction. However, the use of the X26 in probe mode, with its increased risk of injury, is not designed to accomplish this purpose. As will be set out by Plaintiff's taser expert and as is made clear by training documents:

> [T]he intended effect of a probe deployment is incapacitation. This intended effect would have made it impossible for Bryce to get out of the car. In fact the only reason Bryce was able to get out of the car while being tased is that the device was NOT operating as designed-specifically, causing incapacitation-because of the small probe spread between darts in chest.

Through his training, Defendant knew that firing the taser darts into Plaintiff's chest under the circumstances presented would not have furthered his stated purpose of removing Plaintiff from the vehicle. The evidence and testimony shows that safer and more effective alternatives were available, primarily verbalization, that is explaining to Bryce why why he was being detained and why he should exit the car. If the X26 were to be used, it should have been in drive stun mode to achieve pain compliance. Defendant ignored these alternatives in favor of a high risk, low reward twenty second probe

4

deployment. His failure to consider less intrusive and more practical options to accomplish his stated objective is further support of the abusive, excessive and unreasonableness of his actions.

### III. Qualified Immunity

When issuing its summary judgment order, the Court noted that certain factual matters were in dispute concerning Defendant's entitlement to qualified immunity. Pursuant to the Court's Order, questions concerning whether Plaintiff was actively resisting arrest or acting aggressively toward Defendant before the initial Taser deployment still must be resolved.

#### a. 8th Circuit Qualified Immunity for Taser Usage

The Eighth Circuit has determined that a non-violent, non-fleeing subject has a clearly established right to be free from electroshock weapons. *Brown*, 574 F.3d at 499; *cf. DeBoise v. Taser Intern., Inc.*, 760 F.3d 892 (8th Cir. 2014)(restating *Brown's* qualified immunity holding but finding officers repeated use of a taser on a violent resisting subject reasonable under those circumstances). This rule has been used by District Court's within the Eighth Circuit to deny an officer qualified immunity. *See Van Raden v. Larsen*, 2015 WL 853592 at *8 (D. Minn. Feb. 26, 2015)(Denying qualified immunity, the court provided, "[L]ike the plaintiff in *Brown*, Van Raden was not fleeing, or acting violently toward the Officers…while Van Raden could be fairly characterized as 'resisting'-by, for example, refusing to leave his house or get out of his chair-he was in an obvious state of mental distress and was asking to be left alone…With this in mind, the Court concludes that a reasonable juror could conclude that Van Raden was a "non-violent, non-fleeing subject" and therefore that he had a clearly established right to be free from the use of tasers."); *Moore v. City of Ferguson, Missouri*, 213 F.Supp.3d 1138,

5

1145 (E.D. Mo. 2016)(In September 2011, "[t]he law was established that non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers.").

The video evidence demonstrates that at no point did Plaintiff act aggressively or threaten Defendant. Further, after Defendant shot Plaintiff in the chest with his taser, Plaintiff complied with all commands given by Defendant and Plaintiff did not hit, kick or attempt to flee from Defendant. (Stip. Fact ¶¶ 49-50). Despite this, the dash cam video shows defendant continuing to hold the trigger on his taser for fifteen seconds after the discharge was programmed to end, the last eight seconds while Plaintiff is laying prone on the ground.

Rather than acting violently or fleeing, at most Plaintiff did not exit his vehicle and may have propped his feet against the door jamb to prevent Runnels from pulling him out. There were no threats or any aggressive behavior as was present in *DeBoise*. Instead Plaintiff's actions were similar to those seen by the Plaintiffs in *Brown* and *Van Raden* in which qualified immunity was denied. Importantly, any actions that Defendant characterizes as resistance came at a time when Plaintiff was asking if he was under arrest, without Defendant informing Plaintiff why he was being detained and while Plaintiff was filming the encounter on his cell phone. There is zero support for Plaintiff doing anything but fully complying with Defendant during the entirety of the twenty seconds Defendant held the trigger on his taser down for. These are not the type of actions or a scenario in which Qualified Immunity is warranted.

6

### b. Defendant's Training Provided Notice His Actions Violated Plaintiff's Rights

In addition to the decisions in *DeBoise*, *Brown* and *Van Raden*, Defendant's training concerning the use of the training[2] provided that:

To use CEW [taser] in probe mode officer must reasonably perceive subject to be:

- An immediate threat of harm/injury, or
- Fleeing or flight risk from serious offense crime and the officer is justified in tackling the person.

Neither circumstance was present. Plaintiff posed no threat of harm to Defendant and was instead filming the encounter on his cell phone. In addition, Defendant has stipulated that Plaintiff was not fleeing from him at any time and at most Plaintiff's alleged crimes were non-violent municipal ordinance violations.

Runnels was instructed with a slide labeled "Cardiac" that "To reduce cardiac risks (when possible)…Avoid targeting the chest." Another slide provided additional considerations for officers to avoid excessive force liability. These included:

- Following targeting guidelines when feasible;
- Every CEW trigger pull **or** 5 second discharge must be justified under the specific circumstances of the incident; and
- Avoid multiple, repeated, prolonged, extended or continuous CEW exposures unless necessary to counter reasonably perceived threats and it is justifiable.

The evidence and testimony shows that Defendant ignored targeting guidelines supplied by TASER International as well as his employer when shooting Plaintiff in the chest from a matter of feet away, and that he held the trigger down for 20 seconds without reason.

---

[2] Defendant underwent taser recertification training on May 14, 2013 while employed by the City of Independence. The following is taken from the PowerPoint presentation used at this recertification training, Exhibit 8.

7

Defendant was given fair and clear notice that his chosen course of action violated Plaintiff's rights and would lead to excessive force liability. Defendant did not heed these warnings and is not entitled to Qualified Immunity.

## IV. Insurance Coverage for Punitive Damages

Pursuant to Rule 42(b) and at the request of Defendant, the liability and punitive phases of this trial have been bifurcated. Given the conduct of Defendant displayed on his dash cam recording as well as his plea, it is inherently likely that a finding of punitive damages will be made. During the punitive phase, Defendant's net worth and financial status will likely come into evidence. In addition, the jury will be tasked at arriving at an amount of punitive damages or "the purposes of punishing the defendant for engaging in misconduct…" 8th Cir. Model Jury Instr. §4.72.

In order to properly evaluate Defendant's net worth and to arrive at an amount designed to punish Defendant, the jury ought to be informed of the party actually obligated to pay any punitive award. That is Defendant's insurance company, Starr Indemnity & Liability Company ("Starr"), who issued a policy to Defendant's employer that was in effect on September 14, 2014. This policy provides $8,000,000 in indemnity coverage.

### a. Missouri Public Policy Does Not Preclude Coverage for Punitive Damages

Unlike many states, Missouri public policy does not prohibit insurance coverage for punitive damages. *Colson v. Lloyd's of London*, 435 S.W.2d 42, 47 (Mo. Ct. App. 1968); *see also New Madrid County Reorganized School Dist. No. 1, Enlarged, v. Continental Cas. Co.* 904 F.2d 1236, 1242 (8th Cir. 1990)(interpreting Missouri law and holding that public policy does not prohibit insurance coverage for an insured's intentional acts); *Mo. Pub. Entity Risk Mgmt. Fund v. Investors Ins. Co. of America*, 338

8

F.Supp.2d 1046, 1051 (W.D. Mo. 2004)(same). In terms of a claim against an officer arising out of a false arrest, the Missouri Court of Appeals has provided:

> Here we are faced with the problem of whether it would be against public policy to policy to permit an association of law enforcement officers to insure themselves against alleged willful and intentional acts. In or opinion, it would not. It would be extremely rare, particularly in a suit for false imprisonment where the insured participates in the restraining or manhandling of the plaintiff, for there not to be an assertion that this was ground for the assessment of punitive damages.

*Colson*, 435 S.W.2d at 47.

### b. Starr Has Agreed To Indemnify Defendant For Any Punitive Award

Based upon documents provided in response to Plaintiff's discovery requests, Starr at one point reserved its right to deny coverage for punitive damages on one ground. Specifically, Starr attempted to reserve its right to "deny coverage for any award of punitive damages assessed against any insured to the extent that such damages may be uninsurable as a matter of public policy of any state whose laws may apply to this claim." However, Starr has removed its reservation and has agreed to provide indemnity for **any** claim, including punitive damages, which Plaintiff has made.

### c. Rule 411 Does Not Exclude Evidence Of Coverage For Punitive Damages

Fed. R. Evid. 411 provides that:

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Fed. R. Evid. 411.

After the conclusion of the liability phase of the trial, the first sentence of Rule 411 is not implicated. The jury would have already determined Defendant's liability for

9

actual damages, the amount of actual damages, as well as whether Defendant is liable for punitive damages. The only left for jury resolution would be the amount of punitive damages.

Moreover, "the handful of permissible uses of insurance evidence listed in the second sentence of Fed. R. Evid. 411 do not exhaust the purposes for which liability insurance evidence may be admitted." 23 Fed. Prac. & Proc. Evid. § 5368 (1st ed.). This includes admission for the purposes of determining the amount punitive damages to be awarded. *Id.*; *Fleegal v. Estate of Boyles*, 61 P.3d 1267, 1271-72 (Alaska 2002); *Ayers v. Christiansen*, 564 P.2d 458, 461 (Kan. 1977)(" The liability and damage issues were tried together. Evidence of the defendant's financial condition-of which insurance was a part- was relevant to punitive damages."); *Shane v. Rhines*, 672 P.2d 895, 900 (Alaska 1983)(stating that "evidence of insurance arguably is relevant to the appropriate measure of punitive damages…" but finding no error in excluding the defendant's insurance policy as the jury did not make a threshold finding that the defendant was liable for punitive damages.); *Wallace v. Poulos*, 861 F. Supp. 2d 587, 602 (D. Md. 2012)("Far from "distracting" the jury, the indemnification agreement in this case would be relevant to several aspects of the jury's punitive damages determination. For one, informing the jury of the indemnification agreement makes jurors aware that Defendants' ability to pay is essentially a moot point. For another, telling the jury about indemnification ensures that jurors have an accurate understanding of the likely deterrence effect of their judgment. When an officer is fully indemnified, specific deterrence is substantially diminished and perhaps eliminated.")

10

Case 4:16-cv-01045-GAF   Document 277   Filed 12/05/18   Page 13 of 15

Further, when punitive damages are sought, "the ultimate source of payment…is relevant." *Perrin v. Anderson*, 784 F.2d 1040, 1047-48 (6th Cir. 1986). "The jury must know the impact an award will have on the defendant to properly assess punitive damages." *Id.* at 1048. In order to reach a conclusion concerning an amount of punitive damages that will serve as a punishment for Defendant, the jury must be fully informed of the source of any punitive damage payment and the full context of Defendant's financial status. The only way to accomplish this is through the introduction of Defendant's insurance coverage in the punitive phase of trial.

Respectfully submitted,

**LAW OFFICES OF JOHN C. BURTON**

/s/ John C. Burton
John C. Burton        (CA 86029) Pro Hac Vice
128 N. Fair Oaks Ave.
Pasadena, CA 91103
Phone: (626) 449-8300
Fax:    (626) 449-4417
Email: jb@johnburtonlaw.com

**THE HAUS LAW FIRM LLC**

/s/ Daniel J. Haus
Daniel J. Haus         MO #45678
7926 East 171st Street, Suite 106
Belton, MO 64012
Phone: (816) 591-3960
Fax:    (816) 245-7802
Email: dhaus@hauslawfirm.com

**PRESLEY & PRESLEY, LLC**

/s/ Matthew A. McCoy
Kirk R. Presley        MO #31185
Matthew A. McCoy    MO #68240
4801 Main Street, Suite 375
Kansas City, MO 64112
Phone: (816) 931-4611

11

Fax: (816) 931-4646
Email: kirk@presleyandpresley.com
matthew@presleyandpresley.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on December 5, 2018, the foregoing document was filed utilizing the Court's CM/ECF system, which delivers electronic notification to all counsel of record

/S/Matthew A. McCoy
Matthew A. McCoy