UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI


BRYCE E. MASTERS,                      )
                                       )
                    Plaintiff,         )
                                       )
        vs.                            )   Case No.
                                       )   16-CV-01045-GAF
CITY OF INDEPENDENCE,                  )
MISSOURI, et al.,                      )
                                       )
                    Defendants.        )


          TRANSCRIPT OF PROCEEDINGS - VOLUME V
           BEFORE THE HONORABLE GARY A. FENNER
           SENIOR UNITED STATES DISTRICT JUDGE
                   DECEMBER 13, 2018
                  KANSAS CITY, MISSOURI

                     APPEARANCES

FOR THE PLAINTIFF:
      MR. KIRK R. PRESLEY
      MR. MATTHEW A. McCOY
      MS. JILL A. PRESLEY
      Presley & Presley
      4801 Main Street, Suite 375
      Kansas City, Missouri 64112

      MR. JOHN C. BURTON
      128 North Fair Oaks Avenue
      Pasadena, California, 91103



      Proceedings recorded by mechanical stenography, transcript
produced by computer



              KATHERINE A. CALVERT, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
           CHARLES EVANS WHITTAKER COURTHOUSE
                 400 EAST NINTH STREET
               KANSAS CITY, MISSOURI 64106

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 1 of 155

FOR THE PLAINTIFF (continued):
     MR. DANIEL J. HAUS
     The Haus Law Firm LLC
     7926 East 171st Street, Suite 106
     Belton, Missouri 64012

FOR THE DEFENDANT RUNNELS:
     MR. KEITH A. CUTLER
     MS. DANA T. CUTLER
     MS. CHARNISSA E. HOLLIDAY-SCOTT
     James W. Tippin & Associates
     21 West Gregory Boulevard
     Kansas City, Missouri 64114

I N D E X                                        Page

NOVEMBER 27, 2018

VOLUME I

MICHAEL DREILING
     Direct examination by Mr. Presley . . . . . . . . . .  14
     Cross-examination by Mr. Cutler . . . . . . . . . . .  20

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 3 of 155

I N D E X                                        Page
(continued)

DECEMBER 10, 2018

VOLUME II

Plaintiff's opening statement. . . . . . . . . . . . . .  96

Defendant's opening statement. . . . . . . . . . . . . . 109

PLAINTIFF'S EVIDENCE

ANDREW DENNIS
        Direct examination by Mr. Burton. . . . . . . . . . 128
        Cross-examination by Mr. Cutler . . . . . . . . . . 164

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 4 of 155

I N D E X                                    Page
(continued)

DECEMBER 11, 2018

VOLUME III


SCOTT GRASHER
        Direct examination by Mr. Burton. . . . . . . . . . 195
        Cross-examination by Mr. Cutler . . . . . . . . . . 205

ED TURNER
        Direct examination by Mr. Presley . . . . . . . . . 206
        Cross-examination by Mr. Cutler . . . . . . . . . . 225
        Redirect examination by Mr. Presley . . . . . . . . 231
        Recross-examination by Mr. Cutler . . . . . . . . . 233
        Further redirect examination by Mr. Presley . . . . 234

STEPHEN DAVIDSON
        Direct examination by Mr. McCoy . . . . . . . . . . 235
        Cross-examination by Mr. Cutler . . . . . . . . . . 248

MICHAEL LEONESIO
        Direct examination by Mr. Burton. . . . . . . . . . 255
        Cross-examination by Mr. Cutler . . . . . . . . . . 311
        Redirect examination by Mr. Burton. . . . . . . . . 331

ROGER BRYCE BLACKMORE
        Direct examination by Mr. Presley . . . . . . . . . 332
        Cross-examination by Mr. Cutler . . . . . . . . . . 343
        Redirect examination by Mr. Presley . . . . . . . . 345
        Recross-examination by Mr. Cutler . . . . . . . . . 347

STACY MASTERS
        Direct examination by Mr. Presley . . . . . . . . . 349
        Cross-examination by Mr. Cutler . . . . . . . . . . 377

Stipulation of facts were read . . . . . . . . . . . . . . 403

```
              I N D E X                              Page
             (continued)

          DECEMBER 12, 2018

             VOLUME IV
```

TERRIE PRICE
    Direct examination by Mr. Presley . . . . . . . . . . 424
    Cross-examination by Mr. Cutler . . . . . . . . . . 440
    Redirect examination by Mr. Presley . . . . . . . . 450
    Recross-examination by Mr. Cutler . . . . . . . . . 451

MICHAEL J. DREILING
    Direct examination by Mr. Presley . . . . . . . . . 452
    Cross-examination by Mr. Cutler . . . . . . . . . . 461
    Redirect examination by Mr. Presley . . . . . . . . 481

KAREN GROSSMAN TABAK
    Direct examination by Mr. Presley . . . . . . . . . 483
    Cross-examination by Mr. Cutler . . . . . . . . . . 493

STEVEN MICHAEL ARKIN
    Direct examination by Mr. Presley . . . . . . . . . 497
    Cross-examination by Mr. Cutler . . . . . . . . . . 509

STANLEY AUGUSTIN
    Direct examination by Mr. Presley . . . . . . . . . 523
    Cross-examination by Mr. Cutler . . . . . . . . . . 532
    Redirect examination by Mr. Presley . . . . . . . . 538
    Recross-examination by Mr. Cutler . . . . . . . . . 540

DEFENDANT'S EVIDENCE

EVAN BATEMAN
    Direct examination by Mr. Cutler. . . . . . . . . . 553
    Cross-examination by Mr. McCoy. . . . . . . . . . . 556

SCOTT McKEE
    Direct examination by Mr. Cutler. . . . . . . . . . 558
    Cross-examination by Mr. Presley. . . . . . . . . . 562

KURT WYCKOFF
    Direct examination by Mr. Cutler. . . . . . . . . . 562

DARRELL SCHMIDLI
    Direct examination by Mr. Cutler. . . . . . . . . . 565
    Cross-examination by Mr. Presley. . . . . . . . . . 570

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 6 of 155

```
                          I N D E X                        Page
                         (continued)
```

TOM DAILEY

```
      Direct examination by Mr. Cutler. . . . . . . . . . 573
      Cross-examination by Mr. Presley. . . . . . . . . . 579

Jury instructions conference . . . . . . . . . . . . . . 584
```

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 7 of 155

I N D E X                                        Page
(continued)

DECEMBER 13, 2018

VOLUME V

Jury instructions conference . . . . . . . . . . . . . . . 604

GARY MICHAEL VILKE
     Direct examination by Mr. Cutler. . . . . . . . . . 618
     Cross-examination by Mr. Burton . . . . . . . . . . 635

TIMOTHY RUNNELS
     Direct examination by Mr. Cutler. . . . . . . . . . 636
     Cross-examination by Mr. Presley. . . . . . . . . . 653
     Redirect examination by Mr. Cutler. . . . . . . . . 676

Plaintiff's closing argument . . . . . . . . . . . . . . . 692

Defendant's closing argument . . . . . . . . . . . . . . . 707

Plaintiff's rebuttal closing argument. . . . . . . . . . . 730

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 8 of 155

I N D E X                                          Page
(continued)

DECEMBER 14, 2018

VOLUME VI

Verdict. . . . . . . . . . . . . . . . . . . . . . . . 767

Plaintiff waives punitive damage opening statement . . . . 772

Defendant's punitive damage opening statement. . . . . . . 773

PLAINTIFF'S EVIDENCE ON PUNITIVE DAMAGES

Stipulation of facts . . . . . . . . . . . . . . . . . . . 775

DEFENDANT'S EVIDENCE ON PUNITIVE DAMAGES

TIMOTHY RUNNELS
     Direct examination by Mr. Cutler. . . . . . . . . . . 776
     Cross-examination by Mr. Presley. . . . . . . . . . . 783

Plaintiff's punitive damage closing argument . . . . . . . 788

Defendant's punitive damage closing argument . . . . . . . 791

Plaintiff's rebuttal punitive damage closing argument. . . 798

Verdict on punitive damages. . . . . . . . . . . . . . . . 800

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 9 of 155

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE PLAINTIFF: | | | |
| 1 | IPD mission statement | 208 | 208 |
| 4 | Taser information | 247 | 247 |
| 5 | Taser warnings | 247 | 247 |
| 8 | CEW user update | 247 | 247 |
| 12 | Photograph | 202 | 203 |
| 37 | Photograph | 232 | 232 |
| 39 | Taser training | 247 | 247 |
| 41 | Photograph | 194 | 194 |
| 42 | Photograph | 194 | 194 |
| 44 | Response to force policy | 210 | 210 |
| 47 | Taser download | 194 | 194 |
| 53 | Taser user certificate test | 247 | 247 |
| 60 | Bryce Masters' school transcript | 354 | 354 |
| 79 | Photograph | 354 | 354 |
| 80 | Photograph | 357 | 357 |
| 100 | Discharge summary | 528 | 528 |
| 148 | IPD general order code of conduct | 208 | 208 |
| 149 | IPD general order | 210 | 210 |
| 156 | Runnels' report | 660 | 660 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 157 | AMR report | 525 | 525 |
| 158 | Centerpoint medical records | 525 | 525 |
| 161 | Ability KC medical records | 426 | 427 |
| 162 | Rehabilitation Institute medical records | 426 | 427 |
| 169 | DVD dash cam video | 193 | 193 |
| 170 | DVD dash cam video | 193 | 194 |
| 171 | DVD cell phone recording | 194 | 194 |
| 172 | Photograph | 660 | 660 |
| 180 | Photograph | 558 | 558 |
| 183 | Photograph | 364 | 364 |
| 184 | Photograph | 364 | 364 |
| 185 | Photograph | 364 | 364 |
| 187 | Photograph | 202 | 203 |

```
                        INDEX OF EXHIBITS
                          (continued)

EXHIBIT
  NO.              DESCRIPTION            OFFERED      RECEIVED

FOR THE DEFENDANT:

  D13           Toxicology report       536 & 541   536 & 541

  D18           Report of Panelipse        535         535

  D19           Consultation note          541         541

  D23           Neurology progress
                note                       534         534

  D36           CV of Gary Vilke           621         621
```

603

| 1 | DECEMBER 13, 2018 |

1                    DECEMBER 13, 2018

2                    MORNING SESSION

3              (Court in session at 8:20 a.m.)

4              (The following proceedings were had in the courtroom

5    out of the presence of the jury:)

6              THE COURT:  Thank you.

7              Good morning.

8              Mr. Presley, you've proposed some instructions --

9              MR. PRESLEY:  Yes, and in our haste to get these

10   printed down here, the Instruction 14 omitted a critical

11   portion.  I'm having my office revise it and I expect to have

12   it shortly, and that is in paragraph first the wording after

13   "continued deploying Taser into plaintiff's chest."  It should

14   read "for 15 seconds."  So I provided a set and walked Mr.

15   Cutler through the changes that we would propose, and these are

16   based off Rhys' most recent package.  So the numbers would

17   correspond to his email of last night.

18              So as it relates to the packaging instruction

19   No. 13, our record would be that we omit 15, and then

20   Instructions 14 and 16 or 14 through 15, however the Court

21   chooses to number them, would be so directed.  So we have taken

22   Rhys' version of Instruction No. 14 and we have modified the

23   conduct to, as I stated, "First, the defendant continued

24   deploying Taser current into plaintiff's chest for 15 seconds

25   when arresting him."  We would omit the "actively resisting"

1  since it is a stipulated fact, and from that point forward

2  there was no resistance.

3       16 merely removes some brackets that were still

4  present in the damage instruction.

5       Instruction 20, which is the packaging instruction,

6  in essence, for the punitive liability finding, Instruction

7  No. 20.  As written, it was, "or under 14 or 18," which are the

8  two verdict directing instructions for the respective Tasering

9  and drop.  It did not allow for a finding of punitive damage

10  liability on both the Tasering and the drop; and as such, we

11  modified that to read, "and/or find in favor of plaintiff under

12  Instruction 18 and/or 14," or 18 in both places.

13       Now, we have omitted the phrase in Rhys' proposed

14  instruction about -- and the way it reads is simply, "Resisting

15  arrest under Instruction No. 15."  Even if these modifications

16  are not accepted or 15 is still included, we would make the

17  record that it should be actively resisting arrest under

18  Instruction No. 15 consistent with the conduct submitted.

19       Then as it relates to Verdict C, we've modified that

20  to include separate findings as to the punitive damage

21  liability based on the conduct submitted in each package's

22  respective verdict director, and we would similarly propose for

23  Verdict D separate punitive damage award findings for each of

24  the conduct; otherwise, we would be unable to isolate the

25  amount of the actual damage award in relation to the respective

1   punitive award for that conduct for constitutional due process

2   concerns down the road.  And so if the Court insists on

3   continuing with dividing the continuous events from the time of

4   nonresistance from the Tasering forward up and submitting

5   separately the drop, then we have to submit separate damage

6   findings, separate liability findings on the punitive issue for

7   purposes of determining exactly what awards the jury made for

8   which conduct.

9           THE COURT:  All right.  And I'm certain to give you

10  an opportunity to speak to that, Mr. Cutler.

11          I think that obviously, as we're all aware, the

12  underlying and controlling consideration is whether or not

13  continued use of the Taser after the initial five seconds is

14  clearly established or whether or not it remains debatable

15  under the law, and you also filed a brief on that question.

16          MR. PRESLEY:  We did.  We found some authority last

17  night, Your Honor, the Day versus Young case, and Matt has

18  found an additional case early this morning, the Goodwin versus

19  City of Painesville.  Goodwin versus City of Painesville is the

20  most factually identical case we can find as to the Tasering.

21  The Sixth Circuit, I believe it is, dealt specifically with the

22  prolonged nature of the Tasering.  That was either -- it's a

23  little unclear from the record it is a 21-second or a 26-second

24  Tasering, but they specifically addressed the prolonged nature

25  of a chest shot and the consequences to the plaintiff.

1       The only distinguishing factor in Goodwin versus

2   City of Painesville is that it was a home search.  It was a

3   home entry as opposed to a vehicle.  And they do rely on the

4   Eldridge case in there, which was a diabetic who was

5   continually asked to get out of his car.  He was suspected of

6   being drunk.  He was parked in a condominium complex, and they

7   kept ordering him out of his vehicle.  He kept saying, I'm

8   fine, I'm fine.  He wouldn't comply.  And so based on the

9   combination of Eldridge and the Goodwin case, that's the most

10  factually identical circumstance in the way of authority we can

11  find for Your Honor.

12          THE COURT:  All right.  And is it significant this

13  case was decided after the incident at hand as was the one in

14  your brief?

15          MR. PRESLEY:  This was a 2014 decision, Your Honor,

16  but the conduct was --

17          THE COURT:  It was decided and filed March 19th,

18  2015.

19          MR. PRESLEY:  The conduct was actually --

20          THE COURT:  I guess your argument is this case holds

21  at the time of the conduct it was a clearly established --

22          MR. PRESLEY:  It was July 2010 was the Tasering

23  event, and that would be consistent with our evidence regarding

24  Tasers and strengthening of its warning regarding prolonged

25  exposures and cardiac arrest in 2009.

1                THE COURT:  I haven't read the case yet.  I

      2      certainly will.

      3                MR. PRESLEY:  I apologize for not locating that

      4      sooner.

      5                THE COURT:  It appears that the victim in this case

      6      did not resist.

      7                MR. PRESLEY:  He retreated into his home, denied the

      8      officers entry.  He was not resisting during the prolonged

      9      portion of the Tasering.

     10                THE COURT:  All right.  I'll have a look at it.

     11                MR. PRESLEY:  Thank you, Judge.

     12                THE COURT:  I will say, though, that I continue,

     13      even after I've read your brief and then looked at those cases,

     14      to have some real reservation and concern over whether the

     15      prolonged use of the Taser beyond five seconds was clearly

     16      established as a constitutional right.  Certainly there is

     17      evidence that it was in violation of the department policy, but

     18      that does not equate to a constitutional right.

     19                I also have some consideration of the evidence as to

     20      when the damage by use of the Taser occurred.  To my

     21      recollection Dr. Dennis testified that the cardiac arrest was

     22      effected when the Taser was deployed, and Dr. Arkin, also my

     23      recollection, he testified that loss of oxygen to the brain was

     24      evidenced in the video at the time that Mr. Masters collapsed

     25      and fell to the ground.

1    MR. PRESLEY:  I think the key portion of Dr. Dennis

2  is that what he saw in the pig studies and what he opined in

3  this case was that Mr. Masters after the 20-second discharge

4  began a dyssynchronous rhythm, and that is the ventricular

5  tachycardia or that awkward rhythm that prevented perfusion

6  because the heart is beating so irregularly and so quickly and

7  so many beats per minute that it can't fill, and that's totally

8  consistent with Dr. Arkin's finding that he's now experiencing

9  an hypoxic event, because Dr. Dennis said at the conclusion of

10  the Tasering he's now in that -- and, again, the video of the

11  pigs showed that it occurs immediately after the introduction

12  of the shock; and so while he did not go into full ventricular

13  fibrillation and arrest until some two minutes later, it was

14  that prolonged dyssynchronous rhythm and his inability to

15  return to a normal sinus rhythm that was compromised by a

16  combination of the extended duration of the Tasering of an

17  additional 15 seconds and his positioning face first on the

18  ground which prevented him from assuming the normal breathing

19  pattern and being in a recovery position that would have

20  assisted his ability to return to normal rhythm instead of

21  progressing into V-fib.

22    THE COURT:  Okay.  Mr. Cutler, do you have anything

23  that you want to offer on any of the instructions at this time?

24  I'm going to take all of this.  I'm going to look at it.  I'm

25  going to consider it as we go forward, and we will have a final

1  instruction conference after I determine the final package of

2  instructions that I intend to submit and provide them to

3  counsel.

4          MR. CUTLER:  Yes, I do, Your Honor.  Good morning.

5  Thank you.

6          Let's kind of start with the instructions that Mr.

7  Presley provided.  His Instruction No. 13 changes the very

8  first line from "Instructions 14 through 16" to "14 and 16."

9          THE COURT:  He takes out 15.

10         MR. CUTLER:  I'm sorry?

11         THE COURT:  He takes out 15.

12         MR. CUTLER:  Correct.  We disagree with that

13  obviously.  So we would disagree with taking out 15 and the

14  changing of the instruction to "14 and 16."  We think it should

15  be left as is.

16         THE COURT:  I take it, Mr. Presley, you're not

17  claiming a violation from the initial Tase, the initial

18  five-second --

19         MR. PRESLEY:  We're choosing not to submit that,

20  Your Honor.

21         MR. CUTLER:  With respect to his Instruction No. 14,

22  we believe that the wording of Instruction No. 14 used

23  yesterday is appropriate.  So we don't agree with the change

24  that Mr. Presley has made with respect to proposed Instruction

25  No. 14.

1     As relates to No. 16, the concern I have with

2   Instruction 16 is not due to any revision by Mr. Presley.  It's

3   a concern we had with the original proposed version of

4   Instruction No. 16.  The elements of damages that the jury is

5   requested to consider are the physical pain and suffering the

6   plaintiff has experienced and is reasonably certain to

7   experience in the future.  I don't believe there's been any

8   evidence that Mr. Masters will continue to suffer any physical

9   pain from the Tasering event.  He suffered brain injury.

10  That's obviously for the jury to decide.  In terms of physical

11  pain and suffering, I don't think there's been any evidence

12  that he will continue to have that in the future.

13     So I think that instruction, subparagraph 1 of

14  Instruction No. 16 should read, "The physical pain and

15  suffering the plaintiff has experienced, comma, the nature and

16  extent of the injury, comma, whether the injury is temporary or

17  permanent, comma, and whether any resulting disability is

18  partial or total."  And actually that last part there's been

19  no evidence -- well -- so just the "certain to experience in

20  the future" should be omitted from proposed Instruction No. 16.

21     Regarding Mr. Presley's proposed Instruction No. 20,

22  his request to change the first line of the second paragraph to

23  "If you find in favor of plaintiff under Instruction 14 and/or

24  Instruction 18," we don't have any objection to that.

25     And then with respect to his proposal for Verdict C

1  that would separate the damages for the conduct for the Taser

2  from the conduct from the drop --

3           MR. PRESLEY:  Liability.

4           MR. CUTLER:  Liability, yeah, we don't have any

5  objection to that, Your Honor.

6           THE COURT:  All right.  Thank you very much and we

7  will revisit the --

8           MR. CUTLER:  That was with respect to Mr. Presley's

9  proposed changes.  I do have some other concerns to

10 instructions that he did not propose any changes.

11          THE COURT:  All right.

12          MR. PRESLEY:  And by additional record, Your Honor,

13 I think we had submitted 4.70 -- well, let's see.  Let me make

14 sure that's correct.  If you don't mind, Keith, I can address

15 those damages.

16          THE COURT:  Sure.  Then we'll move on to your other

17 concerns.

18          MR. CUTLER:  Sure.

19          MR. PRESLEY:  So the closest damages instruction

20 since 4.72 for civil rights is for punitives, the closest

21 damages instruction would be 4.70, and in the Eighth Circuit

22 model instructions it should be modified to include the

23 physical pain and mental and emotional suffering plaintiff has

24 experienced and is reasonably certain to experience in the

25 future, and that's 4.70.

```
 1              THE COURT:  All right.  Anything further on that,
 2    Mr. Presley?
 3              MR. PRESLEY:  No.  I think that's the most
 4    applicable guidance we have from the model instructions, Your
 5    Honor.
 6              THE COURT:  All right.  That point makes sense if we
 7    instruct on that.
 8              MR. CUTLER:  I'm sorry?
 9              THE COURT:  I said that point makes sense if we
10    instruct on that ultimately.
11              MR. CUTLER:  Okay.  My concern is not the pain or
12    mental suffering that he has experienced in the past.  That's
13    not my concern.  My concern is there is no evidence he will
14    experience in the future.
15              THE COURT:  I understand that.  I think that's
16    probably a question of what can be argued and what cannot.
17              MR. CUTLER:  Well, not only what can be argued but
18    if it's in the instruction, I mean, if there's no evidence of
19    it, you can't or you shouldn't put it in the instruction.  No
20    doctor said he's going to experience physical pain from the
21    Tasering in the future.  Mental, brain injury, sure, but
22    physical pain there is no evidence of that.  There is no
23    testimony about that.
24              THE COURT:  Okay.  Well, I'll go back and look at
25    the model with all those arguments in mind.
```

1          MR. PRESLEY:  I think the evidence specifically in
2   that regard is in the record continuously that Bryce continues
3   to experience this posturing.  His mom addressed that.  In
4   addition to his clumsiness.  That's also substantiated and all
5   a function of a brainstem insult.

6          MR. CUTLER:  The other concern I had was with
7   Instructions No. 14 and 15.  Starting with 15, I think the
8   Court has correctly included affirmative defense instruction.
9   That instruction reads, "If you find that plaintiff Bryce
10  Masters was actively resisting arrest at the time of the Taser
11  discharge, your verdict must be in favor of Timothy Runnels."
12  Since that is an affirmative defense to Instruction 14, there
13  needs to be a complete affirmative defense tail right after
14  paragraph third.  So it would read, paragraph third, "As a
15  direct result, the plaintiff was injured unless you believe
16  plaintiff is not entitled to recover by reason of Instruction
17  No. 15."

18         THE COURT:  I believe you're correct.  If this is
19  all submitted, that tail should be included.

20         MR. CUTLER:  And then the next to the last
21  paragraph, I think there's some brackets that probably need to
22  be removed in the last line of the next to the last paragraph.

23         THE COURT:  I agree.  So I'm removing the bracket,
24  "Without regard to officer's own state of mind, intention, or
25  motivation," the bracketed portion.

1    MR. CUTLER:  Yes.  And there were a couple of other

2    things on page 9 of the packet that was provided to us last

3    night.  It appears that the instruction numbers jump from 5 to

4    8.  Page 7 shows Instruction No. 5, three pages long, then it

5    jumps to Instruction No. 8.

6    THE COURT:  That's Rhys' fault.  That's not my

7    fault.

8    MR. CUTLER:  I'm not assigning fault, Your Honor.

9    MR. PRESLEY:  I know that's a moving target, so I

10   haven't really addressed the numbering because depending on

11   whether we play a video or not, we may not need that and it

12   will change the numbering.  The numbering is the last thing to

13   go, as you always know, Judge.

14   THE COURT:  We'll get that straightened out.  Thank

15   you, Mr. Cutler.

16   MR. CUTLER:  No problem.  Then Instruction No. 9

17   there are some brackets that probably need to be removed.

18   THE COURT:  I think we can remove that whole

19   bracketed portion there in the second paragraph.

20   MR. CUTLER:  Then, lastly, Your Honor, I didn't see

21   this in the packet that was given to us yesterday evening.

22   Yesterday morning we were given a packet of instructions that

23   the Court was considering regarding punitive damages.  It

24   starts with, You decided in the first portion of this trial to

25   award, and in the second portion of the trial, that

1    instruction.  The instruction that follows that starts off
2    with, When deliberating.  I'm referring to that because they're
3    not numbered.  It starts out with, "When deliberating, you
4    should consider the following in deciding the amount of
5    punitive damages to award."  Like I said, I didn't see that in
6    the packet yesterday evening, but it was provided to us
7    yesterday morning in a three-page separate set.
8              THE COURT:  All right.  I'll have a look at that.
9              MR. PRESLEY:  I didn't address the punitives, Your
10   Honor, because I figured we'd take that up -- other than the
11   consistency with the separate finding.
12             THE COURT:  Okay.
13             MR. CUTLER:  So my concern with it was there is a
14   bracketed paragraph -- it tells the jury what they should
15   consider in determining an amount of punitive damages.  There
16   are four paragraphs; how reprehensible the defendant's conduct
17   was, how much harm was caused, the amount considering the
18   financial condition.  That fourth paragraph says, "The amount
19   of fines and civil penalties applicable to similar conduct."  I
20   don't think that's appropriate.  I think that should be
21   omitted.
22             THE COURT:  Your objection's noted.
23             MR. CUTLER:  For the Court's reference the model
24   numbers that are cited on that are 4.24 and 4.72.
25             THE COURT:  Thank you.

616

```
 1              All right.  We will revisit the instructions at a

 2   later point in time, and I'll be back -- are the jurors all

 3   here, Lisa?

 4              THE COURTROOM DEPUTY:  Yes.

 5              THE COURT:  I'll be back at nine o'clock.

 6              (Recess taken at 8:50 a.m.)

 7              (The following proceedings were had in the courtroom

 8   out of the presence of the jury:)

 9              THE COURT:  Thank you.  You can all be seated.

10              Ready, Mr. Cutler?

11              MR. CUTLER:  Yes, sir.

12              THE COURT:  Thank you.

13              Mr. Presley?

14              MR. PRESLEY:  Also, Your Honor.

15              THE COURT:  All right.  Lisa, would you bring the

16   jury in.

17              THE COURTROOM DEPUTY:  Yes.

18              (The following proceedings were had in the presence

19   of the jury:)

20              THE COURT:  Thank you.  Everyone can be seated.

21              Good morning, ladies and gentlemen.

22              I apologize for the delay.  I had some things I had

23   to take up, and I appreciate your all being here and being

24   patient with us.

25              Mr. Cutler, are you ready to proceed this morning?
```

```
 1              MR. CUTLER:  Yes, sir.

 2              THE COURT:  All right.  Good morning.  Come right up

 3    to the witness stand for us, please, and before you're seated

 4    my clerk will swear you in.  Thank you.

 5    GARY MICHAEL VILKE, being sworn by the courtroom deputy,

 6    testified:

 7    DIRECT EXAMINATION BY MR. CUTLER:

 8    Q      Good morning.

 9    A      Good morning.

10    Q      Would you state your name, please.

11    A      My name is Gary Michael Vilke.

12    Q      What is your occupation?

13    A      I'm an emergency physician.

14    Q      And where are you an emergency physician?

15    A      I work at the University of California in San Diego.

16    Q      Generally speaking and fairly briefly, what does it

17    entail to be an emergency physician?

18    A      Sure.  The physician works in the emergency department,

19    and we basically take all-comers that come in, everything from

20    heart attacks and strokes to trauma, gunshot wounds to colds

21    and seizures.  We see a little bit of everything in the

22    emergency room.

23    Q      How long have you been an emergency physician?

24    A      For over 25 years now.

25    Q      Do you have any other occupation or profession?
```

1    A       That's my main occupation.  I have a lot of roles

2    associated with that.

3    Q       Such as?

4    A       I served as the chief of staff of our hospital.  It's

5    an administrative position.  I also worked with peer review and

6    quality improvements and processes with our hospital.  I've

7    worked with the EMS system in San Diego County, so I was the

8    medical director for the system of about 100,000 EMTs -- I'm

9    sorry -- about 4,000 EMTs and about 1,000 paramedics with

10   100,000 calls a year.  I've worked with air medical.  I've

11   worked with air ambulances, helicopters, the SWAT teams, a

12   number of different groups that I've worked with in my role as

13   an emergency physician.

14   Q       What about on the academic side?  Do you do anything on

15   the academic side?

16   A       I do, yes.  I'm full professor with the University of

17   California-San Diego.  I teach medical students.  I teach

18   residents.  I teach fellows.  I do research.  I've published

19   about 70-plus book chapters and two textbooks and about 250

20   peer-reviewed publications in journals.

21   Q       Where did you go to medical school?

22   A       I went to the University of California-San Diego School

23   of Medicine.

24   Q       And when did you graduate?

25   A       1992.

1    Q       And after you graduated from medical school, what did

2    you do?

3    A       I did a year of surgery, surgical internship.  So I

4    worked in the hospital as an intern for the 120 hours a week

5    learning my trade for one year.  Then I went on to the

6    emergency medicine residency.  That's a three-year program to

7    learn emergency medicine.

8    Q       Now, you mentioned that you are a full professor.  Do

9    you also do lectures or seminars, things like that?

10   A       I do, yes.

11   Q       Primarily in what areas?

12   A       It varies.  The basis is always emergency medicine.

13   I've been asked to lecture locally and even internationally on

14   topics of in-custody death issues, Taser issues.  But also do a

15   lot of emergency medicine training as well.  So everything from

16   trauma to cardiac arrest.  I do a lot of areas in that venue.

17   Q       You mentioned you've written about 70 book chapters.

18   Have you written any articles?

19   A       I have, yes.

20   Q       Do you have any idea how many?

21   A       A little over 250 peer-reviewed articles.

22   Q       What kind of articles?

23   A       Peer-reviewed.

24   Q       Okay.  And basically what is peer reviewed?

25   A       Peer review basically is you write a paper.  You send

| 1 | it to a journal in hopes it will get published. They send it |
| 2 | out to sort of peers or experts in that area to review it, |
| 3 | offer feedback, send it back to the editor. They take that |
| 4 | information and decide if they want to accept it, have you |
| 5 | revise it, or reject it. If they go through that process and |
| 6 | it's accepted, that's considered a peer-reviewed article. |
| 7 | Q    Let me show you what has been marked as Defendant's |
| 8 | Exhibit 36. Would you identify that, please? |
| 9 | A    That's my curriculum vitae, basically my resume. |
| 10 | Q    And this is kind of thick. |
| 11 | A    It is, yes. |
| 12 | Q    So I'm not going to read from it, but generally what |
| 13 | does this include? |
| 14 | A    This includes my academic background, awards that I've |
| 15 | received, positions that I've held, committees that I've |
| 16 | chaired and then it consists of a list of my publications and |
| 17 | my grant funding, my abstracts, and some of my presentations. |
| 18 |         MR. CUTLER: Your Honor, we move for admission of |
| 19 | Defendant's 36. |
| 20 |         MR. BURTON: No objection, Your Honor. |
| 21 |         THE COURT: Thank you. |
| 22 |         Received. |
| 23 | Q    (By Mr. Cutler) Now, you mentioned you have written |
| 24 | some articles and you've given lectures on Tasers and police |
| 25 | in-custody deaths. How did you get interested in that? |

1   A      I got interested as a chief resident during my

2   residency.  There was a study being put on, which was started

3   by one of my mentors, looking at the concept of -- this was

4   back in the early '90s -- that they thought if you put somebody

5   in restraints, you handcuffed them, you pull their feet up and

6   restrain them to their feet and left them on their stomach,

7   that that would cause asphyxiation, cause people to die.  So

8   there was a grant funded to us to try to study to see if that

9   was a real possibility, because logically it doesn't make sense

10  if I laid you on your stomach and I put your hands behind your

11  back and I pull your feet up a little bit that all of a sudden

12  you're going to die.  So that's how I got started was a project

13  that I was working with one of my mentors, and basically it

14  debunked the idea that there's any true issues being in that

15  position.

16  Q      So how did you get from that to studying the effects of

17  Tasers?

18  A      Then it sort of just evolved.  After we looked at that,

19  we determined that position was safe physiologically, the

20  question came up that sometimes when people are being arrested,

21  there's some weight being pushed on them to hold them down or

22  while they're putting handcuffs on.  So we looked at research

23  looking at 25, 50 pounds of weight on their back to see if that

24  has any significant physiological differences.  It really

25  didn't.  Then we moved it up 225 pounds of weight, and, again,

```
1   it didn't have any significant clinically important findings.

2           And then pepper spray was being used in cases, and

3   so we got grant funding to look at the effects of pepper spray

4   on ventilation to see if that impacts them.

5           Then over time that's when Tasers started coming

6   into the market, and there were deaths that had involved

7   Tasers, and the question was, it's put out as a weapon but the

8   reality is nobody had looked at a lot of human physiology on

9   it, so we got grant funding to look at the effects of the Taser

10  on human physiology.

11  Q       Including the heart?

12  A       Including the heart, yes.

13  Q       So how long have you been researching and writing about

14  the effects of Tasers?

15  A       Tasers it's probably been about ten years or so that

16  I've been involved with research in that area, maybe longer.

17  Q       Now, you've been retained in this case to provide

18  certain opinions, correct?

19  A       Yes.

20  Q       And you reviewed a lot of materials in order to form

21  your opinions?

22  A       I did, yes.

23  Q       What materials did you review?

24  A       In case specific materials.  I looked at the video.  I

25  looked at the police reports.  I looked at the medical reports
```

1   that were available.  I looked at the depositions and

2   transcripts and files that were brought out, investigations.

3   That's the sort of material from the specifics of the case.

4   Then obviously there's literature surrounding use of Tasers,

5   which I'm familiar in general based on my research, but we

6   looked at some of that as well.

7   Q     Now, you mentioned you looked at some of the

8   depositions.  Did you review the deposition of Dr. Andrew

9   Dennis?

10  A     I did, yes.

11  Q     And did you review the written report that he has

12  prepared in this case?

13  A     I did, yes.

14  Q     And did you review the studies that he relied on to

15  form his opinions?

16  A     I did, yes.

17  Q     As a result of your review of the materials that we

18  just discussed, have you formed any opinions in this case

19  relative to Dr. Dennis' opinions?

20  A     Yes.

21  Q     With respect to Dr. Dennis' opinions -- let me ask you

22  this:  What was Dr. Dennis' opinion about the effect of the

23  Taser on Bryce Masters in this case?

24  A     As I understand his opinion, it was that the Taser

25  activation performed some cardiac capture during the event that

1    led to what's thought to be probably a fast rhythm or maybe a

2    slow rhythm, I think he didn't really qualify that, but a

3    change in rhythm afterwards that about two minutes later

4    deteriorated to ventricular fibrillation.

5    Q    So have you formed any opinions about the validity of

6    Dr. Dennis' opinion about what happened in this case?

7    A    I have, yes.

8    Q    What is your opinion in that regard?

9    A    Based on the available data and research, the idea that

10   an electrical impulse like a Taser would cause a ventricular

11   fibrillation event two minutes later isn't really well

12   supported in the medical literature.

13   Q    All right.  So can you explain that?

14   A    Sure.  The idea of cardiac capture I think has been

15   discussed.  You know that it can happen in pigs.  There's

16   modeling in there if you put the darts close to the heart, you

17   can capture that heart, and then typically when they stop it,

18   stop the electricity, the heart goes back to its normal rhythm.

19   There are a few cases in which the pig went immediately to

20   ventricular fibrillation.

21          Just to put perspective, there's been about probably

22   7,000 activations on pigs, plus or minus, of which they found

23   cardiac capture in about 740, or so, 750, so about 10 percent.

24   Of those 750 pigs that had cardiac capture six of them went

25   into ventricular fibrillation.  So that irregular beat that

625

1    you've heard about already.  Of those six, five of them went

2    immediately into ventricular fibrillation.  The electricity

3    stimulated the heart or electrocution or something along those

4    lines and immediately went into ventricular fibrillation.  One

5    pig had what's called V-tach, a fast rhythm, then a few minutes

6    later, three minutes later, degenerated into ventricular

7    fibrillation.  So that's the data that's being proposed to say

8    that because it happened in this one pig out of 7,000

9    activations, 700 captures, that that's more likely than not

10   what happened to Bryce Masters.  The human data doesn't support

11   it anymore.  There's really no data that shows the human heart

12   can be captured by an X26.

13   Q    Now, you talked about pig studies.  We've heard about

14   pig studies.  What's up with the pigs?  Why are we -- why pigs?

15   A    Well, pigs are easier to study from the perspective of

16   giving prolonged Taser activations, repeated Taser activations

17   just from the perspective of getting it through a human

18   subjects committee.  We did a human subject study and it's

19   difficult to get that through because they want to make sure

20   things are safe for the humans, and so we want to make sure

21   things are okay for pigs but the reality is it's easier to

22   study those animals.

23   Q    Now, aside from them not being human and it's easier to

24   study them, why else is it easier to study pigs?

25   A    Well, it's easier to study pigs because you can control

```
 1   them.  You can control their -- if you put them on ventilators
 2   and they're anesthetized, you can do exactly the number of
 3   Taser activations you want, locate the probes exactly where you
 4   want them.  So it's a modeling they can sort of easily do,
 5   replicate.
 6   Q      So can you translate what happens to a pig directly to
 7   what happens to humans?
 8   A      That's the problem.  You really can't.
 9   Q      You cannot?
10   A      No.
11   Q      Why not?
12   A      So pigs are different than humans obviously aside from
13   the way they look.  Physiologically they have different issues
14   that make taking what happens in a pig directly to a human.
15   Pigs have been used for modeling for defibrillation for
16   decades.  Cardiologists use them for pacemakers and
17   defibrillators that they put into people to test them because
18   pigs go into V-fib much easier than humans do, three times as
19   easy into V-fib, so they're a great model to study in
20   ventricular fibrillation.  But when you're looking for
21   thresholds and causes of it, obviously an organ isn't like a
22   pig that goes into it much more easily probably is not ideal.
23   And the reason this happens is, No. 1, pigs are generally
24   smaller.  Pigs in these studies were much smaller.
25   Q      How much smaller?
```

1    A        So there's never been a pig greater than 50 kilograms,

2    about 110 pounds, that's ever gone into ventricular

3    fibrillation from any of these Taser studies.  Most of them

4    converted -- in fact, the one pig that converted from

5    electricity to that delayed V-fib was about 65 pounds.  It's a

6    very small, tiny pig.  So the size of the pig matters, because

7    obviously you're able to get the darts closer to the heart and

8    that really is the effect of modeling and trying to get pacing,

9    capture, or ventricular fibrillation.

10   Q        Okay.  Any other differences with the pig heart versus

11   the human heart and how it can be translated from pigs to

12   humans?

13   A        Sure.  So the pig has a different anatomy in the heart.

14   Pigs' hearts -- and I'll try to explain this in terms of I'm an

15   ER doc.  I'll try to keep it so I can understand it.  In humans

16   we have these transmitting fibers called Purkinje fibers.

17   Q        Called what?

18   A        Purkinje fibers.

19   Q        Okay.

20   A        They're little nerves that transmit electricity.  Think

21   of it as little transmitters or conductors of electricity.

22   That's what moves the conduction around our heart to make the

23   heart -- with people with their EKG, electrical activity you're

24   measuring, that's what's being transmitted through those

25   Purkinje fibers.

1    In the human heart, you look and see a regular heart

2   there, they're on the inside.  They're on the very inner

3   portion of the muscle layers.  You have a thick muscle wall of

4   the heart all the way around.  It would be on the inner surface

5   here.  So if you're thinking about an electrical impulse coming

6   from the outside of the body, like a Taser, it's got to go

7   through your skin and your fat and your muscle and then maybe a

8   little lung to get to that heart, and it's got to go through

9   the heart muscle to get down to those Purkinje fibers so it can

10  actually have some electrical activity affecting the heart.

11    Pigs are different.  Their Purkinje fibers go all

12  the way through all layers of the heart muscle.  So in a pig

13  their chest walls are thinner in general.  Their

14  dart-to-the-heart portion is closer and they're actually

15  hitting the Purkinje fibers right on the surface.  So the

16  electrical activity is more easily transmitted through the

17  heart tissue, which is why pigs tend to go into ventricular

18  fibrillation more easily than humans do.  So when you see a

19  study that says a pig went into ventricular fibrillation, that

20  means a pig went into ventricular fibrillation.  It's a

21  different heart of different size of different space, and it's

22  not the same as putting the probes in the same position on a

23  human being.

24  Q    The theory that Dr. Dennis has espoused about what

25  happened here, has that ever been demonstrated in a human?

1  A        The idea of a delayed ventricular fibrillation has not

2  been displayed where you see capture followed by proposed

3  rhythm changes to ventricular fibrillation.  It hasn't been

4  demonstrated in any research that's been done on humans.

5  Q        And there have been instances where humans have been

6  Tased obviously, correct?

7  A        Yeah.  About 3 million field uses and 2 and a half

8  million uses in studies and in training sessions, so yes.

9  Q        And the modeling that Dr. Dennis is proposing, it just

10  is not documented anywhere?  I mean --

11  A        I mean he's basing it mainly on this one pig out of the

12  7,000 activations.  In the humans there hasn't been studies

13  that demonstrated cardiac pacing in the X26 that subsequently

14  went into V-fib.  Two and a half million volunteers and many of

15  them had transcardiac placement, including myself, and none of

16  them ever had cardiac pacing demonstrated, and certainly none

17  of them demonstrated that that that went into ventricular

18  fibrillation two minutes later.

19  Q        Now, you talked about the two minutes.  How important

20  is that two minutes or what is the importance of that two

21  minutes?

22  A        So the idea if somebody is going to be electrocuted,

23  whether it's an outlet, whether it's a lightening strike or

24  whether it's a car battery or a Taser, if somebody is going to

25  go into ventricular fibrillation from an electrical activity,

630

1    it happens at the time the electricity is being placed.  That's

         2    the modeling behind it.  That's the five out of six pigs that

         3    actually went into V-fib after Taser activation in these

         4    studies all went into as soon as the -- well, while the Taser

         5    was being used, turn off the energy and they went into

         6    ventricular fibrillation.  That's what you would expect to see

         7    in somebody who was, I guess if you want to call it,

         8    electrocuted or shocked into a dysrhythmia, it should happen at

         9    that time.

        10            So that's why the two minutes after this event he's

        11    moving and moaning and getting out of the car, those types of

        12    things, and I think everybody established he wasn't in cardiac

        13    arrest at that time.  He wasn't in ventricular fibrillation.

        14    So what happened later was not an electrical activity to that

        15    heart that caused the conversion to V-fib like we would expect

        16    it to be.

        17    Q      So as we see from the video, Bryce is Tased and at some

        18    point the Taser discharge stops?

        19    A      Correct.

        20    Q      And then it's two minutes?

        21    A      Correct.

        22    Q      It's been about 45 seconds since I asked you my last

        23    question.  That's not even half of the two minutes you're

        24    talking about, is it?

        25    A      That's correct.

1  Q      And so once the Taser discharge, you just don't have

2  that length of time before you all of a sudden go into V-fib?

3  A      If you're going to model the Taser activation causing

4  V-fib, and there's modeling out there that says it can happen

5  in one in 2.8 million people in Taser activations, the modeling

6  is that at the time of the event you go into ventricular

7  fibrillation.  You immediately go unconscious because that's

8  what happened; and if you check the rhythm, it's V-fib.  He

9  didn't immediately go unconscious.  He was responsive

10  minimally, but he was not in cardiac arrest.

11          When you are in V-fib, you are in cardiac arrest.

12  You've heard of the bag of worms.  The heart doesn't push blood

13  around and people immediately lose consciousness within one or

14  two seconds of going into V-fib.  We know he wasn't in that.

15  That's been established.  So that activation causing the

16  current going into V-fib couldn't have happened because of that

17  time period.

18  Q      And this two-minute-one-second time period that we're

19  talking about, that's not necessarily coming from you.  That's

20  Dr. Dennis' observation that he was not in cardiac arrest until

21  two minutes and one second after the Taser discharge ended?

22  A      That's what I understand Dr. Dennis reported.  It's

23  what it looked like myself when I look at the video as well.

24  Q      Now, Dr. Dennis talked about a person with a pacemaker.

25  How does a pacemaker relate to cardiac capture and how does it

1    relate to Taser applications and what we're talking about?

2    A    Sure.  There was one case report, sort of a publication

3    that talked about a subject or a person who had a pacemaker in

4    place and got a Taser activation and then they recorded what

5    they thought to be cardiac capture when they looked at the

6    download of that pacemaker.

7         So the pacemaker, if you're not familiar with it, is

8    a device that has two wires that go right into your heart.  The

9    idea is to pace your heart if you need it or to defibrillate

10   your heart if you go into a ventricular fibrillation.  If you

11   know anybody that has one of those devices, that's their device

12   that they're set up to protect you or pace you.

13        So when you use a Taser activation, electricity

14   likes to go through the points of least resistance.  Sort of

15   makes sense why you don't step in water when there's

16   electricity there because it transmits very well through that,

17   but it doesn't go well through air.  But it does go well

18   through metal, which is why your houses are wired for

19   electricity with wires.

20        So if you do a Taser activation on somebody on the

21   chest or in the body and the electricity is sort of going

22   through the muscle layers, which is where it likes to go

23   through these superficial muscles because it's a point -- it's

24   sort of a freeway for them.  They like to conduct through that

25   wet environment.  It picks up these wires.  So what happens

1    when it sees these wires that are made of metal?  It likes to

2    conduct down those wires.  So it's an easy transmission of

3    electricity from the pacemaker right into the heart.  So you

4    would expect that somebody who had a pacemaker in and got a

5    Taser activation, that some of that electricity would go down

6    the wire freeway to the heart and potentially cause a cardiac

7    capture.  That's what we do in the ER with pacemakers.  We put

8    wires in to pace people's hearts, so it did exactly what you

9    would expect it to do.  So there was a case in which there was

10   a cardiac capture in a human but it was somebody who had a

11   pacemaker in place.

12   Q      So you testified that you can't really translate pigs

13   to humans because there are just differences?

14   A      Correct.

15   Q      Can you translate a person with a pacemaker to someone

16   without a pacemaker?  Can you make that connection that it

17   happened with a pacemaker so, therefore, it would happen

18   without a pacemaker?

19   A      Because the pacemaker physiology causing the changes in

20   electricity you wouldn't be able to translate that to somebody

21   without a pacemaker.  It's sort of an artificial environment.

22   You have wiring to go to your heart where somebody without a

23   pacemaker doesn't.  So even a single case report out of 5

24   million applications of the Taser wouldn't be overwhelming

25   evidence for it anyway, but the idea that the physiology is

1    different also supports that.

2    Q      Dr. Vilke, the opinions you've given, have they been

3    given to a reasonable degree of medical certainty?

4    A      Yes.

5    Q      And they've been based on your experience, your

6    research?

7    A      Yes.

8    Q      And the available literature in the medical community?

9    A      Yes.

10   Q      And the scientific community?

11   A      Yes.

12           MR. CUTLER:  No further questions, Your Honor.

13   CROSS-EXAMINATION BY MR. BURTON:

14   Q      Dr. Vilke, you have not offered any opinion on what

15   caused Bryce Masters to go into cardiac arrest at about 3:15

16   p.m. on September 14th, 2014, in Independence, Missouri; is

17   that correct?

18   A      That's correct.

19           MR. BURTON:  No further questions.

20           MR. CUTLER:  No further questions.

21           THE COURT:  Thank you, Doctor.  You're excused.

22           THE WITNESS:  Thank you.

23           (Witness excused.)

24   TIMOTHY RUNNELS, being sworn by the courtroom deputy,

25   testified:

635

```
 1    DIRECT EXAMINATION BY MR. CUTLER:

 2    Q      Good morning.

 3    A      Good morning.

 4    Q      Would you state your name, please.

 5    A      Timothy Runnels.

 6    Q      We've been hearing a lot about you over the last couple

 7    days, right?

 8    A      Correct.

 9    Q      You were employed by the Independence Police Department

10    as a police officer, correct?

11    A      Yes, sir.

12    Q      How long were you employed by Independence?

13    A      Just under three years.

14    Q      And you were employed as a police officer?

15    A      Yes.

16    Q      Did you grow up in Independence?

17    A      Yes.

18    Q      And high school, college?

19    A      Yes.  I did all my education in Independence.

20    Q      Where did you go to college?

21    A      I did a community college for the first two years, then

22    I graduated from CMSU my last two years.

23    Q      And what was your degree in?

24    A      Criminal justice.

25    Q      And after you graduated with your degree in criminal
```

1    justice, what did you do next?

2    A      I began applying for police academy, police officer

3    positions.

4    Q      Were you accepted into the academy?

5    A      Yes, sir.

6    Q      Did you go through the academy?

7    A      I did.  I went to the academy with the Kansas City

8    Police Department.

9    Q      And you graduated?

10   A      Yes.

11   Q      And you worked for the Kansas City Police Department,

12   correct?

13   A      Yes.

14   Q      How long did you work there?

15   A      Just under four years, I think.

16   Q      And from Kansas City you went where?

17   A      I went to Raymore for about six months.

18   Q      And then after Raymore?

19   A      I went to Independence when they called and offered a

20   position to me.

21   Q      There's been some testimony about the training you

22   received with respect to Tasers.  Do you remember the training

23   you received?

24   A      Briefly.

25   Q      What do you remember about it?

637

```
 1   A       I remember that Tasers were encouraged to be used and
 2   that they were a less lethal and safe tool to use.
 3   Q       And what about how to use them, where to fire them,
 4   when to fire them?
 5   A       Initially it was we could fire any point in the body.
 6   I remember some training later where they had recommended a
 7   preferred area change for lower midsection for Taser
 8   applications.
 9   Q       When you say "preferred area change," what do you mean?
10   A       They just recommended a preferred area for the Taser
11   deployment.
12   Q       And what was that preferred area?
13   A       I believe anywhere on the body except for the immediate
14   heart area.
15   Q       Do you remember when you underwent Taser training?
16   A       My initial one was in the academy.  I believe it was
17   around 2007.
18   Q       And did you undergo any training while at KCPD?
19   A       I believe I had in-service training, but I'm not sure
20   when it was.
21   Q       Did you undergo Taser training at Independence Police
22   Department?
23   A       I had a recert training.  I believe that was in May.
24   Q       When you say "recert," you mean recertification?
25   A       Correct.
```

```
1    Q      In May of what year?

2    A      2013, I think.

3    Q      So you don't deny that you had some Taser training,

4    correct?

5    A      No, sir.

6    Q      Now, let's fast forward to September 14th of 2014.

7    What was your first interaction with either Bryce Masters or

8    the vehicle he was driving?

9    A      In September what was my first interaction?

10   Q      September 14th of 2014.

11   A      I was on a side street.  I believe it was Savage.  I

12   observed a vehicle going westbound on 23rd Street at a slightly

13   higher rate of speed with darkly tinted windows.

14   Q      What did you do next?

15   A      I pulled out into the flow of traffic.  Upon getting

16   close to the vehicle, the vehicle pulled into the QT parking

17   lot.

18   Q      QT meaning QuikTrip?

19   A      Yes, sir.

20   Q      What did you observe the vehicle do in the QuikTrip

21   parking lot?

22   A      The vehicle parked at one of the pumps at which time

23   when I passed the vehicle, I was able to obtain the license

24   plate.  I parked on the west side of the parking lot.  I

25   conducted a license plate check where it came back with a
```

639

1   warrant in association with the vehicle, and I just sat to
2   observe the vehicle, and it did not appear to be getting any
3   fuel or anything, at which time shortly exited the pumps,
4   circled the adjoining McDonald's parking lot twice without
5   getting fuel.
6   Q       Fuel?
7   A       I'm sorry.  Without getting food.  And then pulled out
8   into, I believe it was Fair, at which time I pulled behind the
9   vehicle.
10  Q       And why did you pull behind the vehicle?
11  A       Due to the warrant on the plate, the darkly tinted
12  windows, and the suspicious driving activities, as far as not
13  getting fuel and not getting food, I decided to conduct a
14  vehicle check.
15  Q       So the vehicle pulled out on to Fair Street, you pulled
16  out behind it, and what happened?
17  A       I engaged my emergency lights and sirens once we
18  proceeded past the intersection of Fair and Noland.
19  Q       And the vehicle pulled over?
20  A       Yes.
21  Q       And you pulled over behind it?
22  A       Yes.
23  Q       We saw from the video there's kind of a period of time
24  between the time your vehicle and the other vehicle stopped and
25  we see you walking to the vehicle, maybe 45, 60 seconds, I'm

1    not sure.  Do you remember what is going on during that time

2    frame before we see you walk to the vehicle?

3     A      Prior to walking to the vehicle?

4     Q      Yes, sir.

5     A      I believe there was air traffic going on at the time,

6    so I was waiting to run the vehicle information and location

7    through dispatch; and once I was able to run it, I was exiting

8    the vehicle and able to approach the Bryce Masters vehicle.

9     Q      And you went around to the passenger side?

10    A      Correct.

11    Q      What did you do?

12    A      I knocked on the window and instructed him to roll it

13   down.

14    Q      Did he do that?

15    A      No, sir.  Well, he rolled it down an inch or two

16   initially.

17    Q      And what was your verbal response to that?

18    A      I believe I told him to roll it down again.  It went

19   down another inch or two, at which time I could smell the odor

20   of marijuana.  I told him to roll it down again, and he did

21   not, at which time that is when I went to the driver's side of

22   the vehicle.

23    Q      We've seen from the video you -- did he tell you that

24   the driver's side window didn't work?

25    A      I don't recall if he said that or not.  I don't believe

1    so.

2    Q      Okay.  You asked him to step out of the vehicle?

3    A      Yes.

4    Q      And then tell us what happened from that point.

5    A      At that point he was already not complying with my

6    instructions and I was instructing him out of the vehicle.  He

7    began to turn and brace himself in the vehicle after I

8    initially told him I was -- or warned him he was going to be

9    Tased if he didn't get out.  I attempted to physically remove

10   him from the vehicle, at which time he spun in the vehicle,

11   leaning back into the passenger side where he brought up his

12   foot in either a kicking motion or bracing motion.  At that

13   time I decided I wasn't able to physically remove him, so I

14   redrew the Taser and warned him again he was going to be Tased,

15   at which time I ultimately ended up deploying the Taser.

16   Q      So you took out the Taser the first time?

17   A      Yes.

18   Q      And what did you do when you took it out the first

19   time?

20   A      I warned him he was going to be Tased if he didn't get

21   out of the vehicle.

22   Q      And he didn't get out, did he?

23   A      No, sir.

24   Q      Why didn't you Tase him at that point instead of

25   putting the Taser back in your holster?

1    A       At that point initially I thought I was able to pull

2    him out, so I attempted to physically remove him before using

3    the Taser; and after unsuccessfully being able to do that, I

4    chose the option of the Taser again.

5    Q       Now, we talked about your Taser training.  When you

6    Tased Bryce Masters, did he respond physically in the way that

7    your training indicated a Tased suspect should?

8    A       No, sir.

9    Q       How was it different?

10   A       Well, this is my first and only Taser deployment in the

11   field, and the fact that he was able to get up and move on his

12   own accord I did not know if the Taser was having an effect,

13   was having a full effect, partial effect, or what was actually

14   occurring.  I just knew that he appeared to be initially

15   complying, but I didn't know what would happen if the Taser

16   deployment were to cease.

17   Q       What do you mean by that?

18   A       If the Taser did have an effect on him and that's what

19   was causing him to comply, once the Taser is ceased, he would

20   revert back to resisting arrest.

21   Q       All right.  So we see from the video Bryce, then he

22   gets out of the car and the Taser activation is still going,

23   correct?

24   A       I believe so, yes.

25   Q       So at some point Bryce gets on the ground, correct?

1    A      Correct.

2    Q      So what are you doing at that point?

3    A      At that point I believe I instructed him to put his

4    hands behind his back.

5    Q      This is while he's on the ground?

6    A      Correct.

7    Q      So you're standing up.  The Taser discharge is

8    continuing.  And you instructed him to do what?

9    A      To place his hands behind his back.

10   Q      Did he do that?

11   A      No, sir.

12   Q      So what did you do at that point?

13   A      At that point I moved in to physically control him and

14   place his hands behind his back.  Once I was able to do so, the

15   Taser was ceased.

16   Q      And then at some point on the video I think we heard

17   you say the words into your radio "Taser deployment"?

18   A      Correct.

19   Q      What was that for?

20   A      Just to notify the dispatch and other officers in the

21   area there was a Taser deployment and to notify AMR to respond

22   due to our policy.

23   Q      AMR, that's the emergency medical response?

24   A      Correct.

25   Q      After you handcuffed Bryce, what happened next?

644

1    A        I believe I instructed him to move over to the side of

2    the road, the curb side of the road.

3    Q        Did he do that on his own?

4    A        No, sir.

5    Q        So what did you do next?

6    A        At that point in time I picked him up, escorted him

7    over to the side of the road.  It appeared he was initially

8    minimally offering assistance.  When I got him over to the side

9    of the vehicle, I was attempting to get him to the curb at

10   which time that is when I dropped him.

11   Q        And just so we're clear, I'm not going to gloss over

12   this, you dropped Bryce to the ground?

13   A        Yes, sir.

14   Q        His hands were handcuffed behind his back, correct?

15   A        Yes, sir.

16   Q        And you dropped him to the ground?

17   A        Yes, sir.

18   Q        Face first?

19   A        Yes, sir.

20   Q        Because you did that, you were charged in federal

21   court, correct?

22   A        Correct.

23   Q        And you pled guilty to violating his civil rights with

24   respect to dropping him to the ground, correct?

25   A        Yes, sir.

1  Q      And you are currently serving a sentence for that in

2  federal prison, correct?

3  A      Correct.

4  Q      And you're here today because permission was granted

5  for you to attend the hearing but you are still in federal

6  prison serving your sentence, correct?

7  A      Correct.

8  Q      How long was your sentence?

9  A      Four years.

10 Q      And not four years from the date this happened.  Four

11 years from the date that you pled guilty, correct?

12 A      Correct.  Four years from the sentencing date.

13 Q      From the sentencing date.  You pled guilty on one date

14 and then there was a subsequent sentencing hearing, correct?

15 A      Correct.

16 Q      And then from that day forward that's when your

17 sentence started?

18 A      Yes.

19 Q      And you're currently serving that federal sentence out

20 of state?

21 A      Yes.

22 Q      You used the phrase "resisting arrest."  Is there any

23 doubt in your mind that Bryce Masters was resisting arrest?

24 A      No, sir.

25 Q      We've heard some talk about the 20-second Taser

1     discharge.  As you were discharging the Taser, what was going

2     through your mind?

3     A     Well, I believe the Taser to do a five-second cycle.

4     Also at the time of the deployment I didn't know if it was

5     actually working or having the desired effect due to Bryce's

6     continued movements.  So I didn't know if it was working or

7     what exactly what was going on.  I just knew at that time I was

8     getting some sort of temporary compliance.

9     Q     At what point did you determine that the Taser

10    discharge was 20 seconds?

11    A     I believe it was a week or two later when the IA

12    investigation was started.

13    Q     You didn't know at the time?

14    A     No, sir.

15    Q     How did you not know at the time that it was 20

16    seconds?

17    A     I wasn't focused on the time.  I didn't realize 20

18    seconds had lapsed.  I was focusing on getting Bryce Masters in

19    handcuffs and under control at that time.

20    Q     So you weren't counting seconds as you were trying to

21    arrest him?

22    A     No, sir.  And the fact, I believe, the Taser was only

23    five seconds, I wasn't -- it wasn't even a thought in my mind.

24    Q     There was some discussion about -- I'm sorry -- there

25    was testimony by Ms. Stacy Masters that you drove by the

1    Masters' house at some point after all of this happened.  Do

2    you recall that testimony?

3    A     Yes, sir.

4    Q     Did you drive by the Masters' house?

5    A     I did on one occasion, yes.

6    Q     Why did you drive by the Masters' house?

7    A     Well, a few week, maybe a month prior I had thought I

8    had observed Bryce leaving our neighborhood in a black vehicle

9    but I wasn't sure, and then over the next few weeks I started

10   receiving multiple reports from my neighbors that a male

11   matching Bryce's description in a black car had been driving by

12   my house.

13   Q     You say a black car.  The video that we saw showed a

14   gray Pontiac?

15   A     Correct.  That was the vehicle in the stop.

16   Q     But you said you saw a black car and it was reported to

17   you that a black car --

18   A     Correct.  It was reported by my neighbors and the

19   vehicle I thought I saw Bryce in was a black, I believe it was

20   an Audi.  Then when I spoke to my immediate neighbor, he said

21   that an individual looking like Bryce drove by my house real

22   slow; and then when he approached the vehicle, the individual

23   yelled out the window, What are you looking at old man, and

24   then drove off.

25   Q     Then what did you do in response to that?

1   A        I didn't do anything initially.  It was a few days to a

2   week later, I believe it was myself and my family were leaving

3   a restaurant in the 40 Highway area.  We were driving eastbound

4   on 40 Highway, and at that point in time I was nervous and

5   concerned about the repeated statements that someone had been

6   driving by my house in a black car, so I decided to drive by

7   their residence to see and confirm if that was the vehicle or

8   that was something different.  I drove by the residence in my

9   truck with the windows rolled up and did not say anything and

10  exited the subdivision subsequently.

11  Q        And you said your family.  Who was in the vehicle with

12  you at that time?

13  A        My wife was in the front passenger seat and my two kids

14  were in the rear seats.

15  Q        And how old are your children?

16  A        At the time I believe they were five and three.

17  Q        So did you interact with the Masters at any point

18  during this time?

19  A        No, sir.  When I drove by, my windows were up, didn't

20  say anything.  I do believe the mom and the dad were outside.

21  I'm not sure what they were doing.  I just recall two

22  individuals being outside when I drove by, but did not

23  appear -- there was no communication.  My windows were up and

24  nothing was said.

25  Q        So was that the end of the encounter then?

1    A        After I exited the neighborhood, I get back on 40

2    Highway and continue eastbound.  I believe in the area of 40

3    Highway and 291 my windows were down at that point because my

4    son likes to have the wind blown when he's in the backseat.  I

5    heard someone call my name, at which time I turned around and

6    it was Mr. Masters, the father, Matt, that was in his vehicle

7    who called my name and said, If you come by my house again,

8    there's going to be trouble.  Nothing further was said on his

9    part or my part and we went our own ways.

10   Q        Did you ever go back by the Masters' house after that?

11   A        No, sir.

12   Q        Had you ever been by the Masters' house before that?

13   A        No, sir.

14   Q        When you drove by the Masters' house at the time you

15   described, did you see a car that matched the description you

16   were looking for?

17   A        No, sir.  I believe there was only one vehicle in the

18   driveway, some sort of SUV, but I did not observe a black

19   vehicle in the driveway.

20   Q        Let's talk about the laser red dot on the Taser.  Did

21   you point the red dot at Bryce's chest?

22   A        I pointed in that general area, yes.

23   Q        And what did you do after you pointed the red dot?

24   A        The red dot, I believe, was initial warning and advised

25   him he was going to be Tased if he didn't get out of the

1  vehicle.

2  Q      So did you point the red dot and fire?

3  A      No, sir.

4  Q      So you pointed the red dot, you advised him that he

5  would be Tased if he didn't get out of the vehicle?

6  A      Correct.  I believe that's when I reholstered it and

7  then I brought the Taser out again, and at that point in time

8  is when he continued to move in his vehicle and was spinning

9  backwards when I applied the Taser.

10 Q      You talked about him moving in the vehicle.  How was he

11 moving?

12 A      He had spun sideways leaning backwards into the

13 passenger seat.  His feet were up in kind of a kicking motion

14 towards me when I tried to grab him out.  His hands were

15 continually moving around so I couldn't see where they were

16 going or what they were reaching for; and upon deployment of

17 the Taser, he was continuing to lean backwards towards the

18 passenger side of the vehicle.

19 Q      You know when we watched the video, we know what

20 happens.  We know how this ends.  When you're there at the

21 scene -- when you were there at the scene, did you know what

22 was going to happen?

23 A      No, sir.

24 Q      From second to second to second did you know how this

25 was going to turn out?

1    A        No, sir, I did not.

2    Q        All right.  So as you're standing there and you've got

3    Bryce Masters moving in the vehicle, he won't come out,

4    correct?

5    A        Correct.

6    Q        You say his hands were doing things you didn't always

7    know where his hands were?

8    A        Correct.  He was moving them around as if he's

9    potentially reaching for something or trying to grab something.

10   Q        So as an officer, what does that cause you to do?

11   A        That raises a big red safety concern, red flag that you

12   need to keep visual on the hands and detain them as soon as

13   possible.

14   Q        There's a dash cam on your vehicle, correct?

15   A        Yes, sir.

16   Q        And you knew that at the time?

17   A        Yes, sir.

18   Q        And you knew it was activated?

19   A        Yes, sir.

20   Q        So you knew everything you were doing was being

21   recorded?

22   A        Yes, sir.

23   Q        Did that cause you any concern?

24   A        No, sir.

25   Q        Did you purposefully aim at Bryce Masters' chest when

1    you discharged the Taser?

2    A       No, sir.

3    Q       What was your purpose in discharging the Taser?

4    A       My purpose was to gain compliance to where I could get

5    him in handcuffs.

6            MR. CUTLER:  At this time I have no further

7    questions, Your Honor.

8            MR. PRESLEY:  If the Court please.

9            THE COURT:  Yes, sir.

10   CROSS-EXAMINATION BY MR. PRESLEY:

11   Q       Officer Runnels, allow me to hand you what we've marked

12   as Exhibit 156.  Do you recognize that document?

13   A       Yes, sir.

14   Q       What is it?

15   A       I believe it's my initial report.

16   Q       Your initial report to whom?

17   A       For the car stop that day.

18   Q       Was this made a day or two after the accident or the

19   encounter with Bryce?

20   A       It was made that same day.

21   Q       And you had a chance to think about what had happened?

22   A       Briefly.  It was made within a few hours of the

23   incident.

24   Q       All right.  This was made within a few hours.  And at

25   that time -- if you'll look at the bottom paragraph, the

1    sentence after "I requested a second unit from dispatch at this

2    time."  Did I read that correctly?

3    A       Yes.  About midsection of the paragraph?

4    Q       Right.

5    A       Yes.

6    Q       Where it says you advised Bryce he was under arrest and

7    to exit the vehicle.  Bryce refused bracing his feet up against

8    the driver's side door of the frame of the vehicle.  Did I read

9    that correctly?

10   A       Sounds right, but I'm trying to find it.

11   Q       It's the sentence before that.  "Bryce again refused

12   and began bracing his feet up against the driver's side door

13   frame of the vehicle."

14   A       Yes.

15   Q       "I requested a second unit from dispatch at this time."

16   Is that correct?

17   A       Yes.

18   Q       You had the option of waiting for backup to arrive and

19   Bryce wasn't going anywhere, was he?

20   A       At that time he was already physically resisting, so it

21   was my determination to get him in custody.

22   Q       Let's be real clear about what Bryce was doing.  He was

23   bracing his feet at that time, correct?

24   A       At that time he made kicking motions and ultimately

25   braced himself in the vehicle.

1   Q       Where is that in your report?

2   A       The bracing is but not the kicking.

3   Q       So you failed to include that in your report?

4   A       Well, it's not in there, yes, sir.

5   Q       In addition, you say, "I reached for his left arm which

6   he pulled away."  Away from you, correct?

7   A       I believe that was the time when I reached in and you

8   can see me being pulled into the vehicle due to trying to grab

9   him when he leaned backwards, yes, sir.

10  Q       You stated in your report to your superiors, quote, I

11  reached for his left arm which he pulled away, closed quote.

12  Did I read that correctly?

13  A       Correct.

14  Q       You state, "I then reached for his left foot in an

15  attempt to pull him out of the vehicle and he was able to pull

16  away."  Did I read that exactly?

17  A       Yes.

18  Q       You then say, "Bryce leaned further back into the

19  vehicle pulling his hands away again."  Did I read that

20  correctly?

21  A       Yes.

22  Q       You then say, "He rebraced his feet on the driver's

23  side door frame."  Is that true?

24  A       Yes.

25  Q       And when he said -- when you said he pulled his hands

655

1   back, he had his cell phone in his hands, did he not?

2   A       I believe he was holding it in one of his hands.

3   Q       Let me hand you what we've marked as 172.  This is a

4   still from Bryce's cell phone video.  Does that represent your

5   position in respect to Bryce and his cell phone at the time you

6   deployed the Taser?

7   A       The Taser was not deployed in this photo, but it would

8   be a fairly consistent position as far as when deployment was.

9   Q       It looks like exactly where you were when you shot him

10  in the chest, correct?

11  A       Consistent with that, yes.

12  Q       You go on to state in your report that you placed the

13  red dot on Bryce's chest the first time, correct?

14  A       Correct.

15  Q       And did you place the red dot on his chest the second

16  time?

17  A       I placed it in that general area of the lower

18  midsection area.

19  Q       So would it be correct, then, at the time that you made

20  your report, Exhibit 156, to your superiors that any action

21  Bryce took was away from you, not toward you?

22  A       Except for the bracing or possibly kicking.

23  Q       You say possibly kicking but you never reported that.

24  So my question is really very specific.  As you reported it at

25  the time, you did not say you were kicked, correct?

656

```
 1    A       Not in my report, no.

 2    Q       No.  And, in fact, that's what you're telling us now;

 3  isn't that true?

 4    A       No, sir.  I told the other sergeants and stuff.  It was

 5  just not in my report.

 6    Q       And so, in addition, you told your superiors that you

 7  grabbed Bryce from behind underneath both shoulders -- we're on

 8  the second page now of 156.

 9    A       Okay.

10    Q       -- and assisted him towards the curb between our

11  vehicles to get him out of the flow of traffic for his safety,

12  correct?

13    A       Correct.

14    Q       It wasn't to get off the dash cam, correct?

15    A       No, sir.

16    Q       "Bryce was moving his knees as if he was assisting me,"

17  is what you reported.  Did I read that correctly?

18    A       Yes.

19    Q       "As I was lifting him up by both arms to get over the

20  curb, he then dropped his shoulders and went limp near the rear

21  of the vehicle.  I then dropped him and he fell to the ground

22  striking his chin on the pavement."  Did you initially tell the

23  Independence Police Department that he slipped out of your

24  grasp?

25    A       I don't believe I used those words, no.
```

1  Q      So you always have admitted that you intentionally

2  dropped Bryce Masters to the ground?

3  A      I admitted, yes, that I dropped him to the ground.

4  Q      And you did so intentionally?

5  A      I did so with the purpose of getting him to the grass

6  but not harming him.

7  Q      I'm sorry?

8  A      I did so with the purpose of trying to get him to the

9  grass but not for the purpose of intentionally hurting him.

10  Q      So you were trying to get him in the grass; is that

11  correct?

12  A      Yes, sir.

13  Q      But you threw him down on the concrete driveway?

14  A      He ultimately hit the concrete, yes, sir.

15  Q      And that's where all the blood is, isn't it, from

16  Bryce's chin?

17  A      Yes, sir.

18  Q      And let's take that drop just for a minute.  As Mr.

19  Cutler indicated, you pled guilty to depriving Bryce of his

20  constitutional rights as it relates to the drop?

21  A      Yes, sir.

22  Q      And you appeared and spoke to the Court at a

23  sentencing; is that true?

24  A      Yes, sir.

25  Q      And you told the Court at that time that, "Your Honor,

```
 1   thank you for allowing me to speak today.  To Bryce I'm deeply
 2   sorry for the pain, the physical and emotional stress and
 3   unrest you've experienced for the last year and a half."  Did I
 4   read that correctly?
 5   A     That sounds correct.  I don't have it but it sounds
 6   correct.
 7   Q     So are you sorry for the Tasering?
 8   A     I'm remorseful for the outcome, but at the time I
 9   believe it was an appropriate use.
10   Q     So I want to make sure you're telling this jury that if
11   you had it to do over again, you believe you would do it
12   exactly the same way?
13   A     I'm not sure if I can answer that.  Based on what I
14   knew at the time and the circumstances, I believe that I was
15   acting appropriately with regard to the Taser.
16   Q     That's right.  In the moment and faced with those
17   circumstances, you would do it exactly the same way?
18   A     Based on what I knew at the time, I would still deploy
19   the Taser.
20   Q     And you indicated -- and I'm a little confused about
21   this because I want to make sure we're clear.  You were trained
22   and taught that a Taser works most effectively when you have
23   probe spread; is that true?
24   A     That sounds correct, yes.
25         MR. PRESLEY:  Can we pull up 172, Chris.
```

```
 1              I would offer 156 and 172 at this time, Your Honor.

 2              MR. CUTLER:  No objection, Your Honor.

 3              THE COURT:  Received.

 4    Q      (By Mr. Presley)  Do you have 172?

 5    A      Not yet, no.

 6    Q      It's in front of you, I believe, the photograph.

 7    A      Oh, okay.  Yes.

 8    Q      So what does your training tell you the best distance

 9    for deploying the Taser for probe spread would be?

10    A      I'm not specific on the best difference of probe

11    spread.  I know that larger the spread the more effective it

12    generally is.

13    Q      How far away from your suspect do you need to be to

14    achieve good probe spread?

15    A      I believe that varies on the individual.  I'm not sure

16    on the set distance.

17    Q      You elected to use probe mode, correct?

18    A      Yes, sir.

19    Q      You made the conscious decision that you were going to

20    use probe mode?

21    A      Yes, sir.

22    Q      And your training teaches you that you use probe mode

23    when you want somebody to be incapacitated?

24    A      Well, our training and IPD policy is probe mode is the

25    preferred method of deployment.
```

1  Q    And the reason is because you're trying to incapacitate

2  a suspect?

3  A    For gaining compliance.

4  Q    Well, you want to review the training because we can

5  look at that, but you've heard all the -- you've been present

6  in the courtroom.  You've heard everyone's testimony.  Probe

7  mode is to incapacitate the suspect or induce neuromuscular

8  incapacitation.  Isn't that your training?

9  A    I believe ideally in the circumstances that is what we

10 wish to obtain, yes.

11 Q    So when you made the conscious decision to employ in

12 probe mode and to shoot Bryce Masters from that position, did

13 you anticipate that he would be incapacitated?

14 A    I wasn't honestly for sure what to anticipate.  This

15 was my first and only deployment in the field.

16 Q    Yeah.  But you have training.  You deployed it in

17 training.  You've seen the videos in training of how it's

18 supposed to work, correct?

19 A    How it's supposed to work, yes.

20 Q    So in your mind when you deployed that Taser, you

21 expected Bryce to be incapacitated; isn't that true?

22 A    I believed him to stop resisting at that point in time

23 with the Taser use.

24 Q    Because he would be incapacitated.  He couldn't do

25 anything, right?

661

1   A        If that's what would happen, then yes.

2   Q        I mean, that's what probe mode's designed to do,

3   correct?

4   A        Ideally, yes.

5   Q        And yet when you gave Bryce a command, you expected him

6   to comply; isn't that right?

7   A        I gave him a command, yes.

8   Q        When he was being Tasered, you expected him to comply?

9   A        Yes.  Because he was able to move, yes.

10  Q        Yes.  Because you knew because you didn't have probe

11  spread and you shot him in the heart that he wasn't

12  incapacitated; isn't that correct?

13            MR. CUTLER:  Your Honor, I object to the form of the

14  question.

15            THE COURT:  Sustained.

16  Q        (By Mr. Presley)  Now, as soon as you Tased Bryce, he

17  was under control enough for you to grab his cell phone and

18  throw it, correct?

19  A        I took the object out of his hand at that time, yes.

20  Q        It wasn't an object.  It was his cell phone, wasn't it?

21  A        I was not for sure until the end.  I don't know what it

22  is.  We're not trained to have anybody point anything in our

23  general direction.

24  Q        I just want to make sure you're telling this jury that

25  from 172, that position, you could not determine that Bryce had

662

1    a cell phone in his hand?

2    A      It looks like a cell phone, but that does not mean it's

3    necessarily a cell phone.

4    Q      So did it appear to be a cell phone?

5    A      It appeared to be one, yes.

6    Q      And did you have any hesitancy about grabbing it?  Do

7    you think it was an explosive or some other device?

8    A      I don't know what it is.  We had just previously

9    received training on cell phones that are .22 cartridges, other

10   Tasers.  Until the scene is safe, we are not allow to have

11   anybody pointing anything in our general direction.

12   Q      So you grabbed the cell phone and tossed it away,

13   correct?

14   A      Correct.

15   Q      And you had the presence of mind to say, "I told you.

16   I told you so."  Isn't that true?

17   A      I said that, yes.

18   Q      While you are continuing to Tase him, correct?

19   A      I believe the Taser was still going, yes.

20   Q      Yes.  And the reason the Taser was still going was

21   because you kept your finger on the trigger, correct?

22   A      I hadn't got him in handcuffs or full control yet.

23   Q      That's right.  So you intended to keep deploying it

24   until you had him in handcuffs, correct?

25   A      I intended to let the five-second cycle go.  I was not

1    aware that it had proceeded past five seconds.

2    Q       But you knew from your training that if you held down

3    the trigger, you would continue to deliver current; isn't that

4    correct?

5    A       Yes.  But on that Taser I believe it would stop after

6    five seconds.

7    Q       So did you continue to hold it down because you didn't

8    think it was working?

9    A       I didn't know what was working.  All I knew was in that

10   moment second by second I was getting some sort of compliance;

11   and until I was able to secure him in handcuffs, the Taser

12   would continue.

13   Q       Now, you would agree that your Taser training tells you

14   to avoid repeated or prolonged exposures; isn't that true?

15   A       I believe it says, yes, when practicable.

16   Q       And to avoid chest shots when possible, true?

17   A       That sounds correct.  I don't have it in front of me,

18   but that sounds correct.

19   Q       You could have -- at this point you could have backed

20   up, you could have shot Bryce in the leg, correct?

21   A       That would have been a very difficult shot, and I would

22   have been backing into traffic where I didn't know what was

23   coming.

24   Q       So you didn't feel safe?

25   A       Not backing up into traffic and still having to deal

1   with the active resistance at hand.

2   Q     Were you afraid of Bryce?

3   A     I didn't know what was going to happen.  I just knew I

4   had a noncompliant active resisting subject at that moment in

5   time.

6   Q     And so you know that it would not be appropriate to

7   Tase Bryce simply because you were frustrated with his

8   noncompliance?

9   A     Well, it depends.  If you have active resistance, then

10  it would be an appropriate use.

11  Q     So my question is, is it okay to Tase people if they

12  are not doing what you ask?

13  A     Depends on what they're doing.

14  Q     If they're seated in their vehicle, is it okay to Tase

15  them?

16  A     In this case I believe so, yes.

17  Q     And is it okay to Tase them if they're just being

18  belligerent?

19  A     It depends on the situation.  I would have to have more

20  information.

21  Q     If they're just seated and they say, Oh, I don't think

22  my windows are tinted, is it okay to Tase them then?

23  A     I would have to have more information.

24        MR. CUTLER:  I would object to the question.  It's a

25  hypothetical question.

| | |
|---|---|
| 1 | MR. PRESLEY:  Let's look at Exhibit 8. |
| 2 | THE COURT:  Objection sustained. |
| 3 | MR. PRESLEY:  Page 13. |
| 4 | Q      (By Mr. Presley)  You were specifically taught and |
| 5 | trained to not use CEW.  That's a Taser, correct? |
| 6 | A      What was the question? |
| 7 | Q      You are specifically trained not to use a CEW.  CEW is |
| 8 | for a conducted electrical weapon or Taser, true? |
| 9 | A      We're trained not to use it? |
| 10 | Q      First of all, CEW is a Taser.  Can we agree on that? |
| 11 | A      Yes.  Yes. |
| 12 | Q      And you're taught and trained not to use your Taser for |
| 13 | verbal defiance, belligerence, punishment, or horseplay, true? |
| 14 | A      Yes. |
| 15 | Q      And you're specifically taught that to avoid excessive |
| 16 | force liability; isn't that correct? |
| 17 | A      Yes. |
| 18 | Q      Now, when you said, "All right, fuck it," was that a |
| 19 | warning to Bryce that you were going to deploy the Taser? |
| 20 | A      No.  That was more just a slip of the tongue.  I really |
| 21 | didn't want to do deployment, but I felt I had given him ample |
| 22 | options and deployment was necessary at that point in time. |
| 23 | Q      So as it relates to options, you had the option of |
| 24 | deploying the Taser in probe mode into his chest for five |
| 25 | seconds by releasing the trigger and that did not occur, true? |

1    A        The exposure was longer than five seconds if that's

2    what you are asking, yes.

3    Q        No.  You had the option of shooting him in the chest

4    and releasing the trigger.  That would deliver a five-second

5    cycle and that was not what happened, correct?

6    A        That's not what happened.  I believed the Taser was

7    going to stop automatically in five seconds.

8    Q        You had the option of deploying the Taser in probe mode

9    and not shooting him in the chest for five seconds; wouldn't

10   that be true?

11   A        I deployed it in the best area I believed possible

12   under the circumstances.  The other areas were not feasible at

13   that time.

14   Q        That's not my question.  You had the option of

15   deploying it for five seconds in some area other than the

16   chest; is that correct?

17   A        The option, but it would not have been a practical

18   option.

19   Q        So you're telling this jury that based on your

20   proximity to Bryce Masters that you see in Exhibit 172, you

21   couldn't have chosen a leg, you couldn't have chosen the

22   abdomen, you couldn't have chosen a shoulder; is that true?

23   A        The fact that his arms and legs were continually moving

24   left me with a very limited targeting area, and I attempted to

25   deploy into the lower midsection; but due to his movements, the

1    impact area changes.

2    Q       And so when you deployed the Taser, you also had --

3    before you deployed the Taser, you also had the option of

4    utilizing the Taser in drive-stun mode; isn't that correct?

5    A       That would be an option, but it's not the preferred

6    method of deployment with our department, and it wouldn't be

7    very feasible due to the additional close proximity that would

8    have been required.

9    Q       Well, you have to be close.  You have to be closer than

10   what we see in 172 to use it in drive-stun mode?

11   A       Drive stun is typically when you have a person that is

12   not moving as much.  When someone is moving, they can easily

13   pull away from the drive stun.  In this circumstance that's not

14   applied here.

15   Q       So drive stun is for pain compliance.  You know that

16   from your training, correct?

17   A       Correct.

18   Q       And so you had his shoulder, his arm.  He had one hand

19   on his cell phone which is from the phone to you in 172,

20   correct?

21   A       I believe he had -- yes.

22   Q       Those are all options for drive stun proper targets,

23   correct?

24   A       Not practicable options.  No.

25   Q       You just couldn't do it?

668

1  A      It would not have been feasible due to his movements,

2  no.

3  Q      Not feasible.  And so the drive-stun mode is activated

4  by your removal of the cartridge, correct?

5  A      Correct.

6  Q      And so when you pulled the Taser and dotted Bryce's

7  chest as a warning instead of reholstering it, you could have

8  had plenty of time to take out the cartridge to use it in

9  drive-stun mode; wouldn't that be true?

10  A      That still wouldn't have been a good option and plus it

11  would have tied both of my hands up when I had an active

12  resisting person in front of me and that's not a safe thing to

13  do.

14  Q      Now, you said you were sorry for the drop.  You said

15  you wouldn't do -- tell me.  Are you sorry for using the Taser

16  for 20 seconds in Bryce's chest?

17  A      I didn't know it was for 20 seconds after the fact.  It

18  was an unfortunate outcome; but based on the circumstances and

19  his continued movement, I believe it was still appropriate even

20  though I did not know it was for 20 seconds at that time.

21  Q      So you mentioned -- are you sorry for driving by the

22  Masters' home a week before the grand jury was convened?

23  A      Am I sorry for it?

24  Q      Yes.

25  A      I was doing it based on the reports given to me out of

1   my own concern for him driving by my house.

2   Q      I see.  So how did you know Bryce had acquired a black

3   Audi?

4   A      Like I said before, I believe I had seen him leaving my

5   vehicle -- leaving my subdivision in a black Audi.

6   Q      You actually witnessed Bryce?

7   A      I believed it was him but I hadn't confirmed it.

8   Q      And so what day did that occur?

9   A      I don't know.  It was maybe a month before.

10  Q      Were you scared at that time of a 17-year-old who had

11  brain damage?

12  A      I was concerned that I was getting multiple reports of

13  an individual matching his description in a vehicle driving

14  slowly by my house.  Yes, I was very concerned.

15  Q      So how did you know where the Masters lived?

16  A      It was in the police report.

17  Q      And so you went back to a police report to be able to

18  locate their address?

19  A      Yes, sir.

20  Q      And that's when you followed them home?

21  A      I did not follow them home, no, sir.

22  Q      Well, you heard Ms. Masters' testimony about you being

23  on 40 Highway, and it was right after that that you drove by

24  their house; is that correct?

25  A      That's what she said, but I did not follow anyone home.

1  When I drove by the house, they were outside of the house.  I

2  have no idea if they were moving in the vehicle.

3  Q    So you never saw them on 40 Highway?

4  A    No, sir.

5  Q    It was your intention to take your family and to

6  specifically go by Bryce's home by having his address from the

7  police report; is that correct?

8  A    It was a last-minute decision as we were driving by the

9  area.  I remembered it was close.  So I chose to drive by due

10 to all the reports I was receiving him being in my neighborhood

11 and driving by my house.

12 Q    And so what were you going to accomplish?

13 A    I just wanted to confirm if this was the new vehicle,

14 the black vehicle that was being reported to me or not.

15 Q    Is there any doubt in your mind that the Taser caused

16 Bryce to lose his ability to respond to your commands at the

17 scene?

18 A    I don't exactly know what your question is.

19 Q    Sure.  You Tased Bryce at the scene.  You had him get

20 on the ground.  You asked him to put his hands behind his back.

21 But he's unresponsive, correct?

22 A    He did not comply with that order, correct.

23 Q    And so did you assess his responsiveness then?

24 A    I believed it was further noncompliance due to the fact

25 he was able to move after the Taser deployment.  There was no

671

1   reason for me to believe he wouldn't put his hands behind his

2   back at that time.

3   Q     So did you ever assess him -- I mean, once he was

4   cuffed, did you ever assess him?

5   A     I assessed him once I got him to the side of the road.

6   Q     Once you got him to the side of the road, did you

7   assess his responsiveness?

8              MR. CUTLER:  Your Honor, may we approach?

9              THE COURT:  Come up.

10             (Counsel approached the bench and the following

11  proceedings were had:)

12             MR. CUTLER:  I don't want to get too far afield into

13  the medical leave issue.  That was already ruled on by the

14  Court.  Proper settlement, all of that already has been ruled

15  on by the Court.

16             MR. PRESLEY:  We're just going to causation.

17             THE COURT:  For what?

18             MR. PRESLEY:  For causation on his lack of

19  responsiveness.

20             MR. CUTLER:  He has no foundation.

21             MR. PRESLEY:  That's the question.

22             THE COURT:  I kind of lost track where you were.

23             MR. PRESLEY:  I'm asking him specifically about

24  whether he assessed Bryce's responsiveness at the time he asked

25  him to put his hands behind his back or at the curb.

```
 1              MR. CUTLER:  And I did not object to him asking

 2   about responsiveness when he was in the street and told to put

 3   his hands behind his back.  Once he is at the curb, the issue

 4   of assess -- did you check, did you see what he was doing.

 5              THE COURT:  You can ask him about putting his hands

 6   behind his back and his responsiveness at that point but not

 7   further.

 8              (The proceedings returned to open court.)

 9   Q      (By Mr. Presley)  So when you told us you acquired the

10   Masters' home address by obtaining a police report, who gave

11   that to you?

12   A      No one did.  It was in my police report.

13   Q      And you had a copy of it?

14   A      Yes, sir.

15   Q      And so what -- were you planning on confronting the

16   Masters?

17   A       No, sir.  I just simply wanted to confirm if there was

18   a vehicle parked outside matching the description that was

19   given to me.

20   Q      And so did you ever report these repeated reports that

21   you had to any law enforcement agency?

22   A      Law enforcement, no.  I reported it to my attorney at

23   the time.

24   Q      Same attorney who was representing you for your

25   criminal charges?
```

1    A        Correct.

2    Q        And you were indicted for the Tasering event, correct?

3    A        That was one of the indictments, yes.

4    Q        But you chose not to accept responsibility for that; is

5    that true?

6                  MR. CUTLER:  Your Honor.

7                  THE COURT:  Sustained.

8                  MR. PRESLEY:  Nothing further.

9                  THE COURT:  Do you want to take a break now or do

10   you want to finish up?

11                 MR. CUTLER:  I have seven minutes probably.  I've

12   got maybe seven minutes, if that much.  So if I can continue.

13                 THE COURT:  Then we could probably have recross.  So

14   I think we'll go ahead and take a break now.  Okay?

15                 MR. CUTLER:  Yes, sir.

16                 THE COURT:  All right, ladies and gentlemen, we're

17   going to take a break for 20 minutes.  Let's be back in the

18   jury room at ten till eleven.  And keep the instruction I've

19   given you previously in mind, as I know you will.

20                 Thank you.

21                 (The following proceedings were had in the courtroom

22   out of the presence of the jury:)

23                 THE COURT:  Keith, how much more evidence are you

24   going to have after Mr. Runnels?

25                 MR. CUTLER:  I am reasonably sure he's our last live

```
1    witness or maybe all the evidence.

2                 MR. PRESLEY:  Are we done with evidence?

3                 MR. CUTLER:  After we redirect and possibly recross,

4    I think that will be the close of the defendant's evidence.

5                 THE COURT:  Okay.  Thank you.  I'll be back.

6                 (Recess at 10:30 a.m.)

7                 (The following proceedings were had in the courtroom

8    out of the presence of the jury:)

9                 THE COURT:  Thank you.  You can all be seated.

10                Ready, Mr. Cutler?

11                MR. CUTLER:  Yes, sir.

12                THE COURT:  Mr. Presley?

13                MR. PRESLEY:  Ready, Your Honor.

14                THE COURT:  Mr. Runnels, would you come back up to

15   the stand, please.

16                And, Lisa, would you bring the jury back in.

17                (The following proceedings were had in the presence

18   of the jury:)

19                THE COURT:  Thank you very much.  Everyone can be

20   seated.

21   TIMOTHY RUNNELS resumed the stand and testified:

22                THE COURT:  And, Mr. Runnels, I'll remind you that

23   you are still under oath, sir.

24                THE WITNESS:  Yes, sir.

25                THE COURT:  Mr. Cutler.
```

675

1        MR. CUTLER:  Thank you, Your Honor.

2   REDIRECT EXAMINATION BY MR. CUTLER:

3   Q      Mr. Runnels, when Mr. Presley was asking you questions,

4   he had you look at the report you made, and there were

5   references to Bryce pulling away.  Do you recall that

6   testimony?

7   A      Yes, sir.

8   Q      And I think the report indicates you reached for his

9   hand and he pulled it away?

10  A      I believe so, yes.

11  Q      Okay.  And you reached for his leg and he pulled it

12  away?

13  A      Yes.  I attempted to pull him out by his leg and he

14  pulled away.

15  Q      Okay.  And in your experience as a police officer, when

16  someone is resisting being arrested, is that what they do?

17  A      That would be considered active resistance, yes.

18  Q      Mr. Presley also asked you about whether you would take

19  the same actions with a Taser if you had this to do all over

20  again.  Let me ask you about the drop so that we're clear.  If

21  you had this to do all over again, would you drop Bryce Masters

22  again?

23  A      No, sir.

24  Q      You would do it differently?

25  A      Yes, sir.

```
 1   Q       I'm sorry.  You wouldn't drop him at all?

 2   A       No, sir.

 3   Q       Is that correct?

 4   A       Correct.

 5   Q       Mr. Presley also asked you some questions, as I did,

 6   about your receiving information that a young man in a black

 7   car was driving slowly past your house and that you believed

 8   you saw him at one point driving past your house.  Do you

 9   recall that testimony?

10   A       Yes, sir.

11   Q       And we talked about what you did in response to that,

12   i.e., driving by the Masters' house to look to see if you could

13   see a similar car.  What else did you do in response to the

14   reports you were receiving that a young man in a black car was

15   driving by your house?

16   A       We purchased some security cameras, installed a

17   security surveillance system on our house.

18   Q       Why would you do that?

19   A       Just from the multiple reports and the situation going

20   on at the time I was concerned that something may occur so I

21   put some cameras up on the house.

22               MR. CUTLER:  No further questions, Your Honor.

23               MR. PRESLEY:  No recross, Your Honor.

24               THE COURT:  Thank you, Mr. Runnels.  You can go back

25   to your seat.
```

```
 1                    (Witness excused.)

 2              THE COURT:  Mr. Cutler.

 3              MR. CUTLER:  Your Honor, the defense has no more

 4   evidence and the defense rests.

 5              THE COURT:  Thank you.

 6              Mr. Presley.

 7              MR. PRESLEY:  No rebuttal, Your Honor.

 8              THE COURT:  I'm sorry.

 9              MR. PRESLEY:  No rebuttal.

10              THE COURT:  Thank you.

11              All right.  Ladies and gentlemen, that concludes the

12   evidence in the case.  I have to do some work on the final

13   instructions on the case, and that will take a little bit of

14   time.  I'm going to give you a little bit longer lunch break

15   and obviously start it early here, but I fully anticipate that

16   the attorneys will have the opportunity -- I'll read my final

17   instructions to you, the attorneys will argue the case, and it

18   will be submitted to you for your consideration this afternoon.

19              I'm going to ask you to be back in the jury room at

20   a quarter till one, and I apologize for the downtime for you

21   all in that regard, but there is some work that needs to be

22   done; and when I read the final instructions to you, you'll see

23   what I'm talking about in that regard.

24              I do want you to keep in mind the instruction I've

25   given you previously.  You are not to read, view, or listen to
```

1  any media reports about the case.

2          You're not to do any research about the case on the

3  Internet or any other source.  You're not to talk with anyone

4  by way of oral communication or social media or any type of

5  messaging.

6          If anyone is talking about the case in your presence

7  or attempts to approach you about the case, you are to let me

8  know about it.

9          We will be back with you at a quarter till one.  So

10  we'll see you then.

11          Thank you.

12          (The following proceedings were had in the courtroom

13  out of the presence of the jury:)

14          THE COURT:  So I'm not asking for further input from

15  the attorneys at this point in time, but I do want to tell you

16  what my general plan of instruction is, and you will be given

17  another round of instructions, and I'm sure that they will all

18  be properly numbered in this submission.

19          I intend to submit both claims, the claim on

20  excessive force for deployment of the Taser, and that will be

21  on the proposed continued deployment as offered by the

22  plaintiff given that they are withdrawing any claim for the

23  initial deployment.

24          I also intend to give an affirmative defense to that

25  instruction that encompasses a reasonable belief of resistance

1    and/or noncompliance; and, additionally, a required finding of

2    intentional deployment.

3         Pretty much the rest of the instructions will not

4    have significant changes beyond what we've already talked

5    about, but that's going to be the key and significant change

6    for submission to the jury; and once I get that all put

7    together, you'll get a copy of it, and we'll meet again when we

8    can make any further record that counsel has.

9         MR. PRESLEY:  The only potential conflict -- I'm

10   kind of flying blind based on the Court's comments.  There is

11   that tail.  It's Footnote 11 to 4.4.0 in the Eighth Circuit

12   model rules about submitting the officer's state of mind, and

13   it says specifically without regard to any motivation, blah,

14   blah, blah.  So there's the potential for conflict as relates

15   to that as it might relate to any intentional submission.  So

16   if we do submit an intentional submission, then obviously that

17   has to come out or we would need to resolve that in some way.

18        THE COURT:  Thank you for mentioning that.

19        Just for purposes of the record, a continued

20   deployment, I believe, is different than a successive

21   deployment; and if that continued deployment is not

22   intentional, then I believe that qualified immunity would

23   apply.  So at any rate we'll talk about it further.  Let's say

24   let's get back together at a quarter till 12.

25        MR. PRESLEY:  We'll be ready.

1    MR. CUTLER:  I do have one other thing, Your Honor.

2    To protect my record, of course, I need to make my motion for

3    judgment, as a matter of law, at the close of all the evidence.

4    The Court has heard the arguments, so I will just incorporate

5    all those arguments right now by reference and would move that

6    the Court grant judgment in favor of Defendant Runnels, as a

7    matter of law.

8    THE COURT:  All right.  Thank you.

9    MR. PRESLEY:  And we would just, by way of

10   supplement, we'd incorporate our same arguments as well, Your

11   Honor.  Not to belabor this, but there is uncontroverted proof

12   of the excessiveness of this force.  There's been no evidence

13   from the defendant and in an expert capacity of any kind that

14   would show that Officer Runnels' actions were objectively

15   reasonable.

16   THE COURT:  Are you talking about the drop?

17   MR. PRESLEY:  As to either event.  I mean, there's

18   simply been no expert testimony by the defendant of any kind in

19   support of Officer Runnels' conduct.

20   THE COURT:  Well, it doesn't have to be expert

21   testimony.  It's a question of fact.  It's up to the jury.

22   MR. PRESLEY:  I agree this is a fact issue.  I would

23   just make that point in addition to our previous record since

24   we didn't know that until the close of the defendant's

25   evidence.

1              THE COURT:  All right.  Motion for directed verdict

          2      at the close of all of the evidence is taken and considered on

          3      the basis as stated and it's denied.

          4              Thank you.  I'll be back at a quarter till 12.

          5              (The noon recess was taken at 11:05 a.m. until 12:45

          6      p.m.)

          7                           AFTERNOON SESSION

          8              (The following proceedings were had in the courtroom

          9      out of the presence of the jury:)

         10              THE COURT:  Thank you.  You can be seated.

         11              First of all, Mr. Presley, you forwarded to my

         12      office an alternative proposed affirmative defense instruction

         13      No. 13, and the reason I worded Instruction No. 13 as I did is

         14      because I believe that at the time Officer Runnels was entitled

         15      to take into consideration all of the circumstances, and I

         16      believe that by saying, "As the Taser was discharged," that the

         17      instruction references the duration of the discharge, and that

         18      permits counsel to argue accordingly, not only the

         19      circumstances that presented as the Taser was initially

         20      discharged but as it continued to be discharged beyond that

         21      initial five-second period.  So I'm going to deny your offered

         22      Instruction No. 13.  I dated it today.  Marked it as having

         23      been offered by the plaintiff and denied.

         24              MR. PRESLEY:  That would be Plaintiff's B, as I

         25      understand it, Your Honor; is that correct?

                                            682

1          THE COURT:  Yes.

2          MR. PRESLEY:  Thank you, Your Honor.

3          THE COURT:  Do you have any other -- well, first of

4    all, all of the record we made regarding the instructions and

5    the objections posed by counsel are considered as a part of the

6    record and are denied.

7          In addition to that, do you have anything further

8    that you'd like to address in the latest version of

9    instructions?

10          MR. PRESLEY:  I do, Your Honor, and these, I think,

11    may just be oversights.  I do not see our stipulated fact

12    instruction.

13          THE COURT:  I wasn't aware that you wanted that.

14          MR. PRESLEY:  Yes.  That was in our proposed and it

15    was in the initial package that Rhys provided, so we ask the

16    stipulated fact instruction be given.

17          THE COURT:  Mr. Cutler, do you have any objection to

18    that?

19          MR. CUTLER:  No, sir.

20          THE COURT:  We'll stick it in there.

21          MR. PRESLEY:  The next one, Your Honor, is also I

22    believe I'm tracking this correctly and I sent everybody an

23    email on this as to Instruction 18.  At the very last sentence

24    of the big paragraph.

25          THE COURT:  Yes.  We referred to the wrong

1    instruction.

2              MR. PRESLEY:  That should be the damage

3    instructions.

4              THE COURT:  It should say reference Instructions 14

5    and 17.  I think you got that.

6              MR. PRESLEY:  I just got this.  Okay.  Great.

7              Then I do just want to make a brief supplemental

8    record since we've amended our proposed verdict director,

9    No. 12, the conduct specifically.

10             THE COURT:  All right.

11             MR. PRESLEY:  If the Court please, Your Honor, and

12   cognizant of the Court's ruling; but in furtherance of our

13   record in support of our proposed tendered instruction

14   Exhibit A, Plaintiff's Exhibit A, first of all, we believe that

15   the evidence is uncontested that there were a combination of

16   factors that brought about plaintiff's brain injury.  Those

17   included his disruption of his cardiac rhythm ultimately

18   resulting in cardiac arrest, all of which led to anoxic

19   contribution to brain cell death.

20             In addition, Dr. Dennis testified that the drop and Mr.

21   Masters' subsequent positioning with his chin near his chest

22   with the tongue falling forward would not provide a clear and

23   unobstructed airway, and that Mr. Masters was at a turning

24   point in his rhythm had he been able to breathe appropriately

25   and ingest oxygen, it would have contributed to the potential

1    recovering back to a sinus rhythm before he entered V-fib, and

2    that the deprivation of breathing ability as a result of his

3    post-drop placement was a contributing factor to his ultimately

4    entering into ventricular fibrillation and his cardiac arrest

5    and ultimate anoxic brain injury.

6         So because of that, we would ask that the conduct of

7    the defendant as submitted in Exhibit -- in our most recent

8    verdict director that we proposed to the Court, which included

9    not just the Taser current into the plaintiff's chest for 15

10   seconds but also the drop in one package would be the most

11   appropriate way to submit those claims and to a single

12   Verdict A; and as such, we believe that it was a continuous

13   event of excessive force with different modalities by the same

14   officer; and as such, that conduct led to a unified and

15   unfortunate result.

16        So, in addition, because we have elected not to

17   submit on the initial deployment of the Taser in probe mode

18   into plaintiff's chest for the trained and well-recognized

19   cycle of five seconds, for which there is numerous citations in

20   the record as to the training and conduct of officers to limit

21   the cycle to five seconds and to reassess, we would object to

22   the submission of any version of Instruction 13 as being

23   duplicative of the Graham factors, and that the fact that Mr.

24   Masters was not in compliance with Officer Runnels' order to

25   remove himself from the vehicle did not justify this use of

1  force and is not immune; and as such, plaintiff's are entitled
2  to have Instruction 13 omitted completely.

3       However, in the alternative we have proposed in
4  conjunction with our modified verdict director focusing on the
5  continuation of the discharge beyond the five seconds, we've
6  asked that 13, that we marked as Exhibit B, be tendered at this
7  time limiting Mr. Masters' resistance, compliance to the post
8  five-second deployment of the initial Taser cycle as well as
9  Defendant Runnels' continued discharge throughout the remaining
10 20 seconds of the total discharge.

11      Thank you, Your Honor, for allowing me to make that
12 record.

13      THE COURT:  Thank you.  Those objections and
14 requests are noted for the record and they're denied.

15      Mr. Cutler, do you have anything that you'd like to
16 address beyond what has already been brought forward?

17      MR. CUTLER:  Yes, sir, Your Honor.  With respect to
18 Instruction No. 12, it has a paragraph fourth in there, and I
19 don't think that should be denominated paragraph fourth.  The
20 phrase, "unless you believe the plaintiff is not entitled to
21 recover on Instruction No. 13," that should be a standalone
22 sentence, not part of the elements of the --

23      THE COURT:  That's the way the model -- Eighth
24 Circuit model has it, which I had to double-check that myself,
25 but that's the way it's set forth in the Eighth Circuit model.

1   And it is a little bit of a mind twist, but I think that it is

2   stated correctly.

3            MR. CUTLER:  Okay.

4            THE COURT:  In that you have to find for the

5   defendant unless you believe the plaintiff -- if you believe

6   the fourth element.  If any of the elements have not been

7   proved but your finding must be for defendant.

8            MR. CUTLER:  Okay.

9            THE COURT:  That's the way it is.

10           MR. CUTLER:  Then next, Your Honor, with respect to

11  Instruction No. 14, then with respect to the physical pain,

12  again, I don't believe there's been any evidence that he's

13  reasonably certain to experience any physical pain in the

14  future.

15           THE COURT:  Well, Mr. Presley did offer some

16  evidence, not extensive, but some evidence of continued

17  physical pain and/or discomfort, and so I'm going to deny your

18  objection to that.

19           MR. CUTLER:  Yes, sir.

20           Then with respect to Verdict A on page 27, I think

21  the version we have, the last paragraph refers to Bruce Masters

22  as opposed to Bryce.

23           THE COURT:  Thank you.

24           MR. CUTLER:  Then in the same place on page 28, next

25  page, Verdict B, as in boy.

1          THE COURT:  Thank you.  Those corrections will be

2    made.

3          MR. PRESLEY:  The only other oversight issue, Your

4    Honor, was packaging instruction for Verdict C too.  Keith and

5    I talked about that.

6          MR. CUTLER:  Yes, sir, we agree.

7          THE COURT:  I'm sorry.  What's that?

8          MR. PRESLEY:  If we need a 2.05 for Verdict C, just

9    a packaging instruction for Instructions 18 and 19; otherwise,

10   they're just kind of loose in there without any reference or

11   application.

12         THE COURT:  All right.  Pursuant to that record, I'm

13   going to put the final instructions together, and we'll be back

14   and we'll proceed at that time.

15         MR. PRESLEY:  Great.  Thank you.

16         (Recess taken at 12:50 p.m.)

17         (The following proceedings were had in the courtroom

18   out of the presence of the jury:)

19         THE COURT:  Thank you.  You can be seated.

20         All right, Lisa, would you bring the jury in.

21         MR. CUTLER:  Your Honor, before we do that.

22         THE COURT:  All right.  Hold on.

23         MR. CUTLER:  I wanted to bring something to the

24   Court's attention.  I let plaintiff's counsel know an hour,

25   hour and a half ago, that during closing argument, I would like

688

1  to make an adverse inference of the plaintiff not taking the

2  stand.  No inference about him not being in the courtroom

3  during the trial but him not taking the stand.  I didn't want

4  it to be a surprise during closing argument.

5           THE COURT:  All right.  Thank you.

6           Do you want to speak to that?

7           MR. PRESLEY:  Just that he's equally available.  I

8  mean, we've had him here at the courthouse.  All he's got to do

9  is ask and put him on the stand.

10          THE COURT:  He's a party plaintiff so you're

11 entitled to argue an adverse interest.

12          MR. CUTLER:  And concomitant with that issue there

13 should be no argument from plaintiff's counsel about why he

14 didn't take the stand because that's not in evidence.

15          MR. PRESLEY:  Well, the reason he didn't take the

16 stand is he has no memory of the event.

17          MR. CUTLER:  There's no evidence of that.

18          THE COURT:  There's no evidence of that.  You can't

19 argue something that's not in evidence.

20          MR. PRESLEY:  Precisely.  But Mrs. Masters testified

21 to that, that he has no memory of the event.

22          MR. CUTLER:  He may not have a memory of the event,

23 but there's no evidence as to why he wasn't here in court --

24 I'm sorry -- to testify.  He can testify about his damages, how

25 he feels.  There's lots of things he can testify to that are

1 relevant to this case.  Because he has no memory of the actual

2 event, that doesn't mean he doesn't have anything to testify

3 to.  My point is there's no evidence as to why he didn't

4 testify.  So because there is no evidence of it, there can't be

5 any argument as to why he didn't testify.

6          THE COURT:  Well, there was testimony that he has no

7 memory of the events, but I'm sure that your adverse inference

8 that you wish to have drawn will go way beyond that in terms of

9 damages.

10          MR. CUTLER:  Correct.

11          THE COURT:  And substantiating what his condition is

12 and what his struggles are and why he's in the circumstance

13 that he claims to be in.

14          MR. CUTLER:  Yes, sir.

15          THE COURT:  You can certainly argue all of that.  I

16 think that the plaintiff can argue that the testimony was that

17 he does not have memory of the event.

18          MR. PRESLEY:  Thank you, Your Honor.

19          MR. CUTLER:  Well, that he does have memory of the

20 event or he doesn't have memory of the event as a reason why he

21 didn't testify?

22          MR. PRESLEY:  I'll limit it to just that he has no

23 memory of the event.

24          THE COURT:  All right.

25          MR. McCOY:  Judge Fenner, we do have one

1    modification to the stipulation of facts.  It looks like we
2    used an old version, and we just need to take out two words.
3              Keith, that's on paragraph 21.
4              THE COURT:  So you're taking out paragraph 21?
5              MR. McCOY:  No.  We're just taking out the "or kick"
6    part on that.
7              THE COURT:  Okay.  So "or kick" comes out.  All
8    right.  Rhys will make that modification.  Or, Janelle, can you
9    do that?  And then just bring it to me and make sure that the
10   extra copies we have for the jurors are changed as well.
11             All right, Lisa, would you bring the jury in.
12             (The following proceedings were had in the presence
13   of the jury:)
14             THE COURT:  Thank you.  Everyone can be seated
15   again.
16             Ladies and gentlemen, thank you for your patience
17   I'm now ready to read my final instructions to you, and then
18   the attorneys will have an opportunity to argue the case to
19   you.
20             All the instructions are in writing.  You will have
21   copies of the instructions for your reference in the jury room.
22   You can certainly take notes as you go along, but you will have
23   copies, written copies of these instructions for you.
24             I'll begin, as Rhys displays them on the screen,
25   with Instruction No. 7.

1              (Court reads Instructions Nos. 7 through 19 and
         2    Verdict Forms A, B, and C, inclusive.)
         3              THE COURT:  Mr. Presley, are you ready to begin your
         4    argument?
         5              MR. PRESLEY:  I am, Your Honor.
         6              THE COURT:  Very well.
         7                    PLAINTIFF'S CLOSING ARGUMENT
         8              MR. PRESLEY:  May it please the Court, Your Honor.
         9              THE COURT:  Yes, sir.
        10              MR. PRESLEY:  Counsel.
        11              Ladies and gentlemen, at the very beginning of this
        12    case back on Monday I opened with these words, "rules for
        13    police conduct that must be followed to protect citizens from
        14    the abuse of power."  However, those rules are meaningless
        15    unless juries like yourselves enforce them.  That is the power
        16    that's invested in you as a jury; and to do so, you have to
        17    follow your sworn oath to adhere to the Court's instructions
        18    and the evidence that's been presented to you.
        19              So it's my opportunity and it's my job at this time
        20    to walk you through those instructions.  You've been given a
        21    lot of information, and I want to make sure that we understand
        22    how mechanically you go about rendering your verdict in this
        23    case.
        24              And your verdict is important in this case because
        25    it should be right and it should be just and it should be a

1    verdict that you collectively agree upon and speak with one
2    voice, and that voice has power.  It has the power to change.
3    It has the power to influence the course of human events, and
4    that is an awesome responsibility, and you all have diligently
5    sat and paid close attention and taken numerous notes, and for
6    that we're eternally grateful.

7            So let's start with the easy part, if there is an
8    easy part to this, and that's Verdict B.  If we can look at
9    Verdict B in this case.  As his Honor has told you, Verdict B
10   is related to the drop.  It refers specifically to Instruction
11   16.  There are two separate verdicts; one for the Taser event
12   and one for the drop.  Because of that, we need to just refer
13   back to Exhibit 16; and so when the foreperson has the ability
14   to look at Verdict B, then you have to turn to what's called
15   the verdict director.  That's Instruction 16.  And it tells you
16   the elements to that.

17           And so the first element is, "Defendant Runnels
18   dropped plaintiff to the ground while plaintiff was handcuffed
19   with his hands behind his back."  And there's just no dispute
20   about that.  That's a stipulated fact.  And you've seen the
21   video and you've heard Officer Runnels' testimony about that
22   and he's pled guilty to violating plaintiff's constitutional
23   rights.  So he's already admitted in the criminal aspect of
24   this case that his force was excessive and it was unnecessary
25   and it was unreasonable; and for those reasons, he pled guilty

693

1    and he's serving his debt to society, but he's not paid his

2    debt to Bryce Masters.  And so when you look through those, you

3    see that the second element is met by admission.

4           The third element, "As a direct result, the

5    plaintiff was injured."  And that gets to be a little more

6    complicated.  Now, it's easy to look at the pictures that are

7    in evidence, see the blood on the concrete.  The report from

8    the treating dentist in the hospital talks about the fractured

9    teeth.

10          But what makes the drop damages difficult to

11   determine is the fact that Dr. Dennis has testified that

12   because of the drop and the prone position of Bryce's chin

13   toward his chest, that blocked his airway and made it difficult

14   for him to breathe.  And as you'll recall Dr. Dennis'

15   testimony, Bryce was in a transition period.  He'd experienced

16   this tachycardia after the cardiac capture during the Taser

17   discharge, then he's in this disrupted or what he called

18   dyssynchronous rhythm.  You'll remember the pig heartbeat.  It

19   was kind of beating all over the place.  And it progressed from

20   there into ventricular fibrillation.  And we know it's V-fib

21   because if you look at the ambulance report, you'll see the

22   very first EKG they got, and it looks exactly like this.  It

23   looks like a quivering heart.

24          And so the critical piece for Bryce is that we --

25   Dr. Dennis' opinion was that his inability to breathe

1    contributed to his inability to return to a sinus rhythm like a

2    lot of people with five-second discharges even to the chest can

3    do instead of having that disrupted rhythm over the 20-second

4    period continue on into V-fib.

5            If Bryce had been in a recovery position, Dr. Dennis

6    said that his absence of being able to breathe appropriately

7    was a contributor.  Could he say how much?  Not exactly.  But

8    it was a contributing event to the anoxic injury and the

9    difficulty of Bryce receiving oxygen to his brain.

10           So what I would suggest to you is that we evaluate

11   the brain injury as a whole and then apportion between the

12   Tasering event and the drop what you believe to be based on the

13   evidence and the facts, and Dr. Dennis' testimony on the

14   positioning is uncontroverted.  Dr. Vilke never addressed that.

15   Not only did he never tell us what caused Bryce's cardiac

16   arrest, he never addressed once the positional problem with

17   Bryce's breathing being blocked.

18           Your tongue falls forward when you're unresponsive,

19   and the very first thing you know from CPR is you get them on

20   their back, you get the chin up, you check their airway, and

21   that was important for Bryce because he might have turned the

22   corner, he might not have gone into V-fib and a great portion

23   of his brain injury might have been eliminated; and that's why

24   I suggest to you that when you determine the amount to write

25   in, Verdict B is relatively easy for you because of the

695

Case 4:16-cv-01045-GAF   Document 368   Filed 07/19/19   Page 104 of 155

1  uncontested and stipulated facts.  And so you write in Bryce

2  Masters.

3          And then the next line you have to fill out is what

4  are the damages?  And so before we address the global

5  responsibility of Defendant Runnels for the brain injury, let's

6  discuss the Taser, and that is going to be Verdict A.  And so

7  on Verdict A the Court asked us to consider Instructions No. 12

8  and 13.

9          And so it's important that Instruction 12 guide your

10 deliberations just as Verdict A says, once again, in the same

11 form as the drop.  The first paragraph describes the conduct.

12 This is very important because we want to make sure that your

13 verdict is right and just for these particular facts and for

14 this particular conduct.

15          So the conduct that's being submitted to you as

16 excessive is the continued deployment of the Taser current into

17 plaintiff's chest for 15 seconds when arresting him.  That's a

18 very critical submission because by your verdict, we are not

19 seeking to take Tasers out of responsible officers' hands.

20 Police officers have a hard job.  They encounter unknown

21 events.  They should have at their disposal the tools that

22 they've been taught and trained, if they are able to follow

23 that training, and to use those tools appropriately.

24          And so by your verdict we're not submitting to you

25 that even the initial Tasering decision was wrong or excessive.

1    Even though if we look at the continuum of force, even though

2    Officer Runnels could have chosen to utilize anything other

3    than the greatest potential risk of harm with a Taser shooting

4    a skinny 17-year-old kid in the chest and holding it down for

5    20 seconds.

6         So what's below that?  Well, he could have still

7    shot him in the chest in violation of his training; but if he'd

8    just pulled the trigger and let go as he was trained to do

9    instead of standing over him saying, "I told you so" after

10   throwing his phone and holding it right over him, and you've

11   seen the video, and that's why Bryce hasn't testified here.  He

12   doesn't have a memory of this event.  The video is our record,

13   and so that is what -- we've offered nothing that's

14   contradictory to the video evidence that we leave to your

15   determination.

16        And so when you look at Exhibit 12 and the continued

17   discharge, there's no question that the deployment of the Taser

18   is for a five-second cycle only.  You heard Sergeant Blackmore.

19   He's done it three times in cases where it was clearly

20   appropriate; running, fleeing burglary victims, people

21   surrounded by knives under a crawl space.  These are the right

22   circumstances to deploy them.  He never needed more than five

23   seconds with serious criminals who are threat -- immediate

24   threats of harm to Sergeant Blackmore.

25        And that's why all the millions of deployments in

1    the field that Dr. Vilke testified about, well, I should hope

2    so, because if you follow your training, you're not going to

3    injure anybody.  If you do the right thing and deliver the

4    right dose, those people are not going to suffer anything other

5    than what Officer Grasher said was the worst pain I've ever

6    experienced.  But it's for a short period.  It's for a short

7    period.

8            And so when you look at the continuum of force to

9    decide whether paragraph second, the force used was excessive,

10   that's where the continuum comes in.  He uses the most severe

11   gradient of force.  He does not shoot him in the heart, release

12   for five seconds.  He does not shoot him with good probe spread

13   to really incapacitate him, even if that's what he intended to

14   do when he's commanding him to get out of the car.

15           The next level of force is drive stun.  He had the

16   opportunity to unholster and holster his weapon.  He could have

17   pulled the cartridge and just zapped him right on the foot,

18   zapped him right on the leg.  You think a 17-year-old kid needs

19   much more guidance than that?  Some of the worst pain that he

20   can experience?

21           So the least amount of force would be just to start

22   the stop the right way.  Tell Bryce why he's being pulled over.

23   Tell him why he's under arrest.  He never does any of that.

24   And he escalates the situation and it's enhancing the conflict.

25   It's almost like he's spoiling for a fight.  It's almost like

1    he's just being a bully, and that's just not right and that's
2    just not just.

3              So in addition to finding that the force was
4    excessive by using the maximum amount of force he could
5    possibly deploy on a Taser when there was no immediate threat
6    of harm; and if you will recall from 149 -- if you'll recall
7    from 149 -- I'm sorry -- it's 3.  This is the officer/violator.
8    We covered that.  That was even found sustained by his own
9    department.

10             But let's go to 3, Chris.

11             That's how this stop should have been handled.  If
12   we go to deployment, "The CEW is generally authorized to be
13   used in circumstances where grounds to arrest or detain are
14   present and the subject's actions cause a reasonable officer to
15   believe that the subject is an immediate threat to an officer
16   or civilian."  And it goes on to say, "And that physical force
17   will be used by the subject."  So even if you say that Bryce
18   was going to use physical force at some point when all he's
19   doing is trying to get away, where is the immediate threat to
20   the officer?  Everything Bryce did was pull him away.
21   Everything he did was try to stay in his car.  And so you have
22   to ask yourself, who is being threatened with force as he's
23   sitting there?  Is it Runnels or is it Bryce?  And that's the
24   analysis.

25             And if we look at the Instruction No. 13, because

you have to find not only the elements that are submitted in 12, you also have to find the elements in Instruction 13, and this is a critical instruction, because the Court has told you what the law is, and the law is that you must find that Defendant Runnels, "had a reasonable belief that plaintiff Bryce Masters was actively resisting arrest as the Taser was discharged," and that's the magic language, because we're claiming only the 15-second continued deployment. It's as the Taser was discharged. And so if you find that as the Taser was discharged that plaintiff was failing to comply or Defendant Runnels continued the Taser discharge unintentionally, your verdict must be in favor of Defendant Runnels.

So let's break that down. So was Bryce not complying? Yes. But was he not complying as the Taser was discharged? And we know from our stipulated facts that will be in your instructions, we know on 39 and 40 of the stipulated facts that, "During the Taser discharge, plaintiff did not attempt to hit, kick, or flee from Runnels." It is stipulated and agreed in this case that, "During the Taser discharge plaintiff complied with all commands given by Runnels." The only command he didn't comply with was putting his hands behind his back when he was unconscious. And so that's not -- these are the stipulated facts.

And so as it relates to whether or not Bryce was actively resisting or failed to comply during the Taser

1    discharge, there's no dispute because there's no evidence to

2    the contrary.

3            The question then is during the continued Taser

4    discharge was it unintentional?  And that's when you have to

5    take Officer Runnels' testimony.  His testimony was not that it

6    was inadvertent or that it was unintentional.  He didn't think

7    it was working, and so that's why he lost track of the time

8    because he shot Bryce in the chest and he continues to stand

9    over him.  He takes his cell phone and throws it.  He tells him

10   "I told you so," and he follows him right down to the ground

11   with the wires; and when Bryce hits the deck, that's the pain

12   that you hear when he cries out from the darts getting even

13   closer to his heart.  Darts getting closer to the heart to

14   disrupt his normal rhythm, to introduce that spinning --

15   remember when I talked about a propeller spinning out of the

16   water?  That's what those pig hearts looked like when Dr.

17   Dennis showed you the videos.  They were beating so fast you

18   could barely keep up with them.  If you just let that trigger

19   go, it lets that capture go.  It sets that heart free and gives

20   it the opportunity to return to rhythm; but as we know, in the

21   15 seconds after the discharge and the initial five, here's

22   what happened.

23            (Video played.)

24            MR. PRESLEY:  Right.  So is it unintentional when

25   he's got the presence of mind to throw his cell phone?  Chat on

1    the radio?  Talk about his Taser deployment?  Listening to that

2    click, click, click, click, click, click, click?  It's an

3    audible warning.  That's part of the safety mechanism in this

4    Taser device, as Mr. Leonesio told you.  And so as we go

5    through Verdict A --

6              THE COURT:  Mr. Presley, you've used 20 minutes.

7              MR. PRESLEY:  Thank you, Your Honor.

8              And as you look at Instructions 12 and 13 -- so as

9    we look at Verdict A, it specifically refers to the key

10   instructions, Instructions 12 and 13.  And so then the issue

11   regarding Bryce's damages from the brain injury comes back

12   around, and it's the combination of not only his cardiac arrest

13   and his anoxia from the dyssynchronous rhythm and ultimately

14   his V-fib, which was documented at the scene, but it comes in

15   on the drop, and so what I would suggest to you is that we look

16   at the damages that are collectively as a brain injury issue.

17             For the economic loss you heard Dr. Tabak based on

18   Mr. Dreiling's vocational rehabilitation report provide you

19   with information regarding the differential between Bryce's

20   potential average college graduate earning capacity and that of

21   an average high school graduate.  That was about 1.25.  Then

22   the worst case scenario is he doesn't even go back to earning

23   what an individual with an average high school -- or below

24   average high school earning capacity does in the 25th

25   percentile, then it goes up to 1.9.  And that's just the pure

1   economic loss.

2           That doesn't count one dime for the past damages of

3   Bryce's hospitalization, Bryce's rehabilitation, Bryce's senior

4   year in high school as the brain damaged kid, and the

5   frustration and anger that surfaced in a kid that was

6   extroverted, happy, with lots of friends, someone who saw the

7   good in everything and everybody, and that kid never left South

8   Side Street.  That kid never came back when they resuscitated

9   him.

10          And so I suggest to you that for the last four years

11  since this has occurred, that that amount for all that he's

12  gone through with his hospitalization, his rehab, his OT, his

13  PT, his speech therapy, his dental work -- well, no the dental

14  work is on the drop.  Let's keep that separate.  I would

15  suggest to you an amount of $2 million.

16          But the real component on this is the future for

17  Bryce.  He's got 56 years left, 56 years of frustration, 56

18  years of having more bad days than good days, 56 years of being

19  more unsuccessful, in getting to work on time, and remembering

20  where you're going and why, remembering where your phone is,

21  where my keys are.  He's got 56 years.

22          And, ladies and gentlemen, he's still got physical

23  problems from the brainstem injury.  He doesn't even notice it

24  but he'll clench up involuntarily.  As you heard his mother

25  testify, he's not sure-footed now.  He's clumsy.  He drops

1   things.  They've replaced a dozen phones.  And my kids, their

2   phones are never broken.  It's never out of their hands.  They

3   never lose them.  It's like a part of them.  And for Bryce, he

4   doesn't know where it is half the time, and that is a testimony

5   to his confusion, his memory loss, his difficulties with

6   executive level functions, the kind of kid with an above

7   average to superior intellect but now has to process and try

8   and apply that intellect in the real world through a

9   brain-damaged filter, and that's the disconnect.  And he's got

10  a lifetime ahead of him of having to cope and deal with that on

11  a daily basis, and he it's led to his depression and it's led

12  to his anxiety.  And for that we would total that at 5 million

13  for the next 56 years.

14          And so if you add all that together, it comes to

15  between 8.25 and 8.9 million.  And so what I would suggest to

16  you that for the drop and just the physical injuries and the

17  insult to Bryce's face and teeth, I would suggest a figure of

18  $50,000.  And then for the blocked airway and the fact that Dr.

19  Dennis uncontroverted, no doctor -- Dr. Vilke never addressed

20  that, says that that contributed to his brain damage, I would

21  say that that is a smaller component.  So the damages from the

22  drop I would suggest to you are between 1.3 and 1.9 million.

23          And so when you go back to the Taser event and you

24  write those in, you should deduct the drop damages and reduce

25  that amount to a net amount.

1                 And, ladies and gentlemen, it's part of my job to

        2     give you these numbers and give you the guidance in finding

        3     damages.  That's what I do for a living.  And this is the best

        4     guidance I can give you, but you should be guided by your own

        5     amount.  You don't have to use my number.  You can do more.

        6     You can do less.  You are the ultimate deciders of those facts,

        7     and so we leave that to your discretion and your sound

        8     judgment.

        9                 And so when we complete Verdicts A and B, we write

       10     Verdict A and we write $7 million; and then when you fill in

       11     Verdict B, you can fill in 1.3 to 1.950, and those will render

       12     your verdicts in this case.  If you want -- if you feel that

       13     what happened on the street on September 14th, 2014, was not

       14     right and not just, this is how you make Timothy Runnels

       15     responsible finally for his actions and his conduct.

       16                 But you don't have to stop there.  You don't have to

       17     stop there.  The Court has given you Instruction No. -- or

       18     Verdict C, and Verdict C relates to the liability phase for

       19     punitive damages in this case; and as the Court instructed you

       20     on punitive damages, and you only get to this point if you find

       21     in favor of Bryce Masters under either Instructions 12 and 13

       22     for the Taser package.  So you can render a verdict in Bryce's

       23     favor for A and you can render a verdict in Bryce's favor on B

       24     or one or the other, but the punitive damage finding, if you

       25     want to get to the punitive liability in this case, the

1    egregious conduct, the reprehensible conduct, if you want an
2    opportunity to assess damages at the second phase of this
3    trial, which will be very short, a matter of minutes, if you
4    want that opportunity, then you have to find that Timothy
5    Runnels is liable for punitive damages in this case.

6              And I would tell you that as it relates to the drop,
7    again, I don't think there's any question that that kind of
8    reprehensible conduct that drew a four-year prison term in the
9    federal penitentiary is something that jurors should speak out
10   on and speak strongly about, and that's what you do when you
11   find liability for punitive damages.

12             And, further, since we've limited the Tasering event
13   to the most severe use of force, this is your opportunity to
14   find that Mr. Runnels is liable for punitive damages as
15   submitted in Instructions No. 12.

16             And so, ladies and gentlemen, that is the mechanism
17   for finding your jury verdict.  You are the sole arbiters of
18   how that gets sorted out.  We leave to your sound discretion
19   the finding on punitive damages, and we would submit to you
20   that if you want to be in a position to tell not only Tim
21   Runnels but every law enforcement agency, every cop on the
22   street, if you want to tell them that what happened here was
23   wrong, this is your vehicle to do it.  If you find him liable
24   for punitive damages, you'll have that opportunity in the
25   second phase of the trial.

1          And so you're the ones who will decide the facts,

2    and fortunately many of the facts are not in dispute.  You'll

3    have the stipulated facts in your instructions.  You'll have

4    the uncontroverted testimony of Dr. Dennis.

5          Of all the parade of police officers that came

6    before you, who stood up for Timothy Runnels?  Who said to you

7    this was okay?  No one.

8          Of all the use-of-force experts that are out there

9    in the country, like Mr. Leonesio, who told us about the Taser

10   and how it should be used and when it's appropriate, who did

11   the defendant bring you?  No one.

12         And because of that, we believe that the liability

13   of Defendant Runnels for both the Tasering and the drop is

14   excessive.  It violates the very constitution that protects us

15   all as citizens but only if you enforce it, only if you say

16   this is what the constitution really means.

17         Thank you.

18         MR. CUTLER:  May it please the Court.

19         THE COURT:  Mr. Cutler.

20         MR. CUTLER:  Thank you, Your Honor.

21              DEFENDANT'S OPENING STATEMENT

22         MR. CUTLER:  Mr. Presley.

23         First of all, ladies and gentlemen, let me say thank

24   you for your time and attention this week.  I think I can speak

25   on behalf of both parties that we sincerely appreciate you

1    taking your time to serve as jurors in this case to help the

2    parties to resolve the dispute that has arisen between them.

3           I know this week you all have heard probably more

4    about pig studies and probe spread and NMI and ventricular

5    fibrillation than you thought you'd ever hear and probably ever

6    want to hear.  So we do really appreciate your attention and

7    time this week.

8           During jury selection, the judge asked every one who

9    was here if they could follow the law.  Even if they disagreed

10   with what the judge told them what the law was, could they

11   follow it.  Everybody who was here had an opportunity to answer

12   that question.  And because you all are sitting here, that

13   means you answered the question yes or did not respond that you

14   couldn't follow the law.

15          So the judge has now given you the law.  He's given

16   it to you in the written instructions.  And because of your

17   oath as jurors, you have to follow the law as the judge gives

18   it to you.  Even if you disagree with it, even if you think it

19   shouldn't be a certain way, even if you think it should be

20   different, you all have taken a sworn oath to follow the law as

21   the judge gives it to you, and I have no doubt that you all

22   will do that.  Now, we're going to talk about the instructions

23   in a minute.

24          What I would like to talk about first is $8 million.

25   That's how much the plaintiff is asking you all to give him, $8

1  million.  What damages has he suffered?  You heard me in

2  opening statement kind of go through what Bryce's life is like

3  now.  You heard that testimony from his mother about what he

4  has done since this accident -- since this incident.  How he

5  has not applied to any colleges, how he has not attended or

6  visited any colleges, how he has not taken any college entrance

7  exams, how he has not taken any online classes or any in-person

8  classes.  Because the damages are because of his brain injury,

9  the allegation is he can't do these things, but he hasn't

10  tried.

11            Not only has he not tried, you heard Dr. Price, the

12  neuropsychologist, the only medical person who's qualified in

13  this case to say whether he can go to college or not.  What was

14  her testimony?  Yes, he can go to college.  So in terms of what

15  his damages are from this incident, that he has a brain injury

16  and he can't go to college, therefore, because he can't go to

17  college, he can't get the kind of job he would get as a college

18  graduate and because of that, he can only get a job of a high

19  school graduate and the pay differential.  Their own doctor

20  says there's no reason he can't go to college.  There's no

21  reason he cannot successfully complete college.  So because of

22  that, the only evidence in this case is there is no

23  differential.  He can do it.  All of that goes out the window

24  in terms of damages.

25            But, you know, what's Bryce doing now?  We talked

1    about that.  I don't want to run through the whole list but you

2    remember the testimony.  Bryce plays video games.  He hangs out

3    with his friends.  He drives.  He manages his own bank account.

4    He's living with his girlfriend.  He is leading a normal life.

5    If you remember that list that we talked about, if you remember

6    his mother's testimony, he's living a normal life of a

7    21-year-old.  He's not living an $8 million deprived life.

8         Now, I can say that.  His mother can testify.  His

9    attorney can talk about it.  We can all talk about what Bryce

10   can or can't do.  The person you should hear it from is Bryce.

11   Did you?  Did you hear Bryce come in here and tell you what he

12   can do?  Did you hear him get on the stand and tell you what he

13   can't do?  Absolutely not.  And because Bryce chose not to come

14   in here and not to get on that stand and not to sit here and

15   tell you what he's going through and tell you what's wrong with

16   him subject to cross-examination, because he chose not to do

17   that, you all are allowed to presume that what he would have

18   said would have been unfavorable to him.  You're allowed to

19   presume that and that makes sense.

20        Timothy Runnels, I mean, he's a person who's serving

21   time for what he did.  He came and sat in this chair right here

22   and told you, he looked you in your eye and said, yes, this is

23   what I did.  This is what I did.  I'm sorry for what I did.

24   I'm paying for what I did.  He sat here and told you that.

25   Looked you in your eye.  Subject to cross-examination.  Where

1   was Bryce?  Where's the person asking you to give him $8

2   million?  Where is he?  Because he didn't take that chair,

3   because he didn't come in here and sit there and look you in

4   your eye, you are allowed to presume that whatever he was going

5   to say was going to be unfavorable to his position that he

6   can't do these things.  Unfavorable to his position that he's

7   having all these ongoing problems.  You can presume that what

8   he was going to say is going to be unfavorable to his position

9   that he needs whatever he needs or he's supposed to get

10  whatever he's going to get.  You can presume that that would

11  have been unfavorable to his position.

12          Now, Mr. Presley is trying to conflate two things.

13  He's trying to combine two things.  He's trying to combine the

14  brain injury and the drop.  He's trying to put them all

15  together.  That because of the drop, you know, he should get

16  this amount for brain injury.

17          He says the testimony is uncontroverted that those

18  two are together and referred to, I believe, Dr. Dennis.  I

19  have two words for him.  Dr. Arkin.  Dr. Arkin was a

20  neurologist.  He came here and he told you about what he

21  observed in the video as to when he believed Bryce started

22  showing the signs that led to his alleged brain injury, and I

23  stood right in this spot and I specifically asked Dr. Arkin,

24  When did you see those signs?  And he said he saw those signs

25  as Bryce was getting out of the car.  Then I asked him --

1   because we talked about the first time Bryce was on the ground

2   and the second time Bryce was on the ground.  Do you remember

3   that?  I said, So you think that the signs that eventually led

4   to Bryce's alleged brain injury happened the first time he was

5   on the ground?  Dr. Arkin said yes.  So, therefore, it wasn't

6   caused by the second time he was on the ground, the drop?  Dr.

7   Arkin said yes.

8           So Mr. Presley says it's uncontroverted that the

9   brain injury is related to the drop.  Yes, it is.  It's

10  controverted.  Not only do we controvert it, their own experts

11  controvert it.  How can there be any medical certainty to it if

12  both of their experts are saying two different things?  The

13  drop has nothing to do with the Tasing.  The Tasing has nothing

14  to do with the drop.  They're two separate incidents.

15          We talked about the drop.  As I mentioned, Timothy

16  Runnels has admitted that he should not have done that.  If he

17  had a chance to do it again, he wouldn't do it.  He recognizes

18  it was wrong.  He pled guilty to it.  And he's serving time for

19  it.  That's the drop.

20          The Tasing is another issue.  Why?  Because Bryce

21  was resisting arrest.  There's no dispute about that.

22  Everybody who came in here told you Bryce was resisting arrest.

23  Not only resisting arrest, actively resisting arrest because

24  that was the question I asked them.  I used the word "active."

25  Each of them said Bryce was actively resisting arrest.  That's

why the Tasing was reasonable.

That's why it was not a violation of department policy. The former chief of police came in. We're not talking about just an investigator or just someone, the chief, the top person, the head of the department came in and told you, I looked at this. I looked at everything that was gathered. I looked at all of the evidence, and I made the determination that what Officer Runnels did was not a violation of policy. There was not evidence enough to say that he violated policy. So, yes, Mr. Presley's talked to you about the policies and all that. There wasn't a violation of the policies.

The other thing I want to mention to you before we get to the jury instructions, I want to talk to you about the pig studies. I know we've heard a lot about pig studies. I want to talk to you about the pig studies because we've got this big medical gap here we have to fill. The defense is arguing, is maintaining that the Tasing did not have -- did not cause Bryce's brain injury. So that leads to a big question. Well, what did? We don't know. We haven't offered any evidence of what caused his brain injury because we don't know. It's not our burden of proof.

It's the plaintiff's burden of proof to show what caused Bryce's brain injury, and the theory that they've advanced is that the Taser captured Bryce's heart. There was a two-minute-and-one-second gap and then Bryce went into

1  ventricular fibrillation and cardiac arrest.  That's what their

2  doctor, Dr. Dennis, came in and testified about.  It's not

3  medically supported.

4          You heard Dr. Vilke this morning come in and tell

5  you why it's not medically supported, why it doesn't happen,

6  why when someone gets Tased, if there's going to be any type of

7  electrocution, as the way he phrased it, it happens

8  immediately.  It doesn't happen two minutes after the fact.

9          He talked to you about the pig studies.  Why do they

10  use pigs?  Because pigs go into VF very quickly.  If you're

11  doing medical research, of course you want to enhance the

12  chance of that -- whatever you're testing is going in to V-fib

13  so you can test it.  That makes sense.  That's why they use

14  pigs.  Its not a translation to what a human would do.  And out

15  of the 7,000 pigs that have been tested for this, only one pig

16  went into VF after a delayed period of time after being shocked

17  with a Taser.  One pig out of 7,000 ten years ago with pigs

18  already being more susceptible to going into VF.  That is not

19  medical certainty.  That's a theory that hasn't been tested.

20  It hasn't been proven.  It has never happened in humans.

21          Now, Dr. Dennis talked about the pacemaker.  Dr.

22  Vilke explained that.  Yes, a person who is Tased with a

23  pacemaker is going to go into -- have cardiac capture because

24  that's what a pacemaker does.  It captures the heart.  So it

25  goes right down the wires to the heart.  That makes sense.  But

1   you can't translate that to say, okay, well, that's what

 2   happened to Bryce Masters.  Bryce Masters didn't have a

 3   pacemaker.  Bryce Masters is not a 40-pound pig.  Bryce Masters

 4   is a six-one, 170-pound teenager who resisted arrest and got

 5   Tased; and then at some subsequent point with all medical

 6   evidence, research, literature had a heart attack and went into

 7   cardiac arrest.  Why did that happen?  We don't know.  But we

 8   know it didn't happen according to the way plaintiff says it

 9   happened because it's not supported by the medical research.

10   It has never happened in a human being that's been documented.

11        Now, let's talk about the jury instructions.  Mr.

12   Presley kind of walked you through the instructions a little

13   bit.  I want to talk to you about them a little bit more.  The

14   instructions are going to be altogether but they're kind of

15   separated by what we call packets.

16        So you see Instruction 11.  The instructions leading

17   up to that, 1 through 10, are kind of general instructions.  So

18   when you get to Instruction No. 11, it tells you what claim

19   we're talking about.  The two claims here; one for -- three

20   claims actually.  One for the Taser, one for the drop, and one

21   to determine is Timothy Runnels liable for punitive damages.

22   So three different claims.

23        This instruction gives you information about the

24   first claim, the damages for excessive force for the use of the

25   Taser.  It tells you that Instructions 12 through 14, along

1   with Instructions 1 through 10, are going to apply to that

2   claim.  So when you're talking about trying to -- when you get

3   back to the jury room and you're trying to figure out, okay,

4   let's talk about the Taser.  Let's say you want to talk about

5   that first.  Let's talk about the Taser.  Instructions 12

6   through 14 are the ones you're going to look at.

7          What does Instruction 12 tell you?  Instruction 12

8   tells you what you must find, "Your verdict must be for

9   plaintiff."  So this is what you have to find in order to find

10  in favor of the plaintiff with respect to the Tasing.  And

11  there are three things there.  First, that Officer Runnels

12  continued deploying the Taser current into plaintiff's chest

13  for 15 seconds when arresting him.  Second, the force used was

14  excessive because it was not reasonably necessary to arrest the

15  plaintiff.  And, third, as a direct result, plaintiff was

16  injured.

17         Now, I just talked about the direct result part and

18  how it is not supported by the medical evidence.  So even if

19  you get down to the third one about as a direct result, not as

20  a possible result, not as an indirect result, as a direct

21  result.  So if you start with the premise that there is no

22  evidence that Bryce Masters 'brain injury was a direct result

23  of the Taser, you can't speculate.  And I told you there's a

24  gap in the medicine.  In that, well, if that didn't do it, what

25  did?  And it's very easy for you all to say, Well, we don't

1    have any other reason so that must have been it.  You can't do

2    that.  You actually have to have medical certainty to show that

3    his cardiac arrest came from the Taser, direct evidence, and

4    it's not there.

5           But the biggest thing in Instruction No. 12, it

6    comes after paragraph third, because you can find all three of

7    those things.  But then it says, "Unless you believe the

8    plaintiff is not entitled to recover under Instruction 13."

9           Let's take a look at Instruction No. 13.

10   Instruction 13 says, "If you find that defendant Timothy

11   Runnels had a reasonable belief that plaintiff Bryce Masters

12   was actively resisting arrest as the Taser was discharged, that

13   plaintiff was failing to comply, or Defendant Runnels continued

14   the Taser discharge unintentionally, your verdict must be in

15   favor of Timothy Runnels.  The burden to prove this is on the

16   defendant," Timothy Runnels.

17          Let's break that down.  You got Instruction 12 and

18   Instruction 13.  Instruction 12 will apply unless 13 applies;

19   and so if you find, according to Instruction 13, that defendant

20   Timothy Runnels had a reasonable belief that Bryce Masters was

21   actively resisting arrest as the Taser was discharged.  There's

22   no dispute he was actively resisting arrest.  Everybody that

23   has come in here has told you that Bryce Masters was actively

24   resisting arrest.  So the first one's there.

25          The second one.  That plaintiff was failing to

comply.  Everybody that has come in here told you he was

failing to comply.  From the beginning of this encounter all

the way through until he was Tased.  He failed to roll down his

window.  He failed to get out of the car when Officer Runnels

told him to.  Officer Runnels told him he was under arrest and

tried to get him out of the car.  He failed to get out of the

car.  Once he was Tased, he got out of the car and got down on

the ground; but even after Officer Runnels is standing there,

he says, Put your hands behind your back, he doesn't do it.  So

at that point Officer Runnels had to get down and place him

under arrest.  But it's clear that Bryce Masters was actively

resisting and that he was failing to comply.

        The third, and this is in the disjunctive, and I

don't want to get into a big English grammar lecture here, but

that "or" is a huge word.  It's a huge word because you don't

have to find all three of those.  It can be one, two, or three.

If you find that even one of those applies, your verdict must

be in favor of Defendant Runnels with respect to the Tasing.

        The third one, then, because we've talked about

actively resisting.  We know that happened.  But even if you

get past that, you look at plaintiff was failing to comply.  We

talked about that.  But even if you get past that, it says,

Your verdict must be for Defendant Runnels if Defendant Runnels

continued the Taser discharge unintentionally.  And the only

evidence that we've heard about whether there was an

intentional discharge was from Officer Runnels.  He told you it
was unintentional.  I didn't realize five seconds had gone by.
You heard the testimony from everybody who looked at the video
that Bryce Masters did not achieve neuromuscular
incapacitation.  He didn't respond the way people respond
normally to Tasers.  So Officer Runnels in that moment, Bryce
is not responding the way people respond to Tasers, he didn't
realize that 20 seconds had elapsed.  He's not standing there
counting one Mississippi, two Mississippi, three Mississippi,
four.  He's not doing that.  He's got an active situation.
He's got a person who is not incapacitated who is getting out
of the car.  Police officers face very dynamic, evolving,
rapidly-changing situations.  They're watching the person in
front of them to make sure that everything goes the way it's
supposed to go.  So, no, he's not counting seconds as this
Taser discharge is going on.  He's trying to get the plaintiff
in handcuffs, to get him arrested.  So, yes, it was
unintentional.

So when you look at Instruction 13, your verdict
must be in favor of defendant Timothy Runnels if any of those
three incidents apply.  Our position is that all three apply
but you don't have to agree on all three.  As long as one of
them applies, then your verdict must be for Timothy Runnels.

Now, we kind of talked about the damages a little
bit and the fact that Bryce Masters did not come into court to

testify and tell you about his damages, but you've heard the
evidence of what his lifestyle is like now, the things he does,
things he doesn't do.  Don't do chores around the house, no
laundry, no making up his bed, hanging out with his friends,
going to the Lake of the Ozarks for Memorial Day weekend, those
kinds of things.  That's what he is doing now.  And he didn't
come in here because he didn't want to have to tell you that.

So when the Instruction No. 14 talks about the
physical pain, the mental, emotional suffering that he's
experienced and will experience in the future, you've got your
evidence about what he's experiencing.

Now, the second thing, the reasonable value of
earning capacity.  Let's talk about Mr. Dreiling.  He was the
vocational rehab person who came in to tell you about this big
disparity in income that Bryce will have over his lifetime, and
we talked about how he used national numbers versus numbers in
Kansas City.  We talked about how he used the median as opposed
to the mean.  We talked about how he just picked a number
because that was what he thought he should pick.  We talked
about how he chose 870 just because he wanted to choose 870.
We talked about all of that.

The big thing we talked about with Mr. Dreiling was
it was not based on any medical evidence whatsoever.  I asked
him specifically, What doctor, what medical record, what do you
have that shows that Bryce cannot do these certain jobs or

1   cannot do any job and will have some type of inability to
2   perform a job that's going to cause him to have a wage earning
3   loss?  And he said it was not based on any medical evidence.
4   This is just his experience.

5          Now, he hasn't followed up with Bryce.  You haven't
6   heard any testimony about him evaluating Bryce since he
7   initially saw him.  The reasonable value of the earning -- what
8   is that based on?  You saw the number that Mr. Presley put up.
9   What is that based on?  It's not based on anything medical.

10          Bryce had a job with the Kansas City Chiefs.  He was
11  there.  He was doing a good job.  He got promoted.  He was
12  supervising other people.  How do you ask for $8 million if
13  you're in a job where you're supervising other people and
14  you're able to hang out with your friends and play Xbox and do
15  all those kinds of things?  How do you do that?  How do you not
16  come into court and ask you for it?  So in terms of the
17  damages, the damages, ladies and gentlemen, are not there.

18          Now, let's talk about -- let's talk about the drop,
19  because Instructions 16 through 17 pertain to the claim of
20  Bryce Masters against Timothy Runnels for excessive force by
21  the drop to the ground.  As I mentioned, Officer Runnels has
22  already told you, yes, he did that.  He is sorry for it.  He's
23  paying the price for it.  If he had the chance to do it, he
24  wouldn't do it again.

25          So with that instruction you have another damages

1    instruction. "If you find in favor of the plaintiff, you must

2    award him an amount of money that will fairly compensate him

3    for any damages you find he sustained as a direct result of the

4    violation of the plaintiff's constitutional rights by being

5    dropped to the ground." So Instruction No. 17 is limited to

6    the damages that Bryce had from being dropped to the ground.

7         Now, I'm not going to insult your intelligence and

8    tell you that it didn't hurt. I'm sure it hurt. I know it

9    hurt. So, yes, he was hurt when he was dropped to the ground.

10   There's no doubt about that. You saw the medical records when

11   he went to the hospital and they took X rays. There was some

12   damage. No doubt. Now, there were no fractures. You saw that

13   in the medical records. No fracture, no fracture to the jaw or

14   anything like that. He did have some teeth that had some

15   injury, but that was four years ago.

16        What evidence have you heard that he's continuing to

17   have dental pain right now? What evidence have you seen that

18   says he can't eat, he can't speak, he has difficulty doing

19   this, he has recurring pain? You've heard no evidence of that

20   whatsoever regarding being dropped to the ground.

21        Again, I'm not excusing him being dropped to the

22   ground. Don't get me wrong. It was a wrong thing to do and

23   Officer Runnels told you that. But this instruction says you

24   have to -- if you find for him, you will award him an amount of

25   money that will fairly compensate him for being dropped to the

1    ground.

2         Now, you should consider the physical pain,

3    suffering that plaintiff has experienced.  We talked about

4    that.  The nature of the injury.  We talked about that.

5    Whether the injury is temporary or permanent.  What evidence

6    have you seen where this is a permanent injury?  It shouldn't

7    have happened but it did, but you have seen no evidence

8    whatsoever that it is a permanent injury.

9         And whether any resulting disability is partial or

10   total.  What disability?  There's been no evidence he's been

11   disabled by this drop to the ground dentally.

12        Now, the last paragraph of that is very important.

13   I want you all to look at that.  It says, "Remember, throughout

14   your deliberations you must not engage in speculation, guess,

15   or conjecture, and you must not award any damages under this

16   instruction by way of punishment or through sympathy."  That's

17   important.  Because working with this case, I've seen the video

18   a lot of times.  And I told you at the beginning it was a very

19   disturbing video, and you will see things in that video that

20   should not have happened.  I told you that.  That was the thing

21   out of my mouth when I talked to you all on Monday.  So I know

22   how disturbing that video is to watch somebody get dropped to

23   the ground.  But this instruction specifically tells you you

24   must not award damages by way of punishment or through

25   sympathy.  Your damages under this instruction for him being

1  dropped to the ground are limited to the physical pain that he

2  experienced, the nature of the injury, and whether it's

3  temporary or permanent, and if there's any resulting

4  disability.  That's what your damages under this instruction

5  are limited to.  As bad as we may feel for him having been

6  dropped to the ground, as bad as that was, your damages cannot

7  include anything by way of sympathy, and it cannot include

8  anything by way of punishment for compensatory damages.

9         Now, let's talk about Instruction No. 18.  I won't

10  read it, but this instruction simply says that in addition to

11  what we just talked about, the liability for the Taser and the

12  liability for the drop.  In addition to that --

13         THE COURT:  Mr. Cutler, excuse me for a moment.

14  Could you and Mr. Presley come up?

15         (Counsel approached the bench and the following

16  proceedings were had:)

17         THE COURT:  When I read that instruction, I reworded

18  it.  It doesn't have all of the language as to Instruction

19  No. 13.  I revised it and this is what I'm giving to the jury.

20         (The proceedings returned to open court.)

21         MR. CUTLER:  Okay.  Instruction No. 18.  It

22  essentially says that if you find that the conduct, even with

23  respect to the Taser or with respect to the drop, was malicious

24  or recklessly indifferent to plaintiff's federally protected

25  rights, then you may, but are not required to, award the

1   plaintiff an additional amount as punitive damages.

2          So the first thing I want to point out is it has to

3   be malicious or recklessly indifferent.  We know the Tasing was

4   not malicious or recklessly indifferent.  It was for the

5   purpose of getting Bryce Masters under arrest and under

6   control.

7          With respect to the drop, it should not have

8   happened, no doubt.  But was it malicious?  Was it recklessly

9   indifferent?  It should not have happened.  People make

10  mistakes.  People make errors in judgment.  But you all have to

11  determine, Was it malicious or recklessly indifferent?

12         The instruction goes on further to say, "The

13  purposes of awarding punitive damages are to punish the

14  defendant for engaging in misconduct and to deter the defendant

15  and others from engaging in similar misconduct."  So in

16  deciding whether to determine that Officer Runnels is liable

17  for punitive damages, you have to determine what the purpose of

18  you doing that is, and it says, The purposes are to punish the

19  defendant and to deter him.  He's been deterred.  He's in

20  federal prison.  I don't know how much more deterred you'd get

21  than having to go to prison and give up your liberty.  So he's

22  already been deterred.  So as you determine should we assess

23  him punitive damages and the purpose of that is to deter him

24  from like conduct, I think he's been deterred.  I think there's

25  no doubt about that.

1    All right.  So now that takes us to the verdict
2    forms.  And Mr. Presley's already been through that with you.
3    Verdict A, this deals with the Taser.  He, of course, Mr.
4    Presley wants you to write the name Bryce Masters on the line.
5    I, of course, want you to write the name Timothy Runnels on the
6    line.  But it's not just what I want.  It's what the evidence
7    shows.  And the evidence shows, again, going back to
8    Instruction No. 13 because you really don't get to write on the
9    line just what you want.  You have to write what the evidence
10   shows.  You have to follow the Court's law -- instruction and
11   the law.  And it says, Your verdict must be in favor of Timothy
12   Runnels if one of those three things is found.  Actively
13   resisting arrest.  We know that.  That plaintiff was failing to
14   comply.  We know that.  That Defendant Runnels continued the
15   discharge unintentionally.  We know that.
16        So because of Instruction 13, really your only
17   option if you follow the evidence is to write the name Timothy
18   Runnels on this line.  And you have to forgive my handwriting.
19   This is an awkward angle.  But I think you get the point.  If
20   you follow the law, if you follow the instructions, that is
21   really the only -- that's really the only choice you can come
22   up with.
23        If you look at Instruction C, this is the one
24   dealing with punitive damages.  Now, I skipped B for a minute.
25   That's the one dealing with the drop.  I want to go to C.  This

```
1    one is where you determine is Timothy Runnels liable for

2    punitive damages?  And remember the purpose of punitive

3    damages, to punish the defendant and to deter him.  He's been

4    punished.  He's been determined -- I'm sorry -- he's been

5    deterred.  So, again, if you follow the evidence, really the

6    only thing to write on that line is "is not."  The top line is

7    for the drop -- I'm sorry -- the Taser.  The bottom line is for

8    the drop.  If you follow the evidence and you follow the law,

9    that is what your Verdict C should look like.

10          The last couple things I want to share with you

11   all --

12          THE COURT:  Mr. Cutler, you've gone 35 minutes.

13          MR. CUTLER:  Did you give me a ten-minute warning

14   and I missed it?

15          THE COURT:  This is it.

16          MR. CUTLER:  Okay.  All right.

17          THE COURT:  You've got plenty of time.

18          MR. CUTLER:  Okay.  Thank you, Your Honor.

19          Here's what I'm asking you all to do.  A lot of

20   times we tell juries, we give them phrases like, use your

21   common sense, follow your conscience, all those good things.

22   I'm telling you to do those things.  I'm telling you to use

23   your common sense.  I'm telling you to follow your conscience.

24   But I'm also telling you all to be fair, to be fair to both

25   sides.  And being fair to both sides means you follow the
```

1    evidence.  As much as your heart may want to say, Okay, his

2    cardiac arrest must have come from the Tasing.  You just can't

3    fill that gap in your mind without evidence; and as much as you

4    all want to say, Well, he's just a kid and maybe he was scared,

5    there's no evidence of that.  You have to follow the evidence,

6    and the evidence is he refused the lawful commands of a

7    uniformed police officer.  Not one command, not two commands,

8    but several commands, repeated commands.  The evidence is he

9    resisted arrest.

10          Now, I wouldn't want to get pulled out of my car.

11   Who does?  That's not the point.  We don't like getting stopped

12   by police officers.  None of us really does.  But it happens.

13   But when a police officer says, "You're under arrest," you have

14   to comply with what that police officer tells you to.  You can

15   go to court and figure it out later.  But a when police officer

16   says, "You're under arrest," you have to comply with what that

17   police officer says.  When you don't, that is resisting arrest.

18          Now, the resisting arrest, when you look at it in

19   the big picture, like, well, yeah, he was arrested but then the

20   officer dropped him on the ground.  I get that.  Two separate

21   things, two separate damages, two separate considerations.

22          So as you listen to the evidence -- I'm sorry -- as

23   you deliberate on the evidence and as you come to your verdict,

24   somebody's got to be the voice back there because you all are

25   going to get to talking and somebody's going to say this and

1   somebody's going to say that, and somebody's not going to agree

2   with somebody initially, and you all will go back and forth,

3   and that is fine.  That's part of the jury deliberative

4   process.  But somebody is going to have to say at some point,

5   Okay, but wait, there's no evidence of that.  Then you'll get

6   to talking again and you'll get to talking, Well, remember what

7   Dr. So-and-So said and Dr. So-and-So said, any maybe this is

8   this and maybe this is this.  Somebody has then got to say,

9   But, wait, there's no evidence of that.  And so as you get to

10  talking and as you get to talking and as you get to talking and

11  deliberating and trying to come up with an answer, I implore

12  you to follow the evidence.

13          When you get back to the jury room -- we introduced

14  some exhibits.  You can all ask for the exhibits.  Just send a

15  note down to the judge saying we want the exhibits so we can

16  look at them.  The judge will respond to your note accordingly.

17  But look at the evidence.  If you want to review the video, you

18  can ask the judge for that.

19          But I'm just -- this was a bad deal, and I don't

20  want anybody here to think that I'm just like, well, it just

21  happened.  He's not entitled to anything so just send him home.

22  It's not that.  It's not that at all.  This was a bad deal all

23  the way around.  It's a bad deal for plaintiff definitely.

24  It's a bad deal for Officer Runnels.  So I'm asking you all to

25  be fair and just listen to the evidence.

1          The evidence is unfortunately that as relates to the

2   Tasing is there's just no medical connection for that and Bryce

3   is not having any continuing problems that he's told you about.

4          As it relates to the drop, bad situation, but he's

5   not having any ongoing problems related to the drop.  And

6   whatever you think Bryce might be entitled to, no way in the

7   world, no way under God's green earth, as my mother would say,

8   is he entitled to $8 million.  If he wanted $8 million, he

9   should have come in here and told you that.  With all the

10  evidence, there's no way that he's entitled anywhere near $8

11  million.

12         Be guided by your conscience.  Be guided by your

13  common sense.  Be guided by the evidence.  Ladies and

14  gentlemen, thank you very much for your time and attention.

15         THE COURT:  Mr. Presley, you have 14 minutes.

16         MR. PRESLEY:  Thank you, Your Honor.

17            PLAINTIFF'S REBUTTAL CLOSING ARGUMENT

18         MR. PRESLEY:  No kid or young man now should have to

19  come in this courtroom and relive the events of that day,

20  especially when he can't contribute a thing in his memory about

21  what happened, his complete amnesia for those events on that

22  day or most of the time in the hospital.  That's the way brain

23  injuries work.  So if there's anybody to blame for not bringing

24  Bryce, it's me.  But if there's anybody who needed him here,

25  really wanted him here, wanted to cross-examine him, Mr. Cutler

1    could have brought him here.  All he had to do was ask.

         2               MR. CUTLER:  Your Honor.

         3               THE COURT:  That's not a proper argument to make.

         4    Mr. Masters was not equally available to Mr. Cutler.

         5               MR. PRESLEY:  So not only does Bryce Masters not

         6    need to be in this courtroom, no kid should ever, ever be here

         7    again, and that's the importance of your decision.  That's the

         8    importance and the ramifications.  That's the bell that will

         9    ring from coast to coast in this country for the future.

        10               And let's look at that because when he has the

        11    opportunity to talk to you about punitive damages, he actually

        12    told you you need to find that there is not punitive liability

        13    for the drop.  And so let's look at the standard.  It's not

        14    just to deter the defendant.  It's to deter the defendant and

        15    others from engaging in similar misconduct in the future.  This

        16    is your opportunity to tell the country what the constitution

        17    means.  And this is the standard that you have to find.  And

        18    you have to find that Timothy Runnels' conduct was malicious or

        19    reck -- and malicious is normally defined in these instructions

        20    and may be, and/or that it's recklessly indifferent to

        21    plaintiff's federally protected rights.  And that's the

        22    standard.  Is he being reckless?  I don't know if he was just

        23    having a bad day or what, but Bryce just got under his skin and

        24    he decided to throw all of his training about how to minimize

        25    conflict out the window; but when you shoot a kid and dot him

1    up with a laser target on his chest from literally point blank

2    range, I mean, this is just -- that is just right there. That

3    is indifferent to the rights when you've been trained.

4         Keith says there is no evidence that the Taser is

5    connected. The very manufacturer of this weapon tells you

6    exactly why you don't shoot him in the chest and why you don't

7    hold the trigger down for prolonged exposures. It's because

8    you'll send them into cardiac arrest. The very manufacturer of

9    this weapon makes that connection.

10        You heard Dr. Dennis. He talked about the

11   Taser-backed studies that showed that. And why do you think

12   they changed their warning? Because it's true. And so when

13   you see the temporal relationship, you're perfectly capable of

14   seeing what's happening and putting the pieces together,

15   especially with the aid of the science that Mr. Burton brought

16   you from Dr. Dennis. I mean, that's well within everybody's

17   common sense and reasoning when you see an event like that.

18   It's as if he said, Well, there's no evidence that dropping him

19   face first on the pavement didn't break those teeth that we saw

20   on the report. I mean, there's a causal temporal relationship

21   between these events, and it's witnessed on the video. It's

22   not based on some reconstruction or some speculation. It's

23   based on actual observation of the patient as he's undergoing

24   the mechanism of injury, and that's what both Dr. Arkin and Dr.

25   Dennis got to say.

1    And so what's the significance of the drop with

2    respect to the brain injury?  Dr. Arkin told you you've got

3    that critical four-minute window.  That's that four-minute

4    window when you pull the kid out of the pool, he's not

5    breathing, he's unconscious, you pump the water out of his

6    lungs, you breathe into his mouth, you get him going again, and

7    he's fine, and he's fine because he's within the four-minute

8    window.  But every minute that goes on beyond that, that damage

9    is occurring to the brain.  It's affecting all of the areas of

10   the brain because it's no longer getting the oxygen it

11   desperately needs.  If you're going to get oxygen, you're going

12   to have to breathe.  You're going to have to have a clear

13   airway and be able to inflate those lungs.  That's how you get

14   back.  That's how you get yourself righted, and it was

15   foreclosed here.  It was foreclosed by an intentional drop to

16   the pavement.

17        And, further, it was imposed intentionally because

18   there was no effort whatsoever to assess Bryce's status.  None.

19   None.  After all that.  I mean, you just saw those guys just

20   standing around.

21        MR. CUTLER:  Your Honor, objection.

22        THE COURT:  Objection sustained.  There was no

23   obligation to medically intercede.

24        MR. PRESLEY:  So the most important thing when it

25   comes to punitive damages is that you remember, and Your Honor

read this instruction to you, that you must read all of the
instructions as a whole and no one instruction is more
important than the others.  In fact, his Honor changed No. 18
to read that he did not resist arrest or fail to comply or
the discharge was not intentional as submitted under
Instruction 13.  And it's as submitted in Instruction No. 13
that it is all as the Taser was discharged, continued the Taser
discharge.  And that's why the conduct that's submitted in
Instruction 12 is limited to the prolonged 15-second delivery
of the Taser into Bryce's chest.

        So when we look at 12 and we look at those factors, I
think it's important to realize what the instructions say about
excessive force; and in determining whether the force was
excessive, you must consider the need for the application of
force.  That goes right back to the policy.  Where's the
immediate threat of harm?  Where's the need for any force at
all?

        The next factor is the relationship between the need
and the amount of force used.  We've already told you it's all
right if you were going to Tase him.  Drive stun him, shoot him
with the probe mode even, but don't shoot him in the chest and
don't hold it down for 20 seconds.

            What is the extent of the injury inflicted?  He was
taught and trained by the very manufacturer of this device that
cardiac arrest was a known risk of shooting people in the

```
 1  chest, and Dr. Dennis brought you the studies that proved it.
 2  And one other factor here is what are the circumstances?  What
 3  is the need for this whole event?  Tinted windows.  Is this a
 4  violent felon?  Is this a fleeing felon?  Tinted windows is a
 5  ticket.  It's a misdemeanor municipal charge.  You go down to
 6  court.  You pay the fine.  You mail it in.  You don't even
 7  appear.  That was what led to this whole event.  Not some
 8  maniac brandishing a sword.  Not someone naked and
 9  schizophrenic and threatening his family or others.  Where's
10  the danger to anyone other than Bryce Masters in this case?
11           And so when you look at the excessiveness of the
12  force and you look at the continuum that was available to
13  Officer Runnels, he went directly to the maximum.  He went
14  directly to a level.  And that's just inappropriate for a guy
15  who's been pulled over on a traffic stop because -- until he
16  got back to the station house, he never even came up with
17  tinted windows.  You heard him tell his sergeant on the video,
18  He ditched me, and he didn't like that.
19           So when he got up to the car, he wants to say Bryce
20  didn't roll the window down.  But what do we see on the video
21  when the officer goes over to start checking the vehicle?  The
22  window's practically all the way down, maybe three-fourths of
23  the way down.  You can hear Bryce's voice change on the audio
24  of the Runnels' dash cam video.  He says, I can hear you.  Then
25  he says, Roll it all the way down.  Then you hear Bryce again.
```

1    And he goes, Roll it all the way down.  He said, I can hear

2    you.  It's real loud.  And then we saw the position of the

3    window.  So what are they going to say?  Bryce was busy

4    rolling the window down as he was rolling the left rear window

5    down for the officer when he came around the car because the

6    passenger -- or the driver's side window didn't work.

7            And so what do they want you to believe about all this

8    marijuana?  What was the point of all of that?  There's a way

9    to arrest people for marijuana possession and it doesn't

10   involve Tasing them into cardiac arrest.

11           THE COURT:  Mr. Presley, five minutes.

12           MR. PRESLEY:  In fact, they did it properly in

13   August and Bryce never resisted.  Bryce never put up a fight.

14   There was no evidence of that.  That's how you do it properly.

15   This is how you do it improperly.  This is how you do it when

16   you violate somebody's constitutional rights.

17           So no kid should have to come into this courtroom

18   and have to relive these events and hear how deficient he is,

19   hear how he struggles, hear -- we want Bryce to go to college.

20   He want him to turn the corner.  We want him to have a future.

21   But we're realistic and we know what he struggles with day to

22   day to day, and we brought you the best person to tell us what

23   he was like before and after, the person who sees him the most,

24   the person who tries to make sure he's okay, the person who

25   loves him unconditionally, but who is strong and

1    straightforward with you on the witness stand, not a confused

2    kid who can't remember what he's seen versus what he's been

3    told versus what he's heard versus his blank spots in his

4    memory that were erased by his cardiac arrest.

5         And so the time for lawyer talk is over, and it's

6    time for you to speak with your voice, and we await your

7    decision.

8         Thank you, ladies and gentlemen.

9         THE COURT:  All right, ladies and gentlemen, I'm

10   going to send you into the jury room with my instructions and

11   the verdict form, but there are a few things I want to tell you

12   before you go in.

13        First of all, you're free to decide among yourselves

14   if you want to take a break and how long you want to take a

15   break for.  You need to understand, though, that although you

16   can now, and you are, to discuss the case among yourselves, you

17   can only do that in the jury room and you can only do that when

18   all eight of you are there.  So if someone steps out to go to

19   the restroom or if you decide to take a break and some people

20   are leaving before others, you have to stop talking about the

21   case when less than all eight of you are there; and when the

22   break is over, you have to wait for everyone to come back

23   before you can resume your discussions about the case.

24        If you decide to take a break, I ask that you keep

25   it to 20 minutes or less, but just let Lisa know when you're

1  going to break and how long you're going to break for; and

2  obviously when you do break, you're free to go out in the hall

3  or wherever you want to go, but if anyone's talking about the

4  case in your presence or tries to approach you, you let Lisa

5  know about that so I can deal with it.

6          All of the particulars of the instruction I've given

7  you before.  You can't do any research.  You can't talk to

8  anybody else about the case.  You can't read, view, or listen

9  to any media reports about the case.  All of those particulars

10  remain in effect until you have finally decided the case and

11  rendered all of your verdicts in this case.

12          Now, one other thing that I have to tell you is

13  there is going to be some alarm testing taking place in the

14  building today after hours, but I do ask that if it's around

15  five o'clock and you're not ready to make a decision, that you

16  let me know and we're going to come back tomorrow morning.

17          And as you can see in the forms, there is a two-part

18  depending on the decisions that you make in the case initially;

19  and if that was to occur, we would likely resume that tomorrow

20  at any rate.

21          So with that, here are my instructions and my

22  verdict forms.  Lisa has some extra copies of the instructions

23  that you can share among yourselves as well.

24          So thank you, ladies and gentlemen, and please

25  retire to the jury room to begin your deliberations.

1          (The case was given to the jury at 3:09 p.m. on

2    Thursday, December 13, 2018, and the jury retired to their room

3    to deliberate on their verdict.)

4          (The following proceedings were had in the courtroom

5    out of the presence of the jury:)

6          THE COURT:  All right.  Thank you all.  While the

7    jury's deliberating, Lisa will let you know if they take a

8    break and you can go for a break yourself.  I ask that one of

9    the attorneys from each side either remain present in the

10   courtroom or let Lisa know where you can be contacted.  If we

11   get a question from the jury, I'll take it up with whoever the

12   representative for each side is that's present in the

13   courtroom.  So we will be in touch.

14         MR. PRESLEY:  Thank you, Your Honor.

15         MR. CUTLER:  Thank you, Your Honor.

16         (A recess was taken.)

17         (The following proceedings were had at 4:50 p.m. in

18   the courtroom out of the presence of the jury:)

19         THE COURT:  Thanks.  Everyone be seated.  We just

20   got a couple of questions from the jury.

21         MR. CUTLER:  Your Honor, if you could wait a moment.

22   I think they're bringing Mr. Runnels in.

23         THE COURT:  Okay.

24         MR. CUTLER:  Thank you.

25         THE COURT:  So the first question is, "What is

1   documentation for past and future economic figures presented by

2   plaintiff's counsel?"  I don't remember any documentation per

3   se being entered in evidence.  I would be inclined to tell the

4   jury in response to that that they will have to recall the

5   evidence on that matter.

6              MR. PRESLEY:  Yes.

7              MR. CUTLER:  That's agreeable.

8              THE COURT:  The second question is, "Any

9   documentation on medical bills paid by Bryce's family."  And my

10  answer to that will be no.

11             MR. PRESLEY:  I think it would be the same.  There's

12  no evidence.

13             THE COURT:  The expert witnesses refer to various

14  sources that they relied upon.

15             MR. PRESLEY:  There's no evidence of medical.

16             THE COURT:  No evidence of medical bills paid.

17             MR. CUTLER:  I mean, Kirk made a reference in

18  closing, but there is no evidence.

19             MR. PRESLEY:  To what?

20             MR. CUTLER:  I said you made reference to

21  hospitalization or the cost of hospitalization, I think is how

22  you phrased it, but there was no bills in evidence.

23             MR. PRESLEY:  I don't think I ever mentioned the

24  cost.

25             THE COURT:  I don't think so either.  So here's what

```
1     I've said, "You will have to recall the evidence presented by
2     plaintiff's witnesses on past and future economic figures."
3               Any objection, Mr. Presley?
4               MR. PRESLEY:  I think it would just be as to future.
5     There was no evidence on past loss.  We started at age 22, a
6     year from now, for Bryce.
7               THE COURT:  Well, they want documentation on past
8     and future economic figures.
9               MR. PRESLEY:  All right.  Then just have to remember
10    the evidence on that issue.
11              THE COURT:  "You will have to recall the evidence
12    presented by plaintiff's witnesses on past and future economic
13    figures."
14              Then the second question was, "Any documentation on
15    medical bills paid by Bryce's family."  I'm going to respond,
16    "There was no documentation presented on medical bills paid."
17              MR. PRESLEY:  Fair enough.
18              THE COURT:  Mr. Cutler.  Question is, "Any
19    documentation on medical bills paid by Bryce's family."  And
20    rather than just saying no, I'm kind of repeating their
21    question, "There was no documentation presented on medical
22    bills paid."
23              MR. CUTLER:  Right.  My concern is the Court's
24    response is no documentation of medical bills paid presumes
25    that the medical bills were paid.  So if you respond there was
```

1    no documentation on medical bills, period.

2          MR. PRESLEY:  Which is fine by me, Your Honor.

3    Because that's exactly right.

4          THE COURT:  Thank you.

5          Now, additionally, the jury advised Lisa that they

6    were not going to reach a verdict today, and they want to know

7    if they were supposed to wait to hear from me before they could

8    go home.  I'm going to have Lisa take my response in to them

9    here and tell them to let her know if they're ready to go home,

10   to adjourn for the day and go home.  If they are, I'm going to

11   call them back in and talk to them about their obligations as

12   jurors at this point in the case.

13         MR. PRESLEY:  Perfect.

14         MR. CUTLER:  Is it their choice as to whether they

15   stay or not?

16         THE COURT:  No.  I told them that they would need to

17   leave about five o'clock today because we're going to have some

18   alarm testing that's supposed to begin around six, and I wanted

19   to give time for everybody to have a chance to clear out; and

20   never knowing if they come back with something at five o'clock,

21   I just wanted to build a cushion in there for them to make sure

22   they were out of here.  So that's what they're reacting to is

23   my comment to them that we're going to need to be out of the

24   building for the testing that's going to take place later.

25         I'm going to have them come back in at 8:45 in the

1    morning, then you all be back at the same time.

2              MR. PRESLEY:  The only other matter, Your Honor,

3    was, assuming we need to get to that, Mr. Denk did file a

4    motion to quash on relevancy as to the insurance issue.

5              THE COURT:  Why don't I have Lisa go ahead and take

6    this in, and my guess is the jury is going to say they want to

7    come back.  They're done.  They want to go.  So she'll bring

8    them in, if that's the case.  Then after they leave we, can

9    talk about other matters.

10             (A recess was taken.)

11             THE COURT:  Thank you.  You can be seated.

12             Ladies and gentlemen, Lisa tells me that you are

13   ready to go home for the evening and that's fine.  We

14   appreciate your work today.

15             I did want to make sure, though, that you understand

16   that since you're deliberating, you are to discuss the case

17   with yourselves, among yourselves, but only in the jury room

18   and only when all eight of you are there.  I'm going to have

19   you come back at 8:45 again tomorrow morning, but you cannot

20   begin deliberations until all eight of you are there.

21             You still are not allowed to do any research on

22   anything that's been mentioned in the course of the case.  You

23   can't get on the Internet.  You can't go to a dictionary.  You

24   can't make an effort to try to talk to somebody who you think

25   might be knowledgeable.  You still can't talk to your family

members other than to tell them what your schedule is here.
You got to come back tomorrow morning. We don't know what the
time frame is going to be, but likely you'll have a decision,
if not tomorrow, by the first of next week. But that's all
going to be totally up to you at this stage. So the schedule's
a little bit unknown at this point.

You're not to read, view, or listen to any media
reports of the case. So it really is important that you just
stay away from local media sources and outlets so that you
don't inadvertently come across something that might be
improper.

Again, if anybody is talking about the case or
attempts to approach you about the case, you are to let Lisa
know about that so that she can pass that along to me.

So you all have a good evening and we'll see you
again tomorrow morning at 8:45.

Now, when you get here at 8:45 and everybody is
here, please let Lisa know; but as soon as everybody is here,
you don't need to come back into court. I don't need to talk
to you or anything again. You just go ahead and resume your
deliberations in the case.

Thank you very much.

(The following proceedings were had in the courtroom
out of the presence of the jury:)

MR. PRESLEY: So, yes, Mr. Denk was just kind of

curious as to a time frame that he might need to appear
           tomorrow morning on that motion, if the Court wishes to take it
           up.

                       THE COURT:  Do I have an option there?

                       MR. PRESLEY:  Well, I mean technically our response
           is due in 30 days or whatever the Court docketed it for.  I
           mean, we obviously would like to take it up.

                       THE COURT:  Sure.  Well, do you want to do it at,
           what, nine o'clock in the morning?

                       MR. PRESLEY:  Sure.  Let me just check if there's
           anything going on or if there's a better time for him.

                       THE COURT:  Just tell him nine or ten and you can
           tell us in the morning.

                       MR. PRESLEY:  He usually gets right back to us on
           this.  He's good about checking his emails.

                       THE COURT:  If we go to a punitive phase, I mean, I
           don't imagine -- I mean, do you want to talk about how much
           time you want for opening statements?

                       MR. PRESLEY:  In fact, I would waive opening, Your
           Honor, and go directly to the evidence.

                       THE COURT:  Mr. Cutler?

                       MR. CUTLER:  Fifteen minutes.

                       THE COURT:  All right.  Well, you all think about
           it, and we'll take it back up in the morning.

                       MR. PRESLEY:  Opening is when we tell the jury what

| | |
|---|---|
| 1 | we expect the evidence to be, and I think the evidence is going |
| 2 | to be so brief that it will speak for itself, at least from our |
| 3 | standpoint. |
| 4 | THE COURT: I'll take it back up with you in the |
| 5 | morning, and we can take up the motion at nine or ten, either |
| 6 | one is fine with me. |
| 7 | MR. PRESLEY: I'll just circulate the email to Lisa |
| 8 | and Rhys when this comes in. |
| 9 | THE COURT: That would be great. |
| 10 | (Court adjourned at 5:09 p.m. until 8:45 a.m. |
| 11 | Friday, December 14, 2018.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

746